UNITED STATES COURT OF INTERNATIONAL TRADE

NEW YORK, NEW YORK

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| SUZANO S.A. (FORMERLY KNOWN AS SUZANO PAPEL E CELULOSE S.A.),  ) ) ) | |
| Plaintiff, ) | |
| v. ) | Case No. 21-00069 |
| UNITED STATES, ) | **NONCONFIDENTIAL VERSION** |
| Defendant. ) | Business Proprietary Information removed from page 26. |

**PLAINTIFF SUZANO S.A.'S
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone:  +1.202.637.5600
Fax:  +1.202.637.5910

*Counsel to Suzano S.A.*

July 16, 2021

**TABLE OF CONTENTS**

RULE 56.2 STATEMENT AND SUMMARY OF ARGUMENT ..................................1

I.     ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED.....................1

II.    ISSUES PRESENTED AND SUMMARY OF THE ARGUMENT..................................2

III.   STATEMENT OF FACTS ..........................................................................4

       A.    Procedural History ........................................................................4

       B.    Suzano Incurred Extraordinarily Large Financial Expenses Throughout 2018 to
             Invest in and Acquire Pulp Manufacturer Fibria in 2019 .........................5

       C.    Commerce Included the Investment-Related Expenses in Suzano's Financial
             Expense Calculation and Declined to Adopt Suzano's Alternative Calculation
             Method, Significantly Distorting Suzano's Financial Expense Ratio ..................11

IV.    STANDARD OF REVIEW ..........................................................................12

V.     ARGUMENT ..........................................................................................13

       A.    Commerce's Finding That the Derivative Expenses Were Not Investment-Related
             is Unsupported by Substantial Evidence on the Record ...........................15

             1.    Commerce's Consistent Policy is to Exclude Investment-Related Expenses
                   from the Cost Calculation ..................................................... 16

             2.    The Derivative Expenses at Issue Here Were Not Part of Suzano's General
                   Financing Activity, But Were Instead Specifically Related to Suzano's
                   Planned Investment in Another Company -- Fibria.............................. 16

             3.    Commerce Erred by Disregarding the Quarterly Financial Data Submitted
                   by Suzano Demonstrating the Nature and Amount of the Expenses ........ 20

       B.    Commerce's Determination That the Derivative Expenses Were Not
             Extraordinary is Also Unsupported by Substantial Evidence and Contrary to Law
             ..........................................................................................26

             1.    Costs that are Not Categorized as Extraordinary on the Financial
                   Statements are Not Precluded from Being Considered Extraordinary for
                   Commerce's Purposes............................................................. 27

             2.    Suzano's Acquisition of Fibria Was Extraordinary and Generated
                   Extraordinary Expenses ......................................................... 28

VI.    CONCLUSION........................................................................................31

# TABLE OF AUTHORITIES

**Cases**

*Allegheny Ludlum Corp. v. United States*, 24 C.I.T. 452, 112 F.Supp.2d 1141 (2000) ... 13, 23, 24

*Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) .......................................... 23, 25

*Bando Chemical Industries, Ltd. v. United States*, 16 C.I.T. 133, 787 F. Supp. 224 (1992).. 13, 23

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ........................................... 13

*Ceramark Technology, Inc. v. United States*, 11 F.Supp.3d 1317 (Ct. Int'l Trade 2014) ...............
................................................................................................................................ 13, 22, 26

*Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197 (1938) ................................................................. 12

*Daewoo Elecs. Co. v. Int'l Union of Elec., Technical, Salaried & Mach. Workers, AFL-CIO*, 6
F.3d 1511 (Fed. Cir. 1993) ........................................................................................................ 13

*Floral Trade Council of Davis, Cal. v. United States*, 16 C.I.T. 1014, 1016 (1992).............. 14, 27

*Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319 (Fed. Cir. 2010) ....................... 13

*Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369 (Fed. Cir. 2003).................. 23, 25

*N.L.R.B. v. Columbian Enameling & Stamping Co.*, 306 U.S. 292 (1939) .................................. 13

*Nucor v. United States*, 33 C.I.T. 207, 612 F.Supp.2d 1264 (2009)............................................ 24

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474 (1951) ........................................................ 12

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)....................................................................................................... 12

19 U.S.C. § 1677b(f)...................................................................................................................... 25

19 U.S.C. § 1677b(f)(1)(A)...................................................................................................... 15, 22

**Rules**

U.S. Ct. Int'l Trade R. 56.2(c) ......................................................................................................... 1

**Commerce Determinations**

*Carbon and Alloy Steel Wire Rod from Spain*, 83 Fed. Reg. 13,233 (Dep't Commerce Mar. 28,
2018)..................................................................................................................................... 14, 27

*Certain Frozen Warmwater Shrimp from Brazil*, 72 Fed. Reg. 52,061 (Dep't Commerce Sept. 12, 2007)........................................................................................................................... 28

*Certain Softwood Lumber Products from Canada*, 82 Fed. Reg. 51,806 (Dep't Commerce Nov. 8, 2017)......................................................................................................................... 14

*Certain Tapered Roller Bearings from the Republic of Korea*, 83 Fed. Reg. 29,092 (Dep't Commerce June 22, 2018)............................................................................................ 17, 18

*Certain Uncoated Paper from Australia, Brazil, Indonesia, the People's Republic of China, and Portugal: Amended Final Affirmative Antidumping Determinations for Brazil and Indonesia and Antidumping Duty Orders*, 81 Fed. Reg. 11,174 (Dep't Commerce Mar. 3, 2016)............ 4

*Phosphor Copper from the Republic of Korea*, 84 Fed. Reg. 69,720 (Dep't Commerce Dec. 19, 2019)........................................................................................................... 14, 16, 17, 18

**Legislative Materials**

S. Rep. No. 103-412 (1994) ........................................................................................................... 25

**PLAINTIFF SUZANO S.A.'S
MEMORANDUM IN SUPPORT OF
RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Plaintiff Suzano S.A., formerly known as Suzano Papel e Celulose S.A. ("Suzano" or "Plaintiff"), respectfully submits the following memorandum in support of Plaintiff's Motion for Judgment on the Agency Record in accordance with Rule 56.2(c) of the Rules of the United States Court of International Trade. For the reasons set forth below, Suzano respectfully requests that the Court reverse the challenged determination of the U.S. Department of Commerce ("Commerce") and remand with instructions to recalculate Suzano's financial expense ratio, and therefore Suzano's dumping margin, in a manner consistent with this Memorandum and the Court's findings.

## RULE 56.2 STATEMENT AND SUMMARY OF ARGUMENT

### I.    ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED

Suzano seeks review of the U.S. Department of Commerce, International Trade Administration's, final results of the third administrative review of the antidumping duty ("AD") order on Uncoated Paper from Brazil, Case No. A-351-842. The final results were published as *Certain Uncoated Paper From Brazil*, 86 Fed. Reg. 7,254 (Dep't Commerce, Jan. 27, 2021) (final results of administrative review) ("Final Results") (P.R. 170). 1/ This appeal also contests certain aspects of Commerce's accompanying *Issues and Decision Memorandum for the Final Results of the 2018-2019 Administrative Review of the Antidumping Duty Order on Certain Uncoated Paper from Brazil*, dated Jan. 19, 2021 ("Final I&D Memo") (P.R. 167). The period of review ("POR") was March 1, 2018, through February 28, 2019.

---

1/      References to public and confidential documents in the administrative record for this appeal are identified as "P.R." and "C.R.", respectively.

**II.     ISSUES PRESENTED AND SUMMARY OF THE ARGUMENT**

Suzano seeks judgment on the agency record with respect to the following issues raised in Suzano's Complaint as set forth below.

**1.     Whether Commerce's determination that certain derivative expenses were not investment-related was supported by substantial evidence on the record.**

Commerce's established practice is to exclude investment-related financial expenses from the calculation of a respondent's financial expense ratio used to determine the cost of production ("COP").  During the relevant reporting period, Suzano incurred extraordinarily large investment-related financial expenses and reported these amounts to Commerce seeking their exclusion from Suzano's financial expenses.

At issue was investment-related financial expenses incurred to acquire Fibria Celulose S.A. ("Fibria") a large multinational wood pulp producer.  Suzano incurred very large financial derivative-related expenses during the 2018-2019 reporting period to finance this investment – expenses that would not have been incurred but for the investment and that were incurred solely for purposes of the investment.  Suzano submitted quarterly earnings statements on the administrative record quantifying the specific amount of the company's derivative expenses that were incurred for this investment purpose and confirming that these expenses were specifically and directly tied to the acquisition of Fibria, which was only concluded in January of 2019.  These quarterly earnings reports were prepared in the ordinary course of business for presentation to Suzano's investors, and the reported amounts for the derivative expenses were reconciled to Suzano's 2019 audited financial statements.  Their amount and investment-related purpose is therefore not reasonably in doubt.

Nevertheless, for the final results, Commerce determined that the derivative expenses at issue were not investment related – or at least that there was insufficient evidence on the record to

support that these expenses were investment-related and separable from Suzano's other financial

expenses.  Commerce concluded instead that these expenses were merely part of Suzano's general

operations and cash flow activities, and therefore were includable in Suzano's financial expense

ratio for the COP calculation.

This determination was in error.  Commerce reached this erroneous determination only by

unreasonably refusing to consider and accept the unrebutted evidence provided in Suzano's

quarterly earnings reports confirming the specific purpose and amount of these investment-related

expenses.  Commerce's refusal to consider this record evidence and Commerce's consequential

determination not to recognize that the derivative expenses were investment-related (and therefore

excluded from the financial expense ratio) was not supported by substantial evidence, is

unreasonable, and is contrary to law.  This determination should be remanded to Commerce for

further consideration consistent with the record before the agency.

> **2.** **Whether Commerce's determination that certain derivative expenses incurred by Suzano in connection with the acquisition of Fibria were not "extraordinary" in nature was supported by substantial evidence.**

Commerce also has an established practice to exclude "extraordinary" expenses from the

calculation of a respondent's net financial expense.  Commerce concluded that the derivative-

related expenses at issue here were not extraordinary.

Commerce's determination that the derivative expenses incurred by Suzano to finance its

acquisition of Fibria were not extraordinary in nature was not supported by substantial evidence

on the record and is unreasonable.  The expenses at issue were incurred by Suzano to finance a

multi-billion-dollar acquisition of another very large international company.  The extraordinary

size, impact, and unique circumstances of the derivative expenses incurred by Suzano to finance

this once-in-a-lifetime acquisition of the world's largest producer of eucalyptus pulp meets any

reasonable definition of an "extraordinary" event as it was unusual in nature and infrequent in

occurrence.  Commerce's failure to consider the evidence on the record demonstrating these facts therefore lead to a determination that was unsupported by substantial evidence and contrary to law.

## III.    STATEMENT OF FACTS

### A.    Procedural History

On March 3, 2016, Commerce published in the *Federal Register* the amended final determination and antidumping duty order covering certain uncoated paper from Brazil.  *Certain Uncoated Paper from Australia, Brazil, Indonesia, the People's Republic of China, and Portugal: Amended Final Affirmative Antidumping Determinations for Brazil and Indonesia and Antidumping Duty Orders*, 81 Fed. Reg. 11,174 (Dep't Commerce Mar. 3, 2016).

On May 29, 2019, Commerce published a notice initiating the third antidumping administrative review of the antidumping duty order on *Uncoated Paper from Brazil*, covering the period of review from March 1, 2018 through February 28, 2019.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 24,743 (Dep't Commerce, May 29, 2019) ("*Initiation Notice*") (P.R. 12).

On July 1, 2019, Commerce issued questionnaires to two respondent exporters: (1) Suzano, and (2) International Paper do Brasil Ltda. and International Paper Exportadora Ltda.  *See Certain Uncoated Paper from Brazil*, 85 Fed. Reg. 18,550 (Dep't Commerce, April 2, 2020) (preliminary results of 2018-19 administrative review) ("*Preliminary Results*") (P.R. 130) and accompanying *Decision Memorandum for the Preliminary Results of the Administrative Review of the Antidumping Duty Order: Certain Uncoated Paper from Brazil; 2018-2019* (Mar. 27, 2020) ("*Preliminary Results Decision Memo*") at 2 (providing procedural background on Commerce's administrative review) (P.R. 131).

Suzano timely submitted questionnaire responses to Commerce's initial antidumping duty questionnaire and supplemental questionnaires from July 26, 2019, through February 21, 2020. *Id*.

**B.      Suzano Incurred Extraordinarily Large Financial Expenses Throughout 2018 to Invest in and Acquire Pulp Manufacturer Fibria in 2019**

Suzano is a fully-integrated manufacturer of paper, including the uncoated paper subject to this review.  As documented in Suzano's questionnaire responses, Suzano and Fibria signed an agreement in 2018 for Suzano to expand its investments by acquiring Fibria, the world's largest producer of eucalyptus pulp.  *See Letter from Steptoe & Johnson to the U.S. Department of Commerce re Antidumping Duty Investigation of Certain Uncoated Paper from Brazil: Suzano's Response to Questionnaire for Section A* at Exh. A-17 (July 26, 2019) ("Initial Section A Response") (P.R. 35-38; C.R. 9-12).   Throughout 2018, Suzano accumulated cash and contracted significant international financial transactions to acquire Fibria.  Given the outsized and unusual nature of this cash accumulation exercise, Suzano (as a Brazilian company with accounting in Brazilian Reais) acquired significant derivatives to protect itself from exchange rate variations that could adversely impact the cash accumulated to make this specific investment.  *See Letter from Steptoe & Johnson to the U.S. Department of Commerce*, Case No. A-351-842 (Aug. 21, 2019) at D-19, D-19a, D-31, D-38-39 ("Initial Section D Response") (P.R. 79-80; C.R. 139, 154-156).  Suzano secured billions of dollars of loans and credit facilities specifically for the purpose of financing the large investment in Fibria.  *See id.* at Exh. D-19a (P.R. 79-80; C.R. 139).  In January 2019, during the last months of the review period, Suzano finally used this financing to purchase all of the shares of Fibria and complete its investment in this new and separate company.  Initial Section A Response at A-1, n.1 (July 26, 2019) (P.R. 26; C.R. 2).  The eventual merger of Fibria

into Suzano received formal shareholder approval in April 2019, forming Suzano S.A. one month after the conclusion of the POR. *Id.*

The acquisition of Fibria represented a major investment by Suzano in a separate company. As reported in the very first sentence of Suzano's 2018 audited financial report to its shareholders: "The year 2018 represents an important milestone in the history of Suzano, the company resulting from the integration between Suzano Pulp & Paper and Fibria Celulose." *See id.* at Exh. A-17, (P.R. 35-38; C.R. 9-12). The Company celebrated the combination of these two companies:

> With the combination of the two companies, Suzano is transformed into an even more competitive and robust company for making investments that improve its services and for blazing new paths based on the sustainable use of natural resources. Always caring for the environment and for people, the company is aware that the size of its responsibility is proportional to its geographic footprint and to the scale of its operations as ***the world's leading producer of eucalyptus pulp and Latin America's leading producer of printing & writing paper***.

*Id.* This combination, as reported to the shareholders, was anything but a continuation of the old parent company. Suzano S.A. reported that this "milestone" event began "a new phase" for the "new company." *Id.* Moreover, notwithstanding this combination and complementary nature of the investments, the primary businesses of the two companies remain separate – "Fibria does not produce paper and its pulp is to be utilized for pulp sales, not for Suzano's papermaking operations." Initial Section D Response at D-38–D-39 (P.R. 79-80; C.R. 154).

In its questionnaire responses, Suzano further explained that the expenses associated with the acquisition of Fibria were separate from Suzano's regular operations of production of subject merchandise – uncoated paper. In fact, Suzano's quarterly financial reports, which were submitted to Commerce as part of Suzano's response to section D of Commerce' initial questionnaire, demonstrated that these expenses were separate from Suzano's regular operations because those quarterly reports separated out the financial expenses related to Suzano's acquisition of Fibria from

Suzano's other financial expenses.  *See id.* at D-31, Exh. D-19a ("Suzano incurred substantial financial expenses throughout 2018, which it isolated in each of its quarterly financial reports.") (P.R. 79-80; C.R. 139, 154-156).  The acquisition was identified by Suzano in its earnings reports as separate from its ordinary operations because, quite simply, it was.

Additionally, given the multi-billion-dollar magnitude (and financial complexity) of the proposed purchase of Fibria, the financial expenses incurred during this period were exceptionally large and unusual for Suzano.  *Id.*  The company's consolidated net financial expenses grew by an astonishing 279% between fiscal years 2017 and 2018.  *See* Initial Section A Response at Exhibit A-17 (P.R. 35-38; C.R. 9-12).  Suzano's 2018 audited financial statements confirmed that the "new company" would "have approximately 37 thousand employees (direct and third), with assets located in Brazil and in the world.  In total there will be 11 industrial units reaching 11 million tons of pulp, 1.4 million tons of paper and annual export volumes totaling R$ 18 billion."  *Id.*  Note 32 of the 2018 Financial Statement further explains the consideration provided for the acquisition which included a R$27,797,440,000 cash installment and an adjustment of value of the shares held by Fibria shareholders.  *Id.*

In Suzano's August 21, 2019, response to section D of Commerce's questionnaire, Suzano reported its net interest expense ratio for fiscal year 2018 based on total interest expense, plus all foreign currency transaction/translation gains and losses, gains and losses on currency forward transactions, less short-term interest income.  *See* Initial Section D Response at Exhibit D-19a (P.R. 79-80; C.R. 139).  The exact amount of the net derivative loss related to accumulating the cash for the Fibria acquisition was separately identified and reported in each of Suzano's quarterly financial reports issued in the ordinary course of business to its shareholders during 2018 and

submitted for the record to Commerce.  *See id.* at Exhs. D-19 and D-19a.  These are the reports which Commerce ignored in its Final Determination and which are at the heart of this appeal.

The quarterly financial reports included several statements explaining the incurred financial expenses, specifically tying certain of the financial expenses to the acquisition of Fibria and highlighting that these expenses were unusually large and extraordinary in nature.  *Id.* at Exh. D-19A (P.R. 79-80; C.R. 139) (emphasis added).  The statements to shareholders made in theses quarterly financial reports include significant details about the large financial expenses Suzano was incurring at this time specifically to finance the proposed investment in Fibria.  These details included information in the 2018 first quarter earnings report that the investment in Fibria was estimated to be worth R$29.0 billion (US$8.8 billion) and informed Suzano's shareholders that Suzano had established credit facilities worth US$9.2 billion "to cover the cash needs of the transaction," and "whose disbursement was subject, among other conditions, to the consummation of the Transaction."  *Id.*  The earnings report further explained that the guaranteed financing was divided into two tranches – the first (term loan) in the amount of US$2.3 billion with term of six years and the second (bridge loan) in the amount of US $6.9 billion with term of three years.  *Id*.

In the third quarter earnings release, Suzano further explained to its shareholders that its financial expenses increased by 46% as compared to the second quarter, specifically reflecting "the commitment of US$4.5 billion in credit facilities made available for the business combination with Fibria and by the loans taken out as of June 2018 for the business combination with Fibria." *Id.*  Similarly, the fourth quarter earnings report noted that compared to a year earlier, the 35.8% increase in financial expenses recorded by Suzano "is explained by the loans taken out for the business combination with Fibria and by the weaker BRL in the period."  *Id.*

As importantly, these quarterly earnings reports included detailed charts (reproduced below) specifically identifying and quantifying the financial expenses incurred by Suzano in this period to finance its investment in Fibria, and clearly distinguishing those investment-related financial expenses from other general expenses incurred by Suzano in the same period to finance Suzano's general operations:

Q2 2018:



Q3 2018:



Q4 2018:



2/

*Id.* With this information, Commerce had both a complete explanation of the cash accumulation that Suzano undertook specifically to carry out the investment in Fibria as well as a detailed accounting of the amounts incurred for that purpose.

Using this information Suzano provided Commerce with a chart, reproduced below, summarizing the Fibria acquisition-related financial expenses for 2018 on a quarterly basis. *Id.*

**2018 Derivative Income (Loss) Breakdown /1**

| | millions | 1st QTR | 2nd QTR | 3rd QTR | 4th QTR | Full Year |
|---|---|---|---|---|---|---|
| **2018 Derivative Income (Loss), Net** | | 69 | (2,550) | (1,367) | 1,113 | **(2,735)** |
| **Fibria Transaction** | | | (1,747) | (1,083) | 613 | **(2,217)** |
| Debt Hedge | | 69 | ˙(438) | (137) | 155 | (351) |
| Cash Flow Hedge | | | (365) | (147) | 345 | (167) |
| **Operations** | | 69 | (803) | (284) | 500 | **(518)** |

/1 See "Derivative Transactions" in the Suzano Quarterly Results Release for Q12018 through Q42018

---

2/      Suzano respectfully notes that these figures tie to the provided summary chart, but the quarterly Fibria-related expenses may diverge by between R$0-1 million due to rounding differences.

*Id.* at Exh. D-19A (P.R. 79-80; C.R. 139).  The amounts reported in these quarterly financial reports, in turn, tie and are reconciled to Suzano's audited income statements which were also provided to Commerce.  *See* Initial Section D Response at Exhibit D-17 (P.R. 79-80; C.R. 137).

Because these financial expenses were clearly identified and tied to investment activity and were incurred outside of the normal operations of the company, Suzano submitted in its questionnaire responses two alternative calculations of its net interest expenses for the period of review.  *See id.*; *Letter from Joel D. Kaufman to the Hon. Wilbur Ross re Antidumping Duty Investigation of Certain Uncoated Paper from Brazil: Suzano's Supplemental Section D Questionnaire Response, Exhibit SD-2* (Feb. 26, 2020) ("Supplemental Section D Response") (P.R. 121; C.R. 221).  In the first calculation, Suzano excluded the derivative losses incurred in connection with the Fibria investment using the amounts identified and reported in Suzano's quarterly financial reports submitted on the record (and reconciled to Suzano's audited income statement).  Initial Section D Response at Exhs. 19 and 19a (P.R. 79-80; C.R. 139).  Suzano presented a second and alternative calculation which combined the net financial expenses of both Suzano and Fibria for the 2018 period, inclusive of the derivative losses incurred to finance the acquisition of Fibria and allocated those combined expenses over the combined cost of sales of the two companies.  Suzano provided the net financial expenses of Fibria on the record to support this approach.  *Id.* at Exh. 19a (P.R. 79-80; C.R. 139).  Because this second approach was the more conservative of the two calculations, Suzano submitted its cost of production data to Commerce using the second methodology.  *Id.* at Exh. 19 (P.R. 79-80; C.R. 139).

**C.  Commerce Included the Investment-Related Expenses in Suzano's Financial Expense Calculation and Declined to Adopt Suzano's Alternative Calculation Method, Significantly Distorting Suzano's Financial Expense Ratio**

On January 27, 2021, Commerce published its *Final Determination* in the Federal Register.  Commerce refused to exclude the investment-related derivative losses from the calculation of

Suzano's financial expenses, stating "{w}e note that the footnotes to {Suzano's 2018 consolidated} financial statements do not identify any derivatives related to the Fibria." Final I&D Memo at Comment 1.  Commerce also dismissed the fact that "Suzano base{d} its arguments on its own quarterly earnings releases to show that certain derivatives were related to the cash requirements of the acquisition of Fibria.  We agree with the petitioners that we should rely on the findings of Suzano's auditors and not exclude a portion of Suzano's financial expenses from our calculations." *Id.*  On this basis, Commerce found that Suzano's derivative expenses were part of the company's "normal business" and were neither investment-related nor extraordinary, noting that the amounts reflected in Suzano's consolidated financial statements were prepared in accordance with Brazilian generally accepted accounting principles ("GAAP") and showed the derivative losses at issue to be part of Suzano's financial expenses.  *Id.*  Finally, Commerce refused to alternatively calculate a combined financial expense ratio for Suzano and Fibria finding that the derivative expenses were incurred by Suzano alone and therefore were not attributable to the combined companies.  *Id.*

As a result of its calculations, Commerce assigned a final weighted-average dumping margin of 32.31% to Suzano.  *See* Final Determination at 7,254.

## IV.    STANDARD OF REVIEW

In appeals of final antidumping duty determinations, the Court shall hold unlawful and remand any administrative determination by Commerce that is "unsupported by substantial evidence on the record or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support conclusion."  *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  It must be "more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established."  *N.L.R.B. v.*

*Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939). "Substantial evidence review requires consideration of the record as a whole, including any evidence that fairly detracts from the substantiality of the evidence." *Ceramark Technology, Inc. v. United States*, 11 F.Supp.3d 1317, 1321 (Ct. Int'l Trade 2014) (quoting *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (internal quotation marks and citation omitted)). Through such review the Court determines "whether the evidence and reasonable inferences from the record support {the agency's} finding." *Daewoo Elecs. Co. v. Int'l Union of Elec., Technical, Salaried & Mach. Workers, AFL-CIO*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (internal quotation marks and citation omitted).

This Court has held that Commerce's "total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders {a determination} unsupported by substantial evidence." *Ceramark Technology*, 11 F.Supp.3d at 1323 (citing *Allegheny Ludlum Corp. v. United States*, 24 C.I.T. 452, 479, 112 F.Supp.2d 1141, 1165 (2000)). Further, this Court has held that "in order to ascertain whether action is arbitrary. . . reasons for the choices made among various potentially acceptable alternatives usually need to be explained." *Bando Chemical Industries, Ltd. v. United States*, 16 C.I.T. 133, 136, 787 F. Supp. 224, 227 (1992). Commerce must therefore provide a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

## V.   ARGUMENT

The sole issue on appeal is the manner in which Commerce calculated Suzano's net financial expense ratio used to determine the cost of production ("COP"). In calculating a respondents' cost of production, including net financial expenses, Commerce's established policy is to exclude expenses that are associated with investment activities or that are considered "extraordinary" in nature. *See, e.g.*, *Phosphor Copper from the Republic of Korea*, 84 Fed. Reg.

69,720 (Dep't Commerce Dec. 19, 2019) (final results of antidumping duty admin. review; 2016-2018) ("*Phosphor Copper from Korea*") and accompanying I&D Mem. at Comment 4; *Carbon and Alloy Steel Wire Rod from Spain*, 83 Fed. Reg. 13,233 (Dep't Commerce Mar. 28, 2018) (less-than-fair-value investigation*)* and accompanying I&D Mem. at Comment 2 (citing *Floral Trade Council of Davis, Cal. v. United States*, 16 C.I.T. 1014, 1016 (1992)).  This is because the inclusion of investment-related and/or extraordinary expenses will not fairly represent the respondents' actual cost of producing the merchandise under consideration.  *See Carbon and Alloy Steel Wire Rod from Spain*, 83 Fed. Reg. 13,233 (Dep't Commerce Mar. 28, 2018) (less-than-fair-value investigation*)* and accompanying I&D Mem. at Comment 2.; *Certain Softwood Lumber Products from Canada*, 82 Fed. Reg. 51,806 (Dep't Commerce Nov. 8, 2017) (final affirmative determination of sales at less than fair value and affirmative final determination of critical circumstances) and accompanying I&D Mem. at Comment 31 ("Investment activities are a separate profit-making activity not related to the company's normal operations. In this instance, {Respondent} is not selling lumber on the Chicago Mercantile Exchange (CME) that results in the shipment of subject merchandise where the sales would be reported. Further, {Respondent} is not proactively attempting to diminish risks related to the volatility in the price of the main inputs used in its general operations to produce subject merchandise. Here {Respondent}'s particular derivative instruments in question are related solely to speculative investment activity and do not relate to the general production operations of the company").

At issue here is whether it was reasonable or supported by substantial evidence for Commerce to have refused to exclude certain "derivative expenses" from the calculation of Suzano's net financial expense ratio where documentary evidence on the administrative record showed that these expenses were incurred for the specific purpose of financing Suzano's multi-

billion dollar investment in Fibria Celulose S.A. – an unrelated producer of eucalyptus pulp sold in the merchant pulp market.  For the *Final Results*, Commerce erroneously determined that the derivative expenses at issue were neither investment-related, nor extraordinary.

Commerce's determination that the derivative expenses at issue were neither investment-related, nor extraordinary was not supported by substantial evidence and was unreasonable in light of the record before the agency.  As discussed below, Commerce committed reversible error by disregarding record evidence contained in certain quarterly earnings releases that identified the precise amount of these expenses, unequivocally demonstrated that the derivative expenses at issue were directly related to the acquisition of Fibria, and demonstrated that they were extraordinary in both nature and magnitude.  Commerce's contrary assertion that the derivative expenses were related to Suzano's "overall cash management" and "normal business," Final I&D Memo at Comment 1, ignores evidence on the record that directly and specifically tied those expenses to the extraordinary and massive investment in Fibria.

As a result of these errors, Commerce failed to consider records that "reasonably reflect{} the costs associated with the production and sale of the subject merchandise," 19 U.S.C. § 1677b(f)(1)(A), resulting in an inaccurate and grossly distorted financial expense ratio that does not reflect the cost of production of the subject merchandise.

### A.    Commerce's Finding That the Derivative Expenses Were Not Investment-Related is Unsupported by Substantial Evidence on the Record

Commerce's finding that the derivative expenses at issue were not "investment-related," but were instead part of the "overall cash management" and "normal business" of Suzano is not supported by the evidence.  Commerce reached this determination only by disregarding evidence presented by Suzano demonstrating the investment-related nature of the expenses.

**1.     Commerce's Consistent Policy is to Exclude Investment-Related Expenses from the Cost Calculation**

In the Final I&D Memo, Commerce acknowledged that "it is Commerce's practice to exclude {} investment-related gains or losses from the calculations of cost of production . . . ." Final I&D Memo at 5.  Commerce has, in fact, consistently recognized that "investment-related expenses" are not "costs associated with the production and sale of the merchandise" and that such costs must therefore be excluded from the financial expense calculation.  *See, e.g.*, *Phosphor Copper from Korea* and accompanying I&D Mem. at Comment 4 ("Commerce's practice is to exclude only investment-related gains or losses from the calculation of {Cost of Production}.").  There is no dispute concerning this practice.

**2.     The Derivative Expenses at Issue Here Were Not Part of Suzano's General Financing Activity, But Were Instead Specifically Related to Suzano's Planned Investment in Another Company -- Fibria**

The derivative expenses at issue here were unquestionably investment-related and unrelated to Suzano's MUC production operations.  As Suzano documented on the record, these derivative expenses were incurred for the specific and targeted purpose of funding Suzano's investment in Fibria and were not related to the financing of Suzano's general operations such as financing cash flow, working capital, the acquisition of raw materials, hedging exposure to inflation or foreign currency rates in relation to the company's overall cash management, etc.  The derivative-related expenses at issue were instead specifically related to financing obtained and used for an investment in a separate profit-making venture.

The acquisition of Fibria cannot reasonably be treated as part of the "overall cash management" of the company and "normal business" of Suzano.  The acquisition of Fibria instead represented an extraordinary multi-billion-dollar investment by Suzano in a much larger company engaged in a different line of business than the production of the uncoated paper that is the subject

- 16 -

of the antidumping proceeding.  As described above and in Suzano's responses to Commerce's

questionnaire, Fibria operates a distinct line of business unrelated to Suzano's production of the

subject merchandise—"Fibria does not produce paper."  Initial Section D Response at D-38–D-39.

Rather, it is the world's largest manufacturer of eucalyptus pulp.  Initial Section A Response, at

Exh. A-17 (P.R. 35-38; C.R. 9-12).  Even after the companies were merged in the final months of

the POR, Fibria's pulp sales and Suzano's paper production were kept separate—"Fibria{'s} pulp

is to be utilized for pulp sales, not for Suzano's papermaking operations."  Initial Section D

Response at D-38–D-39.  Thus, this acquisition cannot accurately be described as "normal

business" of manufacturing paper.  Equally, Suzano's multi-billion dollar acquisition of Fibria

cannot be characterized as part of Suzano's "overall cash management" because Suzano does not

"manage" its cash by borrowing vast (and expensive) amounts of it and spending it all to buy

enormous, distinct businesses.  To put this in perspective, the consolidated Suzano entity earned

R$10.5 billion in net sales revenue in 2017, while the acquisition of Fibria cost R$37.2 billion (or

3.5 times Suzano's 2017 total net revenue).  *See* Initial Section A Response at Exh. A-17, (P.R.

35-38; C.R. 9-12).  A purchase of this magnitude is plainly not "cash management" or part of the

financing of the general operations of Suzano.

In characterizing Suzano's cost of acquiring Fibria as part of the "overall cash

management" of the company and Suzano's "normal business," Commerce found the derivative

expenses addressed in *Phosphor Copper from Korea* and *Certain Tapered Roller Bearings from*

*the Republic of Korea*, 83 Fed. Reg. 29,092 (Dep't Commerce June 22, 2018) (final determination

of sales and less than fair value) ("*TRBs from Korea*") to be akin to those at issue here.  Commerce

argued:

> In both cases, Commerce's determination {to include the derivative
> expenses at issue in the financial expense calculation} was based on

whether the derivative activity itself was a separate profit-making investment activity.  Here, the derivative activity is part of Suzano's normal business."

Final I&D Memo at Comment 1.  But Commerce got this wrong on at least two fronts: first, Suzano's derivative expenditure to acquire Fibria *was* directly related to Suzano's investment in a separate profit-making venture – Fibria's pulp business.  Commerce's reasoning for including the derivatives in both *Phosphor Copper from Korea* and *TRBs from Korea* was because the derivatives were related to the respondents' cash management activities to hedge against certain financial risks (*i.e.*, "foreign exchange risk" and "fluctuating interest rates") in relation to the respondent's *general* operations.  *Phosphor Copper from Korea* and accompanying I&D Mem. at Comment 4; *TRBs from Korea* and accompanying I&D Mem. at Comment 7.  In Suzano's case, the derivates were taken on for a specific and enormous investment in a separate profit-making venture, Fibria, and they had nothing to do with managing the company's financial risk exposure in relation to its general paper-making operations.  Commerce's failure to recognize this distinction is a material flaw in its analysis.  Second, Commerce characterized Suzano's expenses in acquiring Fibria as "part of Suzano's normal business."  Again, this is factually incorrect and unsupported by the record.  In fact, as described above, Suzano's own financial reporting separated out these expenses from Suzano's other financial expenses precisely because these expenses were not part of Suzano's normal business activity.  Again setting the facts at issue here apart from the cases cited by Commerce in the Final I&D Memo, Commerce even specified in *Phosphor Copper from Korea* that "to disregard {a respondent's} cash management mechanisms used in its normal operations would lead to distortions{.}" *Phosphor Copper from Korea* and accompanying I&D Mem. at Comment 4.  As described extensively above, the derivative expenses incurred for the Fibria acquisition cannot be described as part of Suzano's "normal operations," and Commerce's

inclusion of those expenses in the financial expense ratio lead to a significant distortion in the margin calculation.

For these reasons, Commerce's insistence on treating the Fibria acquisition costs as non-investment-related may be best understood as Commerce actually challenging whether there was sufficient record evidence to support Suzano's factual claim that "certain derivatives were related to the cash requirements of the acquisition of Fibria."  Final I&D Memo at 5.  That is to say, Commerce did not truly challenge that the acquisition of Fibria was investment-related activity, but instead challenged that the record evidence supported Commerce excluding part of the Suzano's overall financial expense from its financial expense calculation.  In particular, Commerce stated:

> Here, Suzano's 2018 consolidated financial statements, prepared in accordance with Brazilian GAAP, show the derivative losses in question as financial expenses. We note that the footnotes to those financial statements do not identify any derivatives related to the Fibria acquisition.  Instead, Suzano bases its arguments on its own quarterly earnings releases to show that certain derivatives were related to the cash requirements of the acquisition of Fibria.  We agree with the petitioners that we should rely on the findings of Suzano's auditors and not exclude a portion of Suzano's financial expenses from our calculations.

*Id*.

In other words, Commerce chose to rely on the broad and unhelpful categorization of these expenses in the audited financial statements generically as "financial expenses" while utterly disregarding the evidence presented in Suzano's quarterly earnings reports to its shareholders that separately identified the portion of the financial expense amounts that were, in fact, directly incurred to support the investment in Fibria, a separate company in line of business separate from production of merchandise under consideration.

**3.    Commerce Erred by Disregarding the Quarterly Financial Data Submitted by Suzano Demonstrating the Nature and Amount of the Expenses**

As a preliminary matter, there is no conflict between what is stated in the audited financial statements and the quarterly earnings reports with respect to the nature and purpose of the derivative expenses.  There is no dispute that the derivative expenses are, generically speaking, "financial expenses."  The question is not whether the derivative expenses at issue were "financial" in nature but, rather, whether they were related to an excludable investment activity – i.e., the financing of Suzano's acquisition of Fibria.  By choosing to rely on the broad and generic characterization of these expenses in the audited financial statements as "financial," Commerce failed to address the relevant question of whether these expenses were tied to an investment activity.

The question of whether these derivative expenses were investment-related is, however, directly answered in the quarterly earnings reports placed on the record by Suzano that Commerce deliberately chose not to "rely on."  As discussed in Section III.B above, Suzano provided quarterly financial reports covering the period of review which both identify and quantify Suzano's derivative expenses that were associated with the acquisition of Fibria, and which tie directly to and are reconciled with the audited income statement provided in Suzano's audited 2018 Financial Statements.  The quarterly earnings reports, which were produced in the ordinary course of business and issued through Suzano's regular reporting process, are based on the company's normal books and records.  The disclosures in these earnings reports explain that Suzano's financial expenses significantly increased in 2018 due to the "commitment for financing facility{ies}{}} made available for the business combination with Fibria."  Initial Section D Response at Exhibit D-19a (P.R. 79-80; C.R. 139).  The reports identify the specific amounts that were incurred to finance the Fibria investment and the financial instrument through which the

financing occurred, along with further explanatory notes.  For instance, in its Q2 2018 Quarterly

Report, Suzano explained the loans secured by Suzano:

> On March 15, 2018, the Company announced a transaction with
> Fibria worth R$29.0 billion (US$8.8 billion, at the exchange rate on
> the day) and informed that it already had credit facilities worth
> US$9.2 billion to cover the cash needs of the transaction, whose
> disbursement is subject, among other conditions, to the
> consummation of the Transaction.  The guaranteed financing is
> divided into two tranches: the first (term loan) in the amount of
> US$2.3 billion with term of six years and the second (bridge loan)
> in the amount of US$6.9 billion with the term of three years.

*Id.*  The quarterly reports also provide specific dollar figures of financial expense directly related

to the Fibria acquisition in each quarter of 2018.  *Id.*  Finally, Suzano provided a "2018 Derivative

Income (Loss) Breakdown" summary chart (reproduced below for ease of reference), portraying

the financial expense amounts related to the Fibria transaction from each of the quarterly reports.

*Id. at*  Exhibit D-19 (P.R. 79-80; C.R. 139).



**2018 Derivative Income (Loss) Breakdown /1**

| | millions | 1st QTR | 2nd QTR | 3rd QTR | 4th QTR | Full Year |
|---|---|---|---|---|---|---|
| **2018 Derivative Income (Loss), Net** | | 69 | (2,550) | (1,367) | 1,113 | **(2,735)** |
| **Fibria Transaction** | | | (1,747) | (1,083) | 613 | **(2,217)** |
| Debt Hedge | | 69 | (438) | (137) | 155 | (351) |
| Cash Flow Hedge | | | (365) | (147) | 345 | (167) |
| **Operations** | | 69 | (803) | (284) | 500 | **(518)** |

/1  See "Derivative Transactions" in the Suzano Quarterly Results Release for Q12018 through Q42018

This chart demonstrates that during 2018 Suzano incurred R$2,217,000,000 in derivative losses related specifically to the Fibria investment.  *Id.*

All of this information was before Commerce.  Yet, Commerce chose to cast this all aside in favor of characterizing these expenses generically as "financial," while refusing to "rely on" the information asserted by Suzano because "Suzano bases its arguments on its own quarterly earnings releases to show that certain derivatives were related to the cash requirements of the acquisition of Fibria."  Final I&D Memo at Comment 1 (emphasis added).  While Commerce acknowledged the existence of the quarterly earnings reports, it entirely failed to engage with – in fact, categorically dismissed – their substance and treated the record as bereft of evidence linking the amounts at issue to the acquisition of Fibria.

Commerce does not have discretion to simply disregard relevant information on the record of its proceeding.  Commerce is in fact obligated to review the information that Suzano submitted under the antidumping statute governing the calculation of cost of production:

> Costs shall normally be ***calculated based on the records of the exporter or producer of the merchandise***, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise.  ***The administering authority shall consider all available evidence on the proper allocation of costs, including that which is made available by the exporter or producer on a timely basis,*** if such allocations have been historically used by the exporter or producer, in particular for establishing appropriate amortization and depreciation periods, and allowances for capital expenditures and other development costs.

19 U.S.C. § 1677b(f)(1)(A) (emphasis added).  As discussed above, this Court has held that Commerce's "total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders {a determination} unsupported by substantial evidence." *Ceramark Technology*, 11 F.Supp.3d at 1323 (citing *Allegheny Ludlum*, 24

C.I.T. at 479).  This Court has further held that "reasons for the choices made {by Commerce} among various potentially acceptable alternatives usually need to be explained." *Bando Chemical Industries*, 16 C.I.T. at 136.  The Federal Circuit has similarly held "we must determine the existence of substantial evidence by considering the record as a whole, including evidence that 'fairly detracts from the substantiality of the evidence{,}'" which is to say that the evidence must be analyzed on both sides of an issue. *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (citing *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

One fairly analogous instance where this Court applied the above standard was in *Allegheny Ludlum*, 24 C.I.T. 452.  This Court examined whether Commerce had fully considered a statement placed on the record by a respondent to demonstrate that it controlled certain shares of a particular company in the context of a countervailing duty administrative review.  The statement was made in the respondent's annual financial statement and pertained to whether certain stock in question was controlled by the respondent.  Commerce simply found that it was not controlled by the respondent and calculated the CVD margin accordingly without explicitly acknowledging or otherwise engaging with the statement.  This Court found that further explanation from Commerce was necessary because there was no evidence that the department "explicitly weigh{ed} or analyze{d} the significance of this statement." *Id.*, 24 C.I.T. at 479.  This Court held: "{w}ithout more {explanation} the Court is simply left to conclude that this seemingly important record evidence was not considered by Commerce" and therefore remanded to Commerce. *Id.*

Here, Commerce's failure to consider the evidence at issue is not in question.  Commerce admits that it deliberately chose not to "rely on" the information contained in the quarterly earnings reports that spoke to the issue at hand and chose instead to rely on a broad categorization of the

expenses as "financial" in the audited financial statements.  Yet, no explanation is provided by Commerce in the Issues and Decision Memorandum explaining or justifying Commerce's rejection of the information contained in the quarterly earnings reports.  Neither Suzano, nor this Court has any basis to determine what evidence, if any, led Commerce to this consequential decision.  Much like in *Alleghany*, there is no evidence that Commerce "explicitly weigh{ed} or analyze{d}" Suzano's quarterly earnings reports and its statements relating to those reports. *Allegheny Ludlum*, 24 C.I.T. at 479.  Absent further explanation for its conclusion, this Court must conclude the evidence was not considered by Commerce and requires remand.

This Court also reviewed a similar issue in *Nucor v. United States*, 33 C.I.T. 207, 612 F.Supp.2d 1264 (2009).  In that case, this Court reviewed Commerce's deficient conclusion that a respondent had misidentified the date of sale as the contract date in its sales reporting.  The Court found that Commerce had "essentially ignored the substance of {the respondent's} comments, on the theory that the existence of a single increase in price obviated the need to consider the comments." *Id.,* 33 C.I.T. at 265.  The Court concluded that "{b}ecause Commerce failed to properly consider the record evidence . . . Commerce's determination on remand to use invoice date as the date of sale is not supported by substantial evidence." *Id.* at 269.

Again, much like in *Nucor,* Commerce here has concluded based solely on a theory that the quarterly earnings reports do not warrant consideration because Commerce can instead rely on other information on the record – namely, the broad, and ultimately unhelpful, characterization of the expenses as "financial" in Suzano's 2018 audited financial statements.  But this conclusion entirely negates the purpose of Suzano placing the reports on the record in the first instance -- *i.e.*, to provide Commerce with relevant information concerning the purpose and amount of the financial expenses incurred to finance the investment in Fibria.  Commerce's failure to consider

this information is inconsistent with Commerce's obligation to "consider{ } the record as a whole, including evidence that 'fairly detracts from the substantiality of the evidence." *Huaiyin Foreign Trade Corp.*, 322 F.3d at 1374 (citing *Atl. Sugar*, 744 F.2d at 1562).

Nor did Commerce advance any plausible basis to discredit the information contained in the quarterly earnings reports. As noted above, the information contained in the quarterly earnings reports is consistent with the information in the audited financial statements (on which Commerce purportedly relied) and merely provides further details (details that confirm the investment-related nature and the specific amount of the expenses). Indeed, the detailed amounts reported in the quarterly earnings reports reconcile to the amounts reported in the audited financial statements. Accordingly, there was no basis for Commerce to discredit or doubt the reliability of the information in the quarterly earnings reports as Commerce did here.

The legislative history underlying Section 773(f) of the Act (19 U.S.C. § 1677b(f)) also supports the assertion that Commerce should have given due consideration to the Suzano's quarterly earnings reports. The relevant Senate Report provides:

> With respect to the allocation of costs, {this bill} requires the authorities to **consider all available evidence** on proper allocation, including evidence provided by the exporter or producer in question if they have historically used such allocations, in particular with respect to establishing appropriate amortization and depreciation, periods and allowances for capital expenditures and other development costs. Section 224 of the implementing bill amends section 773 of the 1930 Tariff Act to enact, in new section 773(f)(1)(A), these specific requirements. *The Committee expects the Commerce Department, in determining whether a producer's or exporter's records reasonably reflect the costs associated with the production and sale of the product in question, to examine the recorded production costs with a view to determining as closely as possible the costs that most accurately reflect the resources actually used in the production of the merchandise in question.*

S. Rep. No. 103-412 at 74 (1994) (emphasis added).

Thus, Commerce has an obligation to duly consider the record evidence placed before it to derive margin calculations which accurately reflect the resources used in the production of the merchandise.  Commerce instead failed to consider pertinent evidence on the record related to the Fibria transaction.  This failure caused Commerce to improperly include over R$2 billion in financial expense that are investment-related and therefore excludable.  The improper inclusion of these expenses nearly *doubled* Suzano's actual financial expense ratio related to the cost of production for the merchandise under consideration – from [     ]% of the cost of goods sold (without Fibria acquisition expenses) to [     ]% (with Fibria acquisition expenses).  Supplemental Response to Section D at Exh. SD-2 (P.R. 121; C.R. 221).

In summary, Commerce's "total failure {in this instance} to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion," *Ceramark Technology*, 11 F.Supp.3d at 1323—i.e. that Suzano's financial expenses were *not* "part of Suzano's normal business"—renders Commerce's determination that the expenses were not investment-related unsupported by substantial evidence.  As a result of Commerce's unsupported determination, Commerce failed to accurately reflect the cost of production and sale of subject merchandise in its financial expense ratio calculation.  Accordingly, Commerce's determination to include these expenses in Suzano's cost of production should be reversed and remanded for consideration of the information that Suzano provided in the quarterly earnings reports.

**B.     Commerce's Determination That the Derivative Expenses Were Not Extraordinary is Also Unsupported by Substantial Evidence and Contrary to Law**

Commerce also erred in determining that the derivative expenses at issue were not "extraordinary" in nature and therefore includable in Suzano's costs as ordinary expenses. "Commerce will exclude expenses deemed 'extraordinary' if they pertain to an event which is unusual in nature and infrequent in occurrence." *Carbon and Alloy Steel Wire Rod from Spain*, 83

Fed. Reg. 13,233 and accompanying I&D Mem. at Comment 2 (citing *Floral Trade Council*, 16 C.I.T. at 1016). "An event is "unusual in nature' if it is highly abnormal, and unrelated or incidentally related to the ordinary and typical activities of the entity, in light of the entity's environment. An event is 'infrequent in occurrence' if it is not reasonably expected to recur in the foreseeable future." *Floral Trade Council*, 16 C.I.T. at 1016.

Commerce's determination that the financial expenses incurred by Suzano to finance its investment in Fibria were simply part of Suzano's "ordinary" or "normal" operations was neither reasonable nor supported by substantial evidence in light of the evidence before Commerce of the investment-related nature of the expenses, the extraordinary size of the Fibria acquisition relative to Suzano's then-current operations, the extraordinary impact that the required financing had on Suzano's overall financial expenses for the period, and the extraordinary circumstances of the acquisition itself.

1.     **Costs that are Not Categorized as Extraordinary on the Financial Statements are Not Precluded from Being Considered Extraordinary for Commerce's Purposes**

In the *Final Results*, Commerce found that the derivative expenses related to the acquisition were not "extraordinary" principally because Suzano's audited 2018 Financial Statements did not classify the derivative expenses as extraordinary. Final I&D Memo at Comment 4. While it may be a relevant factor for consideration, the fact that costs are not categorized as extraordinary on a company's audited financial statements does not preclude those expenses from being recognized as extraordinary for purposes of the antidumping cost calculation. Specifically, Commerce has held:

> *{C}osts that are not categorized as extraordinary on the financial statements are not precluded from being considered unforeseen and extraordinary by the Department in its analysis of costs for exclusion or inclusion in the COP.* In fact, section 773(f)(1)(A) of the Tariff Act of 1930, as amended (the Act) directs the Department

> to consider not only how a particular item of income or expense is recorded on the company's financial statement, but also the nature of the item and whether the results reasonably reflect the costs associated with the production and sale of the merchandise. The extraordinary nature of a particular event is not the Department's sole consideration in determining whether or not to allow a cost offset. ***Rather, it is the cumulative nature of the impact of the event.***

*Certain Frozen Warmwater Shrimp from Brazil*, 72 Fed. Reg. 52,061 (Dep't Commerce Sept. 12, 2007) (final results of administrative review) and accompanying I&D Mem. at Comment 1 (emphasis added).

Here, while Commerce disputed Suzano's claim that the derivative expenses were "extraordinary and stem from an isolated event," Commerce unreasonably hinged its determination on the fact that Suzano's auditors issued an unqualified opinion on Suzano's financial statements and did not classify the expenses as extraordinary. As discussed above, Commerce has itself recognized that the auditor's accounting treatment is not dispositive of the question.

### 2. Suzano's Acquisition of Fibria Was Extraordinary and Generated Extraordinary Expenses

As explained above, Suzano's financial expenses related to the Fibria acquisition were unrelated to the general operations of the business, but were rather tied to an isolated, one-time investment in Fibria which was an extraordinary event on several counts. These expenses were not tied to the ongoing operations of Suzano and were unrelated to the manufacture or sale of the uncoated paper under investigation. Initial Section D Response at note 1 (P.R. 79-80; C.R. 139) ("Fibria does not produce paper and its pulp is to be utilized for pulp sales, not for Suzano's papermaking operations, which is already supplied by Suzano's pulp operation."). Further it is unusual for a smaller company to purchase a larger company, and not a frequent occurrence for Suzano. To put the size of the investment in perspective, the consolidated Suzano entity earned

R$10.5 billion in net sales revenue in 2017, while the acquisition of Fibria cost R$37.2 billion (or 3.5 times Suzano's 2017 net revenue). *See* Initial Section A Response at Exh. A-17, (P.R. 35-38; C.R. 9-12). The steps taken by Suzano to finance Suzano's investment in Fibria were therefore qualitatively and quantitatively outside of the boundaries of the company's ordinary business activities.

The acquisition of Fibria also required extraordinarily significant financial resources that severely distorted Suzano's overall financial results. To position itself for the investment, Suzano incurred enormous financial expenses to raise the cash necessary for the acquisition in the beginning of 2018. Suzano's Quarterly Reports detail the specific expenses and explain that they are related to securing a large term loan and bridge loan along with other financial resources to fund the acquisition. *Id.* at Exhs. D-19 & D-19a (P.R. 79-80; C.R. 139). Using the consolidated Suzano entity as a benchmark, that entity's total financial expenses grew by 279% between 2017 and 2018. *See* Initial Section A Response at Exh. A-17, (P.R. 35-38; C.R. 9-12). The Fibria-related derivative expense itself – amounting to R$ 2.2 billion dollars – is more than one-and-a-half times larger than the consolidated Suzano entity's ***total*** 2017 financial expenses. Initial Section A Response at Exh. A-17, (P.R. 35-38; C.R. 9-12); Initial Section D Response at Exh. D-19 (P.R. 79-80; C.R. 139).

Next, while Suzano's auditors may not have categorized the acquisition of Fibria as an "extraordinary" event, they nevertheless recognized throughout the financial statement that the acquisition was a unique and significant event. In fact, the very first sentence of the 2018 Report provides:

> The year 2018 represents an important milestone in the history of Suzano, the company resulting from the integration between Suzano Pulp & Paper and Fibria Celulose. Concluded on January 14, 2019, the combination of two successful and globally relevant companies

> effectively creates opportunities to build a future with even greater
> capacity to create value and to share these accomplishments with all
> our related parties.

Initial Section A Response at Exh. A-17, (P.R. 35-38; C.R. 9-12).   Moreover, the auditors specifically recognized the impact that the Fibria acquisition had on the company's financial expense, reporting: "The net financial expense stood at R$1.0 billion, up 14.0% from 2017, driving {sic} by all the expenses with financing the business combination with Fibria," and "{t}he company had an intense year and was very successful in raising funding, especially for the transactions related to the business combination with Fibria."   *Id.*   The auditors even recognized the impact of the extraordinary acquisition on the company's sustainability efforts, providing that "Although the year 2018 was an atypical one for Suzano, given the start of the process that led to the integration with Fibria, the performance of our social and environmental indicators improved." *Id.*   In short, while the auditors may not have formally categorized the investment in Fibria as extraordinary event, they certainly recognized how significant the event was for Suzano.

Commerce's exclusive reliance on the fact that the auditors did not classify the expenses as extraordinary is not only a deviation from the agency's own statements that such designations are not dispositive, but is also unreasonable in light of the substantial evidence discussed above demonstrating the extraordinary nature of these expenses in absolute magnitude, in their impact on the cost of production, and in light of the highly unusual circumstances of this one-time acquisition.   Commerce's determination should be reversed and remanded for further consideration of this evidence.

## VI.    CONCLUSION

For the forgoing reasons, Suzano respectfully requests that the Court grant its Motion for Judgment on the Agency Record.   Suzano respectfully requests that this Court remand to Commerce with instructions to recalculate Suzano's margin consistent with the arguments set forth above.

Respectfully submitted,

/s/ Craig A. Lewis
Craig A. Lewis
Nicholas W. Laneville

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone:  +1.202.637.5600
Fax:  +1.202.637.5910
E-mail: craig.lewis@hoganlovells.com

*Counsel to Suzano S.A.*

Dated: July 16, 2021

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Hogan Lovells US LLP hereby certifies that the foregoing brief complies with the word-count limitation described in the Standard Chambers Procedures. This brief contains 8,630 words according to the word-count function of the word-processing software used to prepare the brief.

Respectfully submitted,

*/s/ Craig A. Lewis*
Craig A. Lewis

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone: +1.202.637.5600
Fax: +1.202.637.5910
E-mail: craig.lewis@hoganlovells.com

*Counsel to Suzano S.A*

July 16, 2021