UNITED STATES COURT OF INTERNATIONAL TRADE
NEW YORK, NEW YORK

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

———————————————————————

|  |  |  |
|---|---|---|
| SUZANO S.A. (FORMERLY KNOWN AS SUZANO PAPEL E CELULOSE S.A.), | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 21-00069 |
| UNITED STATES, | ) ) | **<u>NON-CONFIDENTIAL</u>** |
| Defendant. | ) ) ) | **<u>VERSION</u>** |
| | ) | Business Proprietary Information removed from Pages 4, 17, and 21 |

———————————————————————

**REPLY OF SUZANO S.A. IN SUPPORT OF
RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone:  +1.202.637.5600
Fax:  +1.202.637.5910

*Counsel to Suzano S.A.*

November 1, 2021

**TABLE OF CONTENTS**

SUMMARY OF ARGUMENT ..................................................................................2

I.      COMMERCE'S REFUSAL TO RECOGNIZE THE PORTION OF DERIVATIVE
        LOSSES RELATED TO THE FIBRIA ACQUISITION WAS NOT REASONABLE OR
        SUPPORTED BY SUBSTANTIAL EVIDENCE ..........................................................6

        A.      Commerce's Inclusion of the Derivative Losses is Not Justified By "Reliance on"
                Suzano's Audited Financial Statements – Suzano is Not Asking Commerce to
                Deviate from the Audit Report ..............................................................6

        B.      Commerce Cannot Disregard the Quarterly Earnings Reports Simply Because They
                May Not Have Been Audited ..............................................................10

        C.      Evidence Did Not Support Commerce's Determination That the Derivative Losses
                Were Attributable to "Overall Cash Management" Rather Than Being Investment-
                Related....................................................................................13

        D.      Commerce Has Failed to Consider the Distortion Caused by Including the Fibria-
                Related Losses in Suzano's Cost of Production ....................................15

        E.      Conclusion ..............................................................................17

II.     COMMERCE FAILED TO ADEQUATELY CONSIDER WHETHER SUZANO'S
        DERIVATIVE EXPENSES WERE EXTRAORDINARY............................................18

        A.      Characterization of Expenses as Extraordinary in Financial Statements is Not a
                Prerequisite for Commerce to Treat Them as Such ..............................19

        B.      Commerce's Determination Must be Remanded for Commerce to Consider the
                Cumulative Nature of the Impact of the Fibria Acquisition................20

III.    CONCLUSION ...........................................................................22

# TABLE OF AUTHORITIES

**Cases**

*Am. Silicon Techs. v. United States*, 24 C.I.T. 167 (Ct. Int'l Trade 2000)..................................11

*Am. Silicon Techs. v. United States*, 261 F.3d 1371 (Fed. Cir. 2001).............................. 10, 11, 16

*Hornos Electricos de Venezuela v. United States*, 27 C.I.T. 1522 (Ct. Int'l Trade 2003) ......20, 21

*Nucor Corp. v. United States*, 371 Fed. Appx. 83 (Fed. Cir. 2010) .............................................9

*Viraj Group, Ltd. v. United States*, 206 F.Supp.2d 1340 (Ct. Int'l Trade Jun. 4, 2002)..............16

*Writing Instrument Mfrs. Ass'n, Pencil Section v. United States Dep't Commerce*, 984 F.Supp.629 (Ct. Int'l Trade 1997)................................................................................................................16

**Statutes**

19 U.S.C. § 1677b(f)(1)(A) ........................................................................................... 11, 16, 19

19 U.S.C. § 3511(a) (1994) ...........................................................................................................11

**Regulations**

19 C.F.R. 351.303(g)......................................................................................................................12

19 C.F.R. 351.307 ..........................................................................................................................12

**Administrative Determinations**

*Carbon and Alloy Steel Wire Rod from Spain*, 83 Fed. Reg. 13,233 (Dep't of Commerce Mar. 28, 2018) ...........................................................................................................................................18

*Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea,* 76 Fed Reg 15,291 (Dep't Commerce Mar. 21, 2011)...............................................................................15

*Certain Frozen Warmwater Shrimp from Brazil*, 72 Fed. Reg. 52,061 (Dep't Commerce Sept. 12, 2007) ................................................................................................................................... 19, 20

*Certain Pasta from Italy*, 69 Fed. Reg. 6,255 (Dep't of Commerce Feb. 10, 2004) ...................18

*Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 73,437 (Dep't Commerce Dec. 12, 2005) ...........................................................................................................................................19

*Certain Tapered Roller Bearings from Korea*, 83 Fed. Reg. 29,092 (Dep't Commerce June 22, 2018) ...........................................................................................................................................14

*Phosphor Copper from the Republic of Korea*, 82 Fed. Reg. 12433 (Dep't Commerce Mar. 3, 2017) ...........................................................................................................................................15

*Polyethylene Terephthalate Resin from Korea*, 83 Fed. Reg. 48,283 (Dep't Commerce Sept. 24, 2018) ..................................................................................................................14

*Ripe Olives from Spain: Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 Fed. Reg. 35,068 (Dep't Commerce July 1, 2021) .............................................................12

*Silicomanganese from India*, 67 Fed. Reg. 15,531 (Dept Commerce Apr. 2, 2002) ....................19

**International Materials**

Agreement on Implementation of Article VI of the GATT, reprinted in 1994 U.S.C.C.A.N. at 4172 .........................................................................................................................................12

UNITED STATES COURT OF INTERNATIONAL TRADE
NEW YORK, NEW YORK

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| SUZANO S.A. (FORMERLY KNOWN AS SUZANO PAPEL E CELULOSE S.A.),<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | Case No. 21-00069<br><br>**<u>NON-CONFIDENTIAL VERSION</u>**<br><br>Business Proprietary Information removed from Pages 4, 17, and 21 |

**REPLY OF SUZANO S.A. IN SUPPORT OF RULE 56.2 MOTION
FOR JUDGMENT ON THE AGENCY RECORD**

Plaintiff Suzano S.A., formerly known as Suzano Papel e Celulose S.A. ("Suzano" or "Plaintiff"), respectfully submits this reply to the September 16, 2021, response of Defendant the United States (the "Government" or "Commerce") in opposition to Suzano's Motion for Judgment Upon the Agency Record ("Government's Response") (CM/ECF 26), and September 29, 2021, response of Defendant Intervenor, Domtar Corporation ("Domtar") in opposition to Suzano's Motion for Judgment Upon the Agency Record ("Domtar's Response") (CM/ECF 28). The Government and Domtar submitted these responses in opposition to Suzano's July 16, 2021, Motion for Judgment on the Agency Record and accompanying memorandum ("Suzano's Brief") (CM/ECF 23), which challenges the final determination of the U.S. Department of Commerce ("Commerce") in the third (2018-19) antidumping duty administrative review of *Certain Uncoated Paper From Brazil*, 86 Fed. Reg. 7254 (Dep't Commerce Jan. 27, 2021) (final results of 2018-19

administrative review) ("*Final Results*") (P.R. 170) 1/ and the accompanying Issues and Decision

Memorandum (Jan. 27, 2021) ("Final I&D Memo.") (P.R. 167).  For the reasons set forth below,

Suzano respectfully requests that the Court reverse Commerce's *Final Results* and remand to the

agency with instructions to recalculate Suzano's financial expense ratio, and therefore Suzano's

dumping margin, in a manner consistent with this Memorandum and the Court's findings.

**SUMMARY OF ARGUMENT**

It is uncontested that during the period of review ("POR") at issue here, Suzano made a

massive and unprecedented R$ 27.8 billion (roughly US$ 5 billion) investment by acquiring and

merging all of the assets of Fibria Celulose S.A. ("Fibria"), a multi-billion dollar pulp company.

*See Letter from Steptoe & Johnson to the U.S. Department of Commerce re Antidumping Duty*

*Investigation of Certain Uncoated Paper from Brazil: Suzano's Response to Questionnaire for*

*Section A* at Exh. A-17 at 16 (July 26, 2019) ("Initial Section A Response") (P.R. 35-38; C.R. 9-

12).  It is also uncontested that Suzano, a smaller company than Fibria, had to take extraordinary

funding to secure the financing necessary to make this one-time investment.  Suzano's audited

financial statements document that among the several financial operations undertaken by Suzano

with international banks specifically to finance its acquisition of Fibria, Suzano entered into certain

derivative contracts that were directly tied to the Fibria acquisition.  The financial statements

identified the balance of these derivatives was obtained specifically to finance the Fibria

acquisition as of December 31, 2018, totaling R$ 4.45 billion  This separate accounting of the

value of the balance of the derivative contracts used specifically to finance the Fibria investment

is clearly identified in Note 4.5a to Suzano's 2018 audited financial statements at page 61.  *See*

---

1/      Throughout this brief, citations to the public record will be referenced "P.R. ___" and
citations to the confidential record are referenced "C.R. __".

Initial Section A Response at Exh. A-17 at 61 (P.R. 35-38; C.R. 9-12) (copy provided as **Attachment A** to this brief).

During 2018, Suzano also incurred significant losses on the derivative contracts it had entered into and used to finance the investment in Fibria.  The amount of these Fibria-related derivative losses is included in the total derivative losses reported for the company in 2018 of R$ 2.735 billion reported as reported in Note 26 to Suzano's 2018 audited financial statements. Initial Section A Response at Exh. A-17 at 105 (P.R. 35-38; C.R. 9-12).  The portion of this total in derivative losses for 2018 that is specifically traceable to the derivative contracts entered into to finance the Fibria acquisition was further identified by Suzano in its official published quarterly earnings reports made available to investors.  Suzano placed excerpts from each of these quarterly earnings reports on the record in Exhibit D-19b to its August 22, 2019 supplemental questionnaire response.  *See Letter from Steptoe & Johnson to the U.S. Department of Commerce*, Case No. A-351-842 (Aug. 22, 2019) at Ex. D-19b ("Initial Section D Response") (P.R. 79-80; C.R. 139, 154-156).  In each of these official published earnings reports, Suzano separately identified the amount of the derivative loss associated with the Fibria investment as well as the derivative losses not associated with the Fibria investment, and the total of these amounts ties directly to the total derivative loss and derivative balances reported in the 2018 audited financial statements.

Suzano requested that Commerce exclude the documented Fibria-related derivative losses from the calculation of Suzano's net financial expenses for the period because the financial expenses incurred to acquire Fibria are related to an extraordinary and singular investment activity that is outside of the scope of the company's general operations.  As such these losses were not part of the general cash management operations of the company or otherwise connected to the

NONCONFIDENTIAL VERSION
CONFIDENTIAL INFORMATION DELETED FROM BRACKETS

production of subject merchandise during the period of investigation. In addition, Fibria is not a paper company nor does it have any link to the production of the paper subject to the order.

In the contested *Final Results*, however, Commerce refused to exclude these investment-related derivative losses from the calculation of Suzano's net financial expenses. Commerce's actions nearly doubled Suzano's net financial ratio from [       ] percent of cost of sales to an extraordinary and highly distortive [       ] percent of cost of sales. *Letter from Joel D. Kaufman to the Hon. Wilbur Ross re Antidumping Duty Investigation of Certain Uncoated Paper from Brazil: Suzano's Supplemental Section D Questionnaire Response*, Exhibit SD-2 (Feb. 26, 2020) ("Supplemental Section D Response") (P.R. 121; C.R. 221). The inclusion of these investment-related financial losses in Suzano's cost of producing subject paper hugely inflated Suzano's cost of production and distorted the margin calculation. In effect, Commerce determined that Suzano's cost of producing paper had hugely increased in the POR when that was not actually the case.

Commerce's justifications for including the Fibria-related derivative losses in the financial ratio were not reasonable and not supported by substantial evidence. The Government's responses to Suzano's claims do not stand up to examination.

First, the Government incorrectly claims that Suzano's financial statements "do not identify any derivatives related to the Fibria acquisition." Final I&D Memo. at 5 (P.R. 167). As discussed above, this is demonstrably false. Note 4.5a at page 61 of Suzano's Audited Financial Statements does exactly that. The outstanding balance of derivative contracts related to the Fibria investment were specifically identified, documented, and quantified on the record before Commerce.

Second, Commerce refused to exclude the derivative losses from the derivative contracts acquired to finance the Fibria acquisition because the breakout of the losses that are specifically

identified in the Fibria contracts was identified in Suzano's official quarterly earnings reports rather than in the audited financial statement. As discussed below, Commerce's refusal to consider the information in the quarterly earnings reports was unreasonable and inconsistent with both the statute and established precedent. The data in the quarterly earnings reports does not in any way conflict with, and is in fact consistent with, the audited figures relied upon by Commerce. This information was also necessary to properly account for the portion of total financial expenses in the period that were tied to investment activities, rather than the general financial operations of the company. Thus, there was no reasonable basis for Commerce to have refused to consider the information in the quarterly earnings reports.

Third, Commerce's conclusion that the derivative contracts at issue were related to the "overall cash management" of Suzano is unreasonable and not supported by substantial evidence in the record taken as a whole. Commerce's conclusion that the financing activity undertaken to acquire Fibria was "part of Suzano's normal business" and not a separate investment activity was based entirely on the fact that Suzano's auditor's classified these expenses as "financial expenses related to Suzano's cost of borrowing." However, it is not in dispute that the derivative expenses are "financial expenses" or that they are related to the "cost of borrowing." The relevant question is whether these financial expenses and the borrowings at issue were incurred in connection with the general financial operations of the company or, as the record demonstrates, were specifically tied to the separate business activity of acquiring Fibria – an activity that is completely unconnected with the manufacture and sale of subject merchandise during the period of investigation. As noted above, Suzano documented that these amounts were directly related to the acquisition of Fibria – indeed, the audited financial statements specifically identified the derivative balances as related to the acquisition. Securing billions of dollars in financing to acquire a separate

multi-billion dollar company cannot reasonably be considered part of "normal business" nor can it reasonably be attributed to the cost of producing subject merchandise during 2018.

Fourth, and finally, Commerce unreasonably rejected the exclusion of these investment-related financial expenses as "extraordinary" expenses. Commerce appears to have premised its determination *solely* on the basis of the fact that Suzano's auditors did not classify the derivative losses as "extraordinary." However, as discussed below, the auditor's classification of these amounts does not relieve Commerce of the obligation to independently assess the nature of the expenses. This is particularly true where record evidence showed that the amounts at issue were incurred in connection with a singular event of extraordinary magnitude relative to the company's ordinary business operations. Commerce cannot simply turn a blind eye to that evidence.

I.     **COMMERCE'S REFUSAL TO RECOGNIZE THE PORTION OF DERIVATIVE LOSSES RELATED TO THE FIBRIA ACQUISITION WAS NOT REASONABLE OR SUPPORTED BY SUBSTANTIAL EVIDENCE**

The Government in its Response Brief, joined by Defendant-Intervenor Domtar, have raised several defenses intended to justify Commerce's unlawful refusal to exclude the derivative losses associated with the acquisition of Fibria. As discussed below, none of these defenses have merit.

A.     **Commerce's Inclusion of the Derivative Losses is Not Justified By "Reliance on" Suzano's Audited Financial Statements – Suzano is Not Asking Commerce to Deviate from the Audit Report**

Throughout its response brief, Commerce repeatedly seeks to frame the issue presented here as a question of whether Commerce was permitted to "rely" on Suzano's audited financial statements. Implicit in this framing is Commerce's assumption that Suzano's auditors resolved the factual issue in Commerce's favor and/or that the information outside of the audited financial statements (i.e., the quarterly published earnings reports) proffered by Suzano in some way conflict with the presentation of the data in the audit reports or seeks to deviate from the auditor's findings.

None of this is true.  Suzano has no objection to Commerce "relying" on Suzano's audited financial statements and does not dispute that they were prepared in accordance with Brazilian GAAP. However, it is simply not correct that these audited financial statements support Commerce's conclusion that the derivative losses at issue were unconnected with the Fibria acquisition and were part of the "general" operations of the company.  Nor is Suzano asking Commerce to deviate from the classification of those expenses by Suzano's auditors.

First, as noted above, Commerce is factually incorrect in claiming that Suzano's auditors did not identify that a portion of the derivatives at issue were specifically tied to the Fibria acquisition.  This fact is clearly identified in Note 4.5a of Suzano's audited financial statements, where the auditors specifically distinguish the balance of derivative contracts associated with the Fibria acquisition ($US 4.45 billion) from other derivative contracts associated with the general operations of the company ($US 3.90 billion).  *See* Attachment A.  In fact, Commerce even concedes the fact that the quarterly earnings statements reconcile with the audited financial statements in its brief: "Although Suzano's quarterly reports may have been derived from the same information contained in Suzano's audited 2018 consolidated financial statements, the audited financial statements represent the GAAP-compliant final classification of such derivative loss." Government's Response at 19.  Thus, Suzano's "GAAP-Compliant Financial Statements" that are the touchstone for all of Commerce's arguments directly substantiate the value of the loss-generating derivative instruments specifically associated with the Fibria acquisition as maintained by Suzano.  Accordingly, if Commerce is inflexibly compelled to accept the auditor's classification of the financial expenses, as Commerce appears to be arguing, then Commerce is compelled to accept the fact that Suzano's auditor's here identified the specific amount of derivates that are tied

to the Fibria calculation.  Commerce can't reasonably disregard this fact as it did for purposes of the *Final Results*.

Second, while Suzano's auditors reported the combined amount of derivative losses (both those related to the Fibria acquisition and those related to the company's general operations) in a single line in the audited financial statements (*see* Initial Section A Response at 105, Auditor's Note 26 (P.R. 35-38; C.R. 9-12)), Commerce has gone too far in suggesting that this in some way implies that the auditors intended to classify the derivative losses related to the Fibria acquisition together as parts of the "general cash management operations" of the company.  Nowhere in the audited financial statements do the auditors make such an assertion.  At most, the auditors recognized that the derivative losses (including the portion related to the acquisition of Fibria) are part of the "Net Financial Results" for Suzano during 2018.  This is, of course, accurate.  The derivative losses associated with the acquisition of Fibria are unquestionably financial expenses incurred by Suzano.  Nobody disputes this fact.  But, acknowledging that these expenses are financial in nature leaves open the question of whether these losses are entirely part of the "general" cash management operations of the company, as Commerce maintains, or, as Suzano maintains and the record supports, are specifically tied to a specific investment activity (i.e., the acquisition of Fibria).  In fact, as noted above, the auditors did not leave this question unanswered. As documented, in Note 4.5a, the auditors expressly identified that a majority of the balance of derivative contracts in 2018 that generated these losses were specifically related to the Fibria acquisition.  Initial Section A Response at 61 (P.R. 35-38; C.R. 9-12).  There is nothing ambiguous about this and it leaves no room for Commerce to speculate, contrary to the auditor's actual findings, that *none* of the derivative losses are related specifically to the Fibria acquisition.

Having said this, it is true that the auditors did not separately break out in the audited financial statements the portion of the total 2018 derivative *losses* that was specifically related to the Fibria acquisition.  However, the breakout of this amount (in an amount directly tied to and reconciled with the total derivative losses reported in the audited financial statements) was provided in Suzano's four quarterly earnings reports published during 2018.  Therefore, in presenting this data, Commerce in no way was being asked to deviate from (or repudiate its "reliance" on) the audited GAAP compliant financial statements.  Accordingly, there was no reasonable basis for Commerce to have simply cast the quarterly earnings report data to the side as it did in the *Final Results*. 2/

In summary, this Court should not be misled by Commerce's framing of the issue as a choice between the treatment of the derivative losses in the audited financial statements versus treatment of the same expenses in the quarterly earnings reports.  Commerce here could reasonably rely on *both* consistent sources in order to obtain a more accurate picture of the source and nature of the derivative losses related to the Fibria acquisition.

---

2/       The decision of the Court of Appeals for the Federal Circuit ("CAFC") in *Nucor Corp. v. United States*, 371 Fed. Appx. 83, 85-87 (Fed. Cir. 2010), is instructive in this regard.  In that case the respondent had provided additional documentation demonstrating that certain expenditures occurred outside of the period of review and were recorded in an account that had historically not been depreciated.  *Id.*  The Court found that Commerce "attached little weight" to this evidence and "dismissed the extensive documentation" provided by the respondent regarding the nature of the items in the account at issue.  *Id.*  The Court rejected Commerce's explanation that "there is no way to link the documents to the 'asset' listed in {the respondent's} financial statement" because Commerce did not discuss the contents of the documents or "explain why those documents failed to establish the requisite 'link,' where any perceived gaps existed, or what additional information could have been provided to bridge those gaps."  *Id.*  The Court also rejected Commerce's finding because Commerce failed to point to any contrary documents and therefore failed to provide substantial evidentiary support for its decision.  *Id.*  As noted above, Suzano provided a direct "link" between the audited financial statements and the quarterly earnings statements.  Commerce simply failed to consider all available evidence to determine the nature of certain expenses.

**B.     Commerce Cannot Disregard the Quarterly Earnings Reports Simply Because They May Not Have Been Audited**

In its response brief, Commerce also argues that it was justified in dismissing the information provided in Suzano's quarterly earnings reports "because those reports were not prepared pursuant to Brazilian GAAP."  Government's Response at 19-20.  We disagree.

First, there is no evidence that the quarterly earnings reports are *not* prepared pursuant to Brazilian GAAP and Commerce points to no such evidence.  Indeed, as discussed above, the derivative losses (and other data) reported in the earnings reports tie directly to the derivative balances and losses reported in the audited financial statements.   Therefore, the only reasonable inference is that the quarterly earnings reports are consistent with the GAAP-consistent audited financial statements (or they would not reconcile).

Second, and also as alluded above, there is no blanket restriction mandating that Commerce may only rely on audited data sources in determining the cost of production – particularly where there are indicia of reliability to the alternative sources of information.  For example, in *American Silicon Technologies v. United States*, 261 F.3d 1371 (Fed. Cir. 2001), the CAFC rejected Commerce's initial refusal to look beyond the audited financial statements to additional record evidence where necessary to reasonably reflect the cost of production.  In that case, the CAFC reviewed Commerce's methodology used to calculate the respondent, Rima Industrial S.A.'s, depreciation expenses within the cost of production in its antidumping investigation of *Silicon Metal from Brazil*.  Rima had provided depreciation worksheets which were not included in its GAAP audited financial statements, that essentially shifted the bulk of the depreciation expenses of furnaces to a period prior to the POR.  The appellant challenged Commerce's reliance on Rima's depreciation worksheets because they were separate from its audited financial statements and allegedly did not reasonably reflect the costs associated with the production and sale of subject

10

merchandise.  *Am. Silicon Techs.*, 261 F.3d at 1374-75.  This Court first upheld Commerce's decision, holding it was reasonable for Commerce to look outside of the audited financial statements to rely on Rima's reported depreciation costs.  The Court referenced 19 U.S.C. § 1677b(f)(1)(A), which requires the records not only to be GAAP compliant but also to reasonably reflect the costs associated with production of subject merchandise.  *Id.* at 1374; *see also Am. Silicon Techs. v. United States*, 24 C.I.T. 167 (Ct. Int'l Trade 2000).  Similar to the case here, this Court also found indicia of reliability to the external documents and "concluded that there was substantial evidence showing that the depreciation worksheets prepared for the review did reconcile to the financial statements" because "the auditors *reported a depreciation expense*." *Am. Silicon Techs.*, 261 F.3d at 1375 (emphasis added).  Notably, this Court also pointed out that the appellant had failed to provide "any verifiable records that the depreciation worksheets were *not* consistent with Brazilian GAAP, or that the reported depreciation did not reconcile to the financial statements." *Id.*

The CAFC affirmed the Court of International Trade, again relying on 19 U.S.C. § 1677b(f)(1)(A).  *Id.* at 1381.  Indeed, the Court actually went a step further and held that "the statute provides that as a general rule, an agency may either accept financial records kept according to generally accepted accounting principles in the country of exportation, or reject the records if accepting them would distort the company's true costs." *Id.* at 1377.  The CAFC also relied on the Statement of Administrative Action ("SAA"), approved by Congress under 19 U.S.C. § 3511(a) (1994), which states that "{c}osts shall be allocated using a method that reasonably reflects and accurately captures all of the actual costs incurred in producing and selling product under investigation or review" to uphold Commerce's reliance on Rima's depreciation worksheets.

*Id.* (citing Agreement on Implementation of Article VI of the GATT, 834-35, reprinted in 1994

U.S.C.C.A.N. at 4172).

Similarly, in the recently-concluded administrative review of the antidumping duty order

on *Ripe Olives from Spain*, the Petitioner argued that Commerce should have rejected certain

unaudited data relied on by the respondent to calculate and report U.S. freight expenses.  Among

other concerns, the Petitioner argued that the trial balance data of the U.S. affiliate used by the

respondent for this purpose should be rejected because it was unaudited.  Commerce dismissed

this basis for rejecting the data, stating in relevant part:

> {The Petitioner} does not explain why the unaudited nature of {U.S. affiliate}'s financial accounts renders {the respondent's} methodology for reporting U.S. freight and U.S. indirect selling expenses deficient.  Although independently audited data may offer some additional degree of reliability, it is not uncommon for Commerce to rely on information that the respondent reports using unaudited data.  The respondent and its legal counsel certify that such information is complete and accurate, pursuant to 19 CFR 351.303(g), and the information is subject to verification, pursuant to 19 CFR 351.307 of Commerce's regulations.

*Ripe Olives from Spain: Final Results of Antidumping Duty Administrative Review; 2018-2019*,

86 Fed. Reg. 35,068 (Dep't Commerce July 1, 2021), Issues and Decision Memo. at cmt. 12.  There

is no reason for Commerce to have acted differently here.

To be clear, the record presented here does not pit the audited financial statements against

a contrary additional record, nor is Suzano asking Commerce to reject its audited financial

statements. 3/   As discussed and documented above, the auditors reported a derivative loss

attributed to the acquisition of Fibria and there is no inconsistency between the derivative balances

---

3/      Nonetheless, *American Silicon Technologies* clearly indicates that even if there were an inconsistency, Commerce cannot blindly follow the treatment accorded to the expenses/costs in the audited financial statements if other evidence suggests that doing so may not reasonably reflect the costs associated with the production and sale of the merchandise.

and derivative losses reported in the audited financial statements and those reported in the quarterly earnings reports. The data in both sources is consistent and directly linked.

This supplemental information not only describes Suzano's investment in Fibria it specifically identifies and quantifies the derivative losses associated with that investment. *See e.g.,* Initial Section D Response at Exh. D-19a (P.R. 79-80; C.R. 139) (explaining financial expenses increased by 46 percent from second quarter 2018 to third quarter 2018, specifically reflecting "the commitment of US$4.5 billion in credit facilities made available for the business combination with Fibria and by the loans taken out as of June 2018 for the business combination with Fibria."); Suzano's Opening Br. at 9. Suzano has additionally provided substantial unrefuted evidence that these quarterly statements reconcile fully with its audited GAAP-compliant financial statements. Commerce has failed to provide any evidence on the record to the contrary. Commerce even concedes the fact that the quarterly earnings statements reconcile with the audited financial statements in its brief: "Although Suzano's quarterly reports may have been derived from the same information contained in Suzano's audited 2018 consolidated financial statements, the audited financial statements represent the GAAP-compliant final classification of such derivative loss." Government's Response at 19. These precedents instruct the Court to remand this case to Commerce to properly consider all evidence on the record related to the cost of production.

### C. Evidence Did Not Support Commerce's Determination That the Derivative Losses Were Attributable to "Overall Cash Management" Rather Than Being Investment-Related

Commerce next argues that the agency acted consistently with past practice in finding that Suzano's derivative losses were associated with "overall cash management" rather than investment activity. As discussed above, this claim is incorrect and is contradicted by the record which unequivocally demonstrates that the auditors specifically isolated and classified certain derivative

13

contracts as related to the financing of the Fibria acquisition, rather than the general cash management operations of the company.

In its response brief, Commerce has also sought to distance itself further from these facts by incorrectly suggesting that its treatment of the derivative losses as part of the "overall cash management" or general operations of the company is supported by precedent.  Although it is not clearly stated as such, Commerce appears to be suggesting that derivative losses are always and in all cases treated as part of the overall cash management of a company, (even where the auditors themselves identified that a majority of the derivative contracts were related to a specific investment).  None of the prior cases identified by Commerce, however, establishes a blanket rule that derivative contracts must always be categorized as part of the general operations of the company.

For example, in *Polyethylene Terephthalate Resin from Korea* ("*PET Resin from Korea*"), 83 Fed. Reg. 48,283 (Dep't Commerce Sept. 24, 2018)  (final determination of sales at less than fair value), Issues and Decision Memo. at cmt. 3, Commerce declined to exclude certain derivative gains from the net financial expense calculation even though the Petitioner claimed a portion of these expenses were related to "investing activities."   Commerce found that the Petitioners' argument was not supported by record evidence.  *Id.*  Commerce found instead that the derivative financial instruments were being used "to hedge against foreign currency risks, interest rate risks and commodity price risks, respectively" for "cash management purposes."  *Id.*  In other words, unlike in Suzano's case, the record in *PET Resin from Korea* apparently lacked information linking the derivative contracts to a specific investment activity.   The other cases cited by Commerce suffer from the same defect.  *See, e.g.*, *Certain Tapered Roller Bearings from Korea*, 83 Fed. Reg. 29,092 (Dep't Commerce June 22, 2018) (final determination of sales at less than fair value), Issues

and Decision Memo. at cmt. 7 (finding that respondent's audited financial statements indicated that "the company uses derivates to hedge against foreign exchange risks arising from the company's operations," and therefore related to "overall cash management."); *Phosphor Copper from the Republic of Korea*, 82 Fed. Reg. 12433 (Dep't Commerce Mar. 3, 2017) (final affirmative determination of sales at less-than-fair-value), Issues and Decision Memo. at cmt. 2 (respondent was using derivatives as a hedging mechanism related to raw material input cost changes were related to "cost management mechanisms."); and *Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea,* 76 Fed Reg 15,291 (Dep't Commerce Mar. 21, 2011) (final results of administrative review) Issues & Decision Memo. at cmt. 19 (considering evidence that showed that certain interest rate swaps, currency swaps, and currency future swaps were "hedging vehicles used { } to manage interest-rate and foreign exchange exposure).

In none of these cases was Commerce confronted with a record in which a portion of the derivatives at issue was specifically identified as related to a separate investment activity. Suzano does not argue that Commerce is entitled to presume that derivative gains and losses are associated with the general operations of the company in the absence of evidence to the contrary, as was true in each of these cases. However, that is not the record that was before Commerce here.

###    D.    Commerce Has Failed to Consider the Distortion Caused by Including the Fibria-Related Losses in Suzano's Cost of Production

Commerce's response brief is also notable in failing to address Suzano's claim that inclusion of the massive derivative losses incurred in 2018 for the purpose of financing the acquisition distorted the resulting cost of production.

In fact, Commerce's inclusion of Suzano's investment-related derivative losses tied to its acquisition of Fibria significantly inflates Suzano's cost of production, thereby distorting its financial expense ratio and dumping margin. As discussed above, Commerce's calculations are

required to "reasonably reflect{} the costs associated with the production and sale of the subject merchandise." 19 U.S.C. § 1677b(f)(1)(A). "{This} statute provides that as a general rule, an agency may either accept financial records kept according to generally accepted accounting principles in the country of exportation, or reject the records if accepting them would distort the company's true costs." *Am. Silicon Techns.*, 261 F.3d at 1377. Moreover, this Court has held that Commerce must calculate "a fair and accurate dumping margin." *Viraj Group, Ltd. v. United States*, 206 F.Supp.2d 1340, 1343-44 (Ct. Int'l Trade Jun. 4, 2002) (holding that Commerce must further "the congressional goal of accuracy in dumping determinations" and that Commerce must "reach a fair and accurate dumping margin determination"). This Court has also held that the "paramount objective of the statute is to obtain the most accurate determination of dumping margins utilizing the best information available within the broad outlines of the statute*." Writing Instrument Mfrs. Ass'n, Pencil Section v. United States Dep't Commerce*, 984 F.Supp.629 (Ct. Int'l Trade 1997).

Commerce's calculations in this case did not reasonably reflect Suzano's cost of production, and therefore Commerce failed to calculate a fair and accurate dumping margin. The acquisition of Fibria required extraordinary financial resources that severely distorted Suzano's overall financial results. To position itself for its investment in Fibria, Suzano incurred enormous financial expenses to raise the cash necessary for the acquisition in the beginning of 2018. Suzano's Quarterly Reports detail the specific expenses and explain that they are related to securing a large term loan and bridge loan along with other financial resources to fund the acquisition. *See* Initial Section A Response at Exs. D-19 & D-19a (P.R. 79-80; C.R. 139). Using the consolidated Suzano entity as a benchmark, that entity's total financial expenses grew by 279 percent between 2017 and 2018. *See* Suzano's Initial Section A Response at Ex. A-17, (P.R. 35-

16

38; C.R. 9-12).  The Fibria-related derivative expense itself – amounting to R$ 2.2 billion dollars – is more than one-and-a-half times larger than the consolidated Suzano entity's total 2017 financial expenses.  *Id.*;  Initial Section D Response at Ex. D-19 (P.R. 79-80; C.R. 139).

By failing to exclude these investment related expenses, Commerce erroneously included over R$ 2 billion in financial expenses.  Inclusion of these expenses nearly doubled Suzano's actual financial expense ratio related to the cost of production for the merchandise under consideration – from [     ] percent of the cost of goods sold (without Fibria acquisition expenses) to [     ] percent (with Fibria acquisition expenses).  Supplemental Response to Section D at Ex. SD-2 (P.R. 121; C.R. 221).  In effect, Commerce found that Suzano's cost of producing subject paper was substantially higher during this period when there was no corresponding change to Suzano's actual costs of producing the subject merchandise.  That is not a reasonable method of determining cost of production, and Commerce's distortive calculations are not supported by substantial evidence and are contrary to law as they do not result in a fair and accurate dumping margin.

E.    **Conclusion**

Not only does Commerce blindly rely on Suzano's audited financial statements, it's interpretation of such statements is factually incorrect.  The auditors clearly identified a portion of derivative contracts specifically tied to the Fibria acquisition.  These costs are further explained in Suzano's quarterly earnings statements, which directly reconcile with the audited financial statements.  Under its precedent Commerce was obligated to review this additional evidence on the record to discern the costs that reasonably reflect the cost of production.  Commerce's failure to do so is not supported by substantial evidence and is contrary to law.  Had Commerce reviewed both the audited financial statements and quarterly earnings statements in tandem, as Suzano requested, Commerce would have found that certain derivative losses – those tied to the Fibria

acquisition – do not reasonably reflect the cost of production and therefore should be excluded as they are investment related.  Commerce's wrongful inclusion of these costs significantly distorts Suzano's dumping margin, making it unsupported by substantial evidence and contrary to law. Commerce's determination must be remanded to correct these errors.

## II.      COMMERCE FAILED TO ADEQUATELY CONSIDER WHETHER SUZANO'S DERIVATIVE EXPENSES WERE EXTRAORDINARY

Commerce also declined to treat Suzano's derivative expenses at issue as extraordinary expenses because "the auditors who issued an unqualified opinion on Suzano's financial statements did not classify the derivative expenses as extraordinary."  Final I&D Memo. at cmt 1. In its response brief, Commerce stands behind this simplistic determination stating that "Suzano argues at length as to why the Fibria acquisition constituted an extraordinary event" (*see* Government's Response at 5-11, 26-30), but that issue is irrelevant because Commerce determined that the audited financial statements neither classified the derivative expenses as related to the acquisition of Fibria nor classified the derivative expenses were extraordinary.  At the same time, and rather contrarily, Commerce concedes that Commerce is not actually bound by how such expenses have been labeled in GAAP compliant financial statements.  *See* Government's Response at 21-22 (citing *Carbon and Alloy Steel Wire Rod from Spain*, 83 Fed. Reg. 13,233 (Dep't of Commerce Mar. 28, 2018), and accompanying Issues and Decision Memo. at cmt. 2; *Certain Pasta from Italy*, 69 Fed. Reg. 6,255 (Dep't of Commerce Feb. 10, 2004) and accompanying Issues & Decision Memo. at cmt. 24).

As discussed below, we agree that Commerce is not bound by the classification of the expenses as ordinary or extraordinary in the audited financial statements.  However, Commerce acted unreasonably and contrary to the record evidence in rejecting Suzano's evidence demonstrating the extraordinary nature and magnitude of the Fibria-related acquisition costs.

18

A.      **Characterization of Expenses as Extraordinary in Financial Statements is Not a Prerequisite for Commerce to Treat Them as Such**

Commerce and Suzano are in agreement that the categorization of the expenses as ordinary or extraordinary in the audited financial statements is not dispositive of their proper treatment in the antidumping cost calculation.  Commerce has broadly held "that the placement of an income or expense item on the financial statements should not be the determining factor of whether the amount should be included or excluded from the reported cost."  *Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 73,437 (Dep't Commerce Dec. 12, 2005) (final results of antidumping duty administrative review) Issues & Decision Memo at cmt. 8 (rejecting inclusion of respondent's closure costs as an operating expense, as classified in its financials, because this would distort production costs).  More specifically, Commerce has found that "costs that are categorized as extraordinary in a company's financial statements are not automatically exempt from the Department's calculation of the COP."  *Certain Frozen Warmwater Shrimp from Brazil*, 72 Fed. Reg. 52,061 (Dep't Commerce Sept. 12, 2007) (final results of administrative review) and accompanying Issues & Decision Memo. at cmt. 1; *see also Silicomanganese from India*, 67 Fed. Reg. 15,531 (Dept Commerce Apr. 2, 2002) (notice of final determination of sales at less than fair value and final negative critical circumstances determination) Issues & Decision Mem. at cmt. 14 (declining to treat expenses as extraordinary even when characterized as such in financial statements).  Commerce explained further:

> {S}ection 773(f)(1)(A) of the Tariff Act of 1930, as amended (the Act) directs the Department to consider not only how a particular item of income or expense is recorded on the company's financial statement, but also the nature of the item and whether the results reasonably reflect the costs associated with the production and sale of the merchandise.  The extraordinary nature of a particular event is not the Department's sole consideration in determining whether or not to allow a cost offset.  *Rather, it is the cumulative nature of the impact of the event.*

19

*Certain Frozen Warmwater Shrimp from Brazil*, at cmt 1 (emphasis added); Suzano Br. at 27-28. Commerce's refusal in this case to even consider whether the expenses were extraordinary solely because they were not categorized as such in Suzano's audited financial statements is not in accordance with the statute and Commerce's precedent. Commerce's determination must therefore be remanded.

**B.**   **Commerce's Determination Must be Remanded for Commerce to Consider the Cumulative Nature of the Impact of the Fibria Acquisition**

As noted above, in evaluating whether an event is extraordinary, Commerce must consider the cumulative nature of the impact on the respondent. *Id.* In this instance, that means Commerce was obligated to have considered the significance to Suzano's operations and the cumulative impact of the Fibria acquisition on Suzano's financial results in 2018.

As explained in depth in Suzano's opening brief, the Fibria acquisition was an isolated, one-time investment in a larger company. It is self-evidently an extraordinarily rare event for a smaller company to undertake a massive acquisition of a company larger than itself. Characterizing this investment as an "ordinary business" activity and treating the related expenses as if they reflect the ordinary costs of manufacturing the uncoated paper under consideration is unreasonable. This event was in the truest sense of the words "unusual in nature and infrequent in occurrence" and possessed a "high degree of abnormality" that was "clearly unrelated to, or only incidentally related to, the ordinary and typical activities of the enterprise." Government's Response at 20-21 (citing *Hornos Electricos de Venezuela v. United States*, 27 C.I.T. 1522, 1534 (Ct. Int'l Trade 2003)). It was also "of a type that would not reasonably be expected to recur in the foreseeable future." *Id*.

The facts speak for themselves. The singular investment in Fibria required massive financial resources. To put the size of the investment in perspective, the consolidated Suzano

entity earned R$ 10.5 billion in net sales revenue in 2017, while the acquisition of Fibria cost R$ 27.8 billion (or nearly triple Suzano's entire 2017 net revenue).  *See* Initial Section A Response at Ex. A-17, (P.R. 35-38; C.R. 9-12).  The steps required to finance Suzano's massive investment in Fibria were therefore both qualitatively and quantitatively outside of the boundaries of the company's ordinary business activities.

The cumulative impact of such an acquisition on Suzano's financial condition was immense and extraordinary.  Suzano made a massive R$ 27.8 billion (roughly $US 5 billion) investment by acquiring and merging all of the assets of Fibria.  Derivative losses related to the financing of this acquisition amounted to some R$ 2.217 billion.  Initial Section D Response at Ex. D-19b (P.R. 79-80; C.R. 139, 154-156).  These additional expenses nearly doubled Suzano's net financial ratio from [     ] percent of cost of sales to an extraordinary and highly distortive [     ] percent of cost of sales.  Supplement D Response at Ex. SD-2 (P.R. 121; C.R. 221).  It is not reasonable for Commerce to characterize these expenses – either their circumstances or their amount – as "ordinary" and reasonably reflective of the cost of producing the merchandise under consideration.  As stated in Suzano's audited financial statements "the year 2018 was an atypical one for Suzano, given the start of the process that led to the integration with Fibria . . . ."  *Id.*

Commerce's sole rebuttal to this extraordinary litany of facts contradicting its determination that the expenses were "ordinary" is to reference this Court's decision in *Hornos Electricos de Venezuela*, in which Commerce concluded that an industrial accident was "neither unusual nor unforeseen" in certain industries.  Government's Response at 22.  It is not reasonable, however, to compare a multi-billion dollar acquisition of a large multinational company to the occurrence of a routine industrial accident.  Industrial accidents may well occur and are part of the manufacturing process.  Investments in new business are unrelated to ongoing manufacturing and

sales activities and their inclusion in the cost of production was unreasonable in this case. Commerce should be instructed on remand to reconsider its decision that the investment was extraordinary.

## III.   CONCLUSION

For the forgoing reasons, Suzano respectfully requests that the Court grant its Motion for Judgment on the Agency Record.   Suzano respectfully requests that this Court remand to Commerce with instructions to recalculate Suzano's margin consistent with the arguments set forth above.

Respectfully submitted,

/s/ Craig A. Lewis
Craig A. Lewis, Esq.
Nicholas W. Laneville, Esq.
Cayla D. Ebert, Esq.

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone:  +1.202.637.5600
Fax:  +1.202.637.5910
E-mail: craig.lewis@hoganlovells.com

*Counsel to Suzano S.A.*

Dated: November 1, 2021

**Attachment A**

**Suzano Papel e Celulose S.A.**
**Notes to the Standardized Financial Statements**
**At December 31, 2018**
*In thousands of Brazilian reais (R$), unless otherwise indicated*



The Company is also exposed to international oil prices, which reflects on logistical costs for selling to the export market.

On December 31, 2018 there is long position in bunker oil R$ 5 million to hedge its logistics costs. (December 31, 2017, there is no long position in bunker oil)

|  | 12/31/2018 | | |
|---|---|---|---|
|  | Probable | Possible Increase ( Δ 25%) | Remote Increase ( Δ 50%) |
| Oil derivative | (1,140) | 2,399 | 3,735 |
|  | (1,140) | 2,399 | 3,735 |

## 4.5   Derivative financial instruments

The Company determines the fair value of derivative contracts and recognizes that these amounts can differ from the amounts realized in the event of early settlement. The amounts reported by the Company are based on an estimate and using data provided from a third party, which is reviewed by Management.

**a)   Outstanding derivatives by type of contract**

On December 31, 2018 and 2017, the consolidated positions of outstanding derivatives are presented below:

## Suzano Papel e Celulose S.A.
**Notes to the Standardized Financial Statements**
**At December 31, 2018**
*In thousands of Brazilian reais (R$), unless otherwise indicated*



| | Notional value in US$ | | Fair value | |
|---|---|---|---|---|
| | 12/31/2018 | 12/31/2017 | 12/31/2018 | 12/31/2017 |
| **Cash flow** | | | | |
| **Undesignated exchange hedge** | | | | |
| Zero-cost collar (R$ vs. US$) | 2,340,000 | 1,485,000 | (41,122) | 25,822 |
| NDF (R$ x US$) | 50,000 | - | 6,749 | - |
| Fixed Swap (US$) vs. CDI | - | 50,000 | - | 5,356 |
| Fixed Swap CDI vs. US$ | - | 50,000 | - | (2,485) |
| Subtotal | 2,390,000 | 1,585,000 | (34,374) | 28,693 |
| **Debt hedge** | | | | |
| **Exchange hedge** | | | | |
| Swap CDI vs. Fixed (US$) | 752,110 | 291,725 | (377,020) | (21,562) |
| Subtotal | 752,110 | 291,725 | (377,020) | (21,562) |
| **Interest hedge** | | | | |
| Swap LIBOR vs. Fixed (US$) | 757,143 | 19,841 | (33,663) | (1,117) |
| Subtotal | 757,143 | 19,841 | (33,663) | (1,117) |
| **Hedge de Commodity** [a] | | | | |
| Swap Bunker | 5,344 | - | (1,140) | - |
| Subtotal | 5,344 | - | (1,140) | - |
| **Total in derivatives (Cash Flow)** | 3,904,597 | 1,896,566 | (446,196) | 6,014 |
| **Fibria's operation** | | | | |
| **Undesignated exchange hedge** | | | | |
| Zero cost collar (R$ x US$) | 700,000 | - | (93,692) | - |
| NDF (R$ x US$) | 100,000 | - | 10,287 | - |
| Subtotal | 800,000 | - | (83,405) | - |
| **Debt hedge** | | | | |
| **Exchange hedge** | | | | |
| Swap CDI x Fixed (US$) | 1,650,000 | - | (476,121) | - |
| Subtotal | 1,650,000 | - | (476,121) | - |
| **Interest hedge** | | | | |
| Swap Libor x Fixed (US$) | 2,000,000 | - | (137,044) | - |
| Subtotal | 2,000,000 | - | (137,044) | - |
| **Total in derivatives (Fibria's operation)** | 4,450,000 | - | (696,570) | - |
| **Total in derivatives** | 8,354,597 | 1,896,566 | (1,142,766) | 6,014 |
| Current assets | | | 352,454 | 77,090 |
| Non-current assets | | | 141,480 | 56,820 |
| Current liabilities | | | (596,530) | (23,819) |
| Non-current liabilities | | | (1,040,170) | (104,077) |
| | | | (1,142,766) | 6,014 |

[a] The commodity hedge amount was contracted through the subsidiary Suzano Trading.

**Suzano Papel e Celulose S.A.**
Notes to the Standardized Financial Statements
At December 31, 2018
*In thousands of Brazilian reais (R$), unless otherwise indicated*

Fair value does not represent an obligation for immediate disbursement or cash receipt, given that such effect will only occur on the dates of contractual fulfillment or on the maturity of each transaction, when the result will be determined, depending on the case and market conditions on the agreed dates.

Contracts outstanding on December 31, 2018 are over-the-counter operations without any margin or early settlement clause imposed due to mark-to-market variations.

Each existing contract and respective protected risks are described below:

i) CDI Swap x Fixed US$: positions in conventional swaps by changing the rate of Interbank Deposits (DI) by pre-fixed dollar rate. The objective is to change the debt index in *Reais* to dollars;

ii) NDF US$: Positions sold in futures contracts of dollars, with the purpose of protecting the cash flow of exports.

iii) Swap Fixed US$ x CDI: positions in conventional swaps exchanging pre-fixed rate variation in dollars by Interbank Deposits (DI) rate. The objective is to revert debts in dollars to *Reais*;

iv) Swap LIBOR x Fixed: positions in conventional swaps exchanging post-fixed rate for a pre-fixed rate in dollars. The objective is to protect the cash flow of variations in the US interest rate;

v) Zero-Cost Collar: positions in an instrument consisting of the simultaneous combination of the purchase of put options and the sale of US dollar call options, with the same principal and maturity, in order to protect the cash flow of exports. This strategy establishes an interval where there is no deposit or receipt of financial margin on the position adjustments.

vi) Swap Bunker (oil): positions purchased in oil bunker, with the objective of protecting logistics costs related to the contracting of maritime freight.

**b) Fair value by maturity date**

Derivatives mature as follows:

| Maturity of derivatives | Net Fair value | |
|---|---|---|
| | 12/31/2018 | 12/31/2017 |
| In 2018 | - | 53,270 |
| In 2019 | (244,069) | (16,064) |
| In 2020 | (180,333) | (31,192) |
| In 2021 | 87,851 | - |
| In 2022 | 83,692 | - |
| In 2023 | 80,052 | - |
| In 2024 | 82,963 | - |
| In 2025 | (486,958) | - |
| In 2026 | (565,964) | - |
| | (1,142,766) | 6,014 |

**Suzano Papel e Celulose S.A.**
**Notes to the Standardized Financial Statements**
**At December 31, 2018**
*In thousands of Brazilian reais (R$), unless otherwise indicated*



### c)  Long and short position of outstanding derivatives

On December 31, 2018 and 2017, the consolidated positions of outstanding derivatives are presented below:

| Consolidated | Currency | Notional value 12/31/2018 | Notional value 12/31/2017 | Fair value 12/31/2018 | Fair value 12/31/2017 |
|---|---|---|---|---|---|
| **Debt hedge** | | | | | |
| **Assets** | | | | | |
| Swap CDI vs. Fixed (US$) | R$ | 8,722,620 | 950,000 | 119,178 | 22,525 |
| Swap LIBOR vs. Fixed (US$) | US$ | 2,757,143 | 19,841 | - | 65,517 |
| **Subtotal** | | | | 119,178 | 88,042 |
| | | | | | |
| **Liabilities** | | | | | |
| Swap CDI vs. Fixed (US$) | US$ | 2,402,110 | 291,725 | (972,319) | (44,087) |
| Swap LIBOR vs. Fixed (US$) | US$ | 2,757,143 | 19,841 | (170,707) | (66,634) |
| **Subtotal** | | | | (1,143,026) | (110,721) |
| | | | | | |
| **Total swap agreements** | | | | (1,023,848) | (22,679) |
| | | | | | |
| **Cash flow** | | | | | |
| Zero-cost collar (US$ vs. R$) | US$ | 3,040,000 | 1,485,000 | (134,814) | 25,822 |
| Swap Fixed (US$) vs. CDI | US$ | - | 50,000 | - | 5,356 |
| NDF (R$ x US$) | US$ | 150,000 | - | 17,036 | - |
| Swap Bunker | US$ | 5,344 | - | (1,140) | - |
| Swap CDI x Fixed (US$) | US$ | - | 50,000 | - | (2,485) |
| **Subtotal** | | | | (118,918) | 28,693 |
| | | | | | |
| **Total in derivatives** | | | | (1,142,766) | 6,014 |

**Suzano Papel e Celulose S.A.**
Notes to the Standardized Financial Statements
At December 31, 2018
*In thousands of Brazilian reais (R$), unless otherwise indicated*



### d) Settled derivatives

In the year ended December 31, 2018 and 2017, the consolidated positions of settled derivatives were as follows:

|  | Cash paid / Received amount | |
|---|---|---|
| **Consolidated** | **12/31/2018** | **12/31/2017** |
| **Cash flow** | | |
| **Exchange hedge** | | |
| Zero-cost collar (R$ vs. US$) | **(110,271)** | 28,159 |
| NDF (R$ vs. US$) | **(1,235,448)** | 11,110 |
| NDF (MXN vs. US$) | **-** | 39 |
| **Subtotal** | **(1,345,719)** | 39,308 |
| **Commodity hedge** | | |
| Bunker (oil) | **-** | 2,631 |
| **Subtotal** | **-** | 2,631 |
| **Debt hedge** | | |
| **Exchange hedge** | | |
| Swap CDI vs. Fixed (US$) | **19,145** | 78,411 |
| Swap Fixed (US$) vs. CDI | **-** | (8,809) |
| Swap CDI vs. Libor (US$) | **-** | (162,769) |
| **Subtotal** | **19,145** | (93,167) |
| **Interest hedge** | | |
| Swap LIBOR vs. Fixed (US$) | **(4,939)** | (2,588) |
| Swap Coupon vs. Fixed (US$) | **-** | 15,824 |
| **Subtotal** | **(4,939)** | 13,236 |
| **Total in derivatives** [a] | **(1,331,513)** | (37,992) |

[a] On December 31, 2018, there was a payment of the derivative premium in the amount of R$ 254,902 and on December 31, 2017 there was a receipt of R$ 77,687 of unhedged options and, therefore, are not presented in the table above.

### 4.6    Capital management

The main objective of Company's capital Management is to ensure and maintain a solid credit rating, in addition to mitigating risks that may affect capital availability in business development.

The Company monitors constantly significant indicators, such as: