# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SUZANO S.A., <br><br>　　　　　Plaintiff, <br><br>　　v. <br><br>UNITED STATES, <br><br>　　　　　Defendant, <br><br>　　and <br><br>DOMTAR CORPORATION, <br><br>　　　　　Defendant-Intervenor. | Before: Gary S. Katzmann, Judge <br> Court No. 21-00069 <br><br> *PUBLIC VERSION* |

## OPINION AND ORDER

[The court grants Plaintiff's motion for judgment on the agency record and remands to Commerce for further proceedings consistent with this opinion.]

　　　　　　　　　　　　　　　　　　　　　　　　　　　　Dated: August 16, 2022

Craig A. Lewis, Hogan Lovells US LLP, of Washington, D.C., argued for Plaintiff Suzano S.A., Ltd. With him on the briefs was Nicholas W. Laneville.

Antonia R. Soares, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States. With her on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Tara K. Hogan, Assistant Director. Of counsel on the brief was Kirrin Hough, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Daniel L. Schneiderman, King & Spalding, LLP, of Washington, D.C., argued for Defendant-Intervenor Domtar Corporation. With him on the brief were Stephen J. Orava.

　　Katzmann, Judge: To what extent does 19 U.S.C. § 1677b(f)(1)(A) give the U.S. Department of Commerce ("Commerce") license to rely upon (or not) the records of a producer or exporter where those records comply with one but not both of the statutory requirements for costs

calculation? Does reliance on an audited source preclude reliance on the producer or exporter's unaudited records? What evidence is sufficient basis to conclude that an expense is not extraordinary? These are some of the questions raised by Suzano S.A.'s (formerly known as Suzano Papel e Celulose S.A.) ("Suzano") appeal of the final results of Commerce's 2018–2019 administrative review of the antidumping duty order on uncoated paper from Brazil. Certain Uncoated Paper From Brazil: Final Results of Antidumping Duty Administrative Review; 2018–2019, 86 Fed. Reg. 7,254 (Dep't Commerce, Jan. 27, 2021) (P.R. 170) ("Final Results").

Suzano, a fully-integrated paper manufacturer located in Brazil, brings this action against the United States ("the Government") to challenge Commerce's calculation of its cost of production. Specifically, Suzano argues that Commerce erred by failing to exclude certain of its derivative expenses from the cost of production calculation as both (1) investment-related and (2) extraordinary. The court concludes that Commerce's decision to include the derivative expenses in Suzano's cost of production is unsupported by substantial evidence and remands for further proceedings consistent with this opinion.

**BACKGROUND**

*I.     Statutory Framework*

Under the Tariff Act of 1930, Commerce is authorized to levy antidumping duties ("ADs") on foreign goods sold in the United States for less than their fair market value. Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1046–47 (Fed. Cir. 2012). A product is sold at less than its fair market value when its export price is lower than its normal value. Saha Thai Steel Pipe (Pub.) Co., Ltd. v. United States, 635 F.3d 1335, 1338 (Fed. Cir. 2011); 19 U.S.C. § 1677b(a). Where such sales are identified, Commerce imposes ADs equal to "the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise."

Shandong Rongxin Imp. & Exp. Co. v. United States, 42 CIT __, __, 331 F. Supp. 3d 1390, 1394 (2018) (quoting 19 U.S.C. § 1673), aff'd, 779 F. App'x 744 (Fed. Cir. 2019); see 19 U.S.C. § 1677(35)(A). Normal value is, broadly speaking, the price at which the subject merchandise is sold in the exporting country. 19 U.S.C. § 1677b(a)(1)(B)(i).

The calculation of a product's normal value is governed by 19 U.S.C. § 1677b, which sets out various mandatory and permissible conditional adjustments. One such adjustment is described in 19 U.S.C. § 1677b(b)(1), which provides that:

> If the administering authority determines that sales made at less than the cost of production—
>
> > (A) have been made within an extended period of time in substantial quantities, and
> >
> > (B) were not at prices which permit recovery of all costs within a reasonable period of time,
>
> such sales may be disregarded in the determination of normal value. Whenever such sales are disregarded, normal value shall be based on the remaining sales of the foreign like product in the ordinary course of trade. If no sales made in the ordinary course of trade remain, the normal value shall be based on the constructed value of the merchandise.

Cost of production ("COP") is in turn described by 19 U.S.C. § 1677b(b)(3), which provides that COP is equal to the sum of (1) the cost of "materials and . . . fabrication or other processing," (2) "selling, general, and administrative expenses," and (3) "the cost of all containers and coverings" required for sale and shipment. 19 U.S.C. § 1677b(b)(3)(A)–(C).

Relevant here, the statute provides the following additional rules for Commerce's calculation of COP:

> Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise. The administering authority shall consider all

>available evidence on the proper allocation of costs, including that which is made available by the exporter or producer on a timely basis, if such allocations have been historically used by the exporter or producer, in particular for establishing appropriate amortization and depreciation periods, and allowances for capital expenditures and other development costs.

19 U.S.C. § 1677b(f)(1)(A).

### II. Past Practice

Beyond the specific requirements of the statute, Commerce's practice has been to exclude both "investment-related" and "extraordinary" expenses from its calculation of COP. With respect to investment-related expenses, Commerce has stated that its practice is "to exclude . . . investment-related gains or losses from the calculation of COP" while nevertheless "includ[ing] gains and losses attributable to derivative transactions related to a company's overall cash management in the calculation of financial expenses." Mem. from J. Maeder to J. Kessler re Phosphor Copper from the Republic of Korea: Issues and Decision Mem. for the Final Results of Antidumping Duty Admin. Rev.; 2016–2018 at 23 (Dep't Commerce Dec. 13, 2019) (on file with the Int'l Trade Admin.) (citations omitted) ("Phosphor Copper from Korea"); see also AG der Dillinger Hüttenwerke v. United States, 45 CIT __, __, 532 F. Supp. 3d 1338, 1344 (2021) (noting Commerce's "practice [is] to exclude investment-related gains and losses from the calculation of the cost of production because it considers them a separate profit-making activity unrelated to a company's normal operations") (citation omitted).

With respect to extraordinary expenses, Commerce has stated that it "will exclude expenses deemed 'extraordinary' if they pertain to an event which is 'unusual in nature and infrequent in occurrence.'" Mem. from J. Maeder to G. Taverman re Issues and Decision Mem. for the Final Aff. Determ. in the Less-Than-Fair-Value Investigation of Carbon and Alloy Steel Wire Rod from Spain at 16 (Dep't Commerce Mar. 19, 2018) (on file with the Int'l Trade Admin.) (citations

omitted) ("Wire Rod from Spain"); *see also* Hornos Electricos de Venezuela v. United States, 27 CIT 1522, 1534 (2003) ("To be considered an 'extraordinary' event giving rise to extraordinary treatment . . . the event must be unusual in nature and infrequent in occurrence.") (quoting Floral Trade Council v. United States, 16 CIT 1014, 1016 (1992)).  An event is "unusual in nature" if it is "highly abnormal, and unrelated or incidentally related to the ordinary and typical activities of the entity, in light of the entity's environment." Wire Rod from Spain at 16.  Separately, "an event is 'infrequent in occurrence' if it is not reasonably expected to recur in the foreseeable future." Id.

### III. *Factual Background*

On March 3, 2016, Commerce issued an AD order covering certain uncoated paper from Brazil. Certain Uncoated Paper from Australia, Brazil, Indonesia, the People's Republic of China, and Portugal: Am. Final Aff. Antidumping Determ. for Brazil and Indonesia and Antidumping Duty Orders, 81 Fed. Reg. 11,174 (Dep't Commerce Mar. 3, 2016) ("AD Order").  Suzano was one of two Brazilian producers specifically identified in the order. Id.; Pl.'s Corrected Mem. of Pts. and Auths. in Supp. of Rule 56.2 Mot. for J. on the Agency R. at 5, Nov. 12, 2021, ECF No. 36 ("Pl.'s Br.").  On May 29, 2019, Commerce initiated its third administrative review of the AD Order covering the period from March 1, 2018, through February 28, 2019. Initiation of Antidumping and Countervailing Duty Admin. Reviews, 84 Fed. Reg. 24,747 (Dep't Commerce May 29, 2019) (P.R. 12).

In March 2018, the first month of the review period, Suzano announced its intention to acquire Fibria Celulose S.A. ("Fibria"), the "world's largest producer of eucalyptus pulp." Pl.'s Br. at 2; see Letter from Steptoe & Johnson to the U.S. Dep't of Commerce re Antidumping Duty Investigation of Certain Uncoated Paper from Brazil: Suzano's Resp. to Questionnaire for Section A at Ex. A-17 p.1 (July 26, 2019) (P.R. 28, 35-38; C.R. 2, 31-34) ("Initial Section A Resp.").  In

January 2019, shortly before the close of the review period, Suzano acquired a 100% ownership stake in Fibria, and in April 2019, after the close of the review period, the acquisition received formal shareholder approval and the two companies merged.  Id.  Throughout 2018, Suzano secured numerous loans and credit facilities in anticipation of its acquisition of Fibria.  Id. at 8.  Relevant here, Suzano also acquired numerous derivatives in the months leading up to the acquisition to protect itself against adverse exchange rate fluctuations.  See Letter from Steptoe & Johnson LLP to Sec'y Commerce, re Antidumping Duty Investigation of Certain Uncoated Paper from Brazil:  Suzano's Resp. to Questionnaire for Section D at D-31, D-38–39, and Exs. D-19 & D-19a (Aug. 21, 2019) (P.R. 79–80; C.R. 154–156) ("Initial Section D Resp.").

On July 1, 2019, Commerce issued an initial questionnaire to Suzano in which it requested that Suzano calculate its financial expense ratio and submit its supporting financial records.  Letter from Matthew Renkey, Acting Program Manager, Off. V, AD/CVD Operations, to Steptoe & Johnson LLP at D-15 (Dep't Commerce July 1, 2019) (P.R. 13) ("Initial Questionnaire").  A producer's financial expense ratio is calculated by dividing the producer's full-year net financial expenses by the producer's full-year cost of goods sold.  See Union Steel Mfg. Co. v. United States, 36 CIT 717, 722 n.2 (2012).  Commerce then uses the producer's financial expense ratio to calculate its COP, which in turn allows Commerce to accurately determine an antidumping margin.  Initial Questionnaire at D-15.

On August 21, 2019, Suzano calculated its combined financial expense ratio based on consolidated 2018 financial statements for both Suzano and Fibria.  Initial Section D Resp. at D-30–31.  Suzano's calculation included its derivative losses in the numerator of the financial expense ratio, and combined the cost of sales of both companies in the denominator, resulting in a financial expense ratio of [[     ]] percent.  Id. at Ex. D-19 p.3.

On February 14, 2020, Commerce instructed Suzano to recalculate its financial expense ratio based on the audited 2018 consolidated financial statements of Suzano alone, in order to reflect the required highest level of consolidation. Letter from Robert Galantucci, Program Manager, Off. V, Enforcement & Compliance, to Steptoe & Johnson LLP re Suppl. Questionnaire for Section D at 3 (Dep't Commerce Feb. 14, 2020) (P.R. 117; C.R. 199) ("Suppl. Section D Questionnaire"). In response, on February 26, 2020, Suzano submitted two revised calculations of its financial expense ratio and requested that Commerce adopt the latter calculation. Letter from Steptoe & Johnson LLP to Sec'y Commerce, re Antidumping Duty Investigation of Certain Uncoated Paper from Brazil: Suzano's Suppl. Section D Questionnaire Resp. at Ex. SD-2 (Feb. 26, 2020) (P.R. 121; C.R. 221) ("Suppl. Section D Resp."). The first calculation relied solely on the audited 2018 consolidated financial statements, resulting in a financial expense ratio of [[ ]] percent. Suppl. Section D Resp. at Ex. SD-2. The second calculation relied on both the audited 2018 consolidated financial statements and Suzano's unaudited quarterly reports. Id.; see also Initial Section D Resp. at Exs. 19, 19a. Since the unaudited quarterly reports explicitly associate Suzano's derivative losses with the Fibria acquisition, thus excluding the losses from normal operations, this second calculation resulted in a financial expense ratio of [[ ]] percent. Suppl. Section D Resp. at Ex. SD-2.

On March 27, 2020, Commerce published the preliminary results of its review. Certain Uncoated Paper from Brazil, 85 Fed. Reg. 18,550 (Dep't Commerce, April 2, 2020) ("Preliminary Results"). In the Preliminary Results, Commerce relied upon the first of Suzano's proposed financial expense ratio calculations from its revised February 26, 2020 response. Mem. from J. Maeder to J. Kessler re Decision Mem. for the Prelim. Results of the Admin. Review of the Antidumping Duty Order: Certain Uncoated Paper from Brazil; 2018–2019 at 2 (Dep't Commerce

Mar. 27, 2020) (P.R. 131) ("PDM"). On January 27, 2021, Commerce published the final results of its administrative review. Final Results. In its Final Results, Commerce again relied upon Suzano's first revised expense ratio, noting that it was obligated to "rely on the findings of Suzano's auditors and not exclude a portion of Suzano's financial expenses from [its] calculations." Mem. from J. Maeder to J. Kessler re Issues and Decision Mem. for the Final Results of the 2018–2019 Admin. Rev. of the Antidumping Order on Certain Uncoated Paper from Brazil at 5 (Dep't Commerce Jan. 19, 2021) (P.R. 167) ("IDM"). Commerce thus declined to use of Suzano's second revised expense ratio calculated using both the audited 2018 consolidated financial statements and Suzano's unaudited quarterly reports. Id. Commerce similarly declined to exclude the derivative losses, or to include Fibria's cost of sales in the ratio's denominator. Id. Consequently, Commerce held Suzano to a financial expense ratio of [[       ]] percent and calculated a weighted-average dumping margin of 32.31%. Id.; Final Results at 7,254.

## IV. *Procedural History*

On February 24, 2021, Suzano initiated this appeal to contest Commerce's Final Results. Summons, ECF No. 1; Compl., Mar. 3, 2021, ECF No. 9. On March 23, 2021, Domtar Corporation ("Domtar"), a domestic producer of products similar to the subject merchandise, joined the action as a defendant-intervenor. Consent Mot. to Intervene as a Matter of Right, Mar. 22, 2021, ECF No. 14; Order, ECF No. 18. On July 16, 2021, Suzano filed a motion for judgment on the agency record, arguing that Commerce's failure to exclude certain of its derivative losses from its calculation of the financial expense ratio was unsupported by substantial evidence and otherwise not in accordance with law. Pl.'s Br. at 1, 8–10. On September 16, 2021, the Government filed its response in opposition to Suzano's motion. Def.'s Resp. in Opp. to Pl.'s Mot. for J. on the Agency R., ECF No. 26 ("Def.'s Br."). On September 29, 2021, Domtar likewise submitted a

response in opposition. Def.-Inter.'s Resp. in Opp. to Pl.'s Mot. For J. on the Agency R., Sept. 29, 2021, ECF No. 27 ("Def.-Inter.'s Br."). Suzano replied on November 1, 2021. Reply of Suzano S.A. in Supp. of Rule 56.2 Mot. for J. on the Agency R., ECF No. 31. Oral argument was held on April 26, 2022, in advance of which the parties submitted written responses to questions issued by the court. Oral Arg., ECF No. 52; Pl.'s Resps. to Ct.'s Qs. in Adv. of Oral Arg., Apr. 21, 2022, ECF No. 48 ("Pl.'s OAQ Resps."); Def.-Inter.'s As. to Qs., Apr. 21, 2022, ECF No. 49 ("Def.-Inter.'s OAQ Resps."); Def.'s Resps. to the Ct.'s Oral Arg. Qs., Apr. 21, 2022, ECF No. 50 ("Def.'s OAQ Resps."). Following argument, on May 3, 2022, the parties each submitted a supplemental brief. Def.-Inter.'s Post. Arg. Submission, ECF No. 53; Pl.'s Post-Oral Arg. Suppl. Submission, ECF No. 54; Def.'s Post-Arg. Br., ECF No. 55.

**JURISDICTION AND STANDARD OF REVIEW**

The Court has jurisdiction over any "final determination . . . by the administering authority or the Commission under [19 U.S.C. § 1675]" pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(iii). As has been noted, at issue here is the appeal of Commerce's final determination in the third administrative review of the AD order on certain uncoated paper from Brazil, issued under 19 U.S.C. § 1675(a)(1). Final Results. Such appeal is within the jurisdiction of the court.

In assessing appeals of final AD determinations, the Court shall hold unlawful any determination by Commerce that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). A reasonable mind requires a "rational connection between

the facts found and the choice made." Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962). If a determination is not supported by substantial evidence, the court will hold the determination unlawful. Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1559 (Fed. Cir. 1984).

To support its determination by substantial evidence, Commerce "must take into account whatever in the record fairly detracts from" the weight of the evidence. CS Wind Vietnam Co. v. United States, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting Gerald Metals, Inc. v. United States, 132 F.3d 716, 720 (Fed. Cir. 1997)). This includes "contradictory evidence or evidence from which conflicting inferences could be drawn." Universal Camera, 340 U.S. at 487. A determination will be upheld if it is "reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusion," so long as that evidence is adequately considered. Alloy Piping Prods., Inc. v. United States, 26 CIT 330, 333 (2002) (citation omitted). Conversely, "[a]n administrative determination is inadequate when the agency 'entirely failed to consider an important aspect of the problem.'" Diamond Sawblades Mfrs.' Coal. v. United States, 41 CIT __, __, 219 F. Supp. 3d 1368, 1375 (2017) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

Although Commerce is not required to address all the evidence submitted, the court has previously held that Commerce must address any arguments made by the parties that are material to Commerce's determination. Itochu Bldg. Prods., Co., Inc. v. United States, 40 CIT __, __, 163 F. Supp. 3d 1330, 1337 (2016). An argument is material if it is a "focal point" of a party's argument or if a final determination cannot be "sufficiently reviewed without specific discussion of the issue." Asociacion Colombiana de Exportadores de Flores v. United States, 12 CIT 1174, 1177 (1988).

**DISCUSSION**

The primary question raised by this case is whether Suzano's audited 2018 consolidated financial statements constitute substantial evidence that Suzano's derivative expenses were neither investment-related nor extraordinary. Suzano claims that they do not, arguing first that its unaudited quarterly reports provide substantial evidence that the derivative expenses were investment-related, and second that Commerce's failure to consider evidence of the derivative expenses' extraordinary nature rendered its administrative review determination unsupported. The court concludes that by failing to adequately address the record evidence, Commerce did not support its determination with substantial evidence. Accordingly, the Final Results are remanded.

### I. *Commerce's Determination that the Derivative Expenses were Not Investment-Related was Unsupported by Substantial Evidence.*

In its Final Results, Commerce treated Suzano's derivative losses as financial expenses rather than investment-related expenses incurred due to the Fibria acquisition. IDM at 4–5. In so doing, Commerce "rel[ied] on the findings of Suzano's auditors," whom it concluded categorized the derivative losses as financial expenses broadly. Id. at 5 (citing Initial Section A Resp. at Ex. A17). While Commerce acknowledged its practice of "exclud[ing] . . . investment-related gains or losses from the calculation of [COP]," it described Suzano's derivative expenses as "capital management mechanisms" distinct from the separate profit-making investment activity at issue in Phosphor Copper and similar investigations. Id.

Suzano argues that Commerce erred by concluding the contested derivative expenses were "part of the 'overall cash management' and 'normal business' of Suzano" rather than excludable investment-related expenses. Pl.'s Br. at 15. In particular, Suzano contends that Commerce impermissibly disregarded record evidence "demonstrating the investment-related nature of the expenses." Id. The Government and Domtar disagree, alleging that Commerce properly included

the expenses in Suzano's financial expense ratio upon adopting the auditors' characterization in Suzano's GAAP-compliant audited financial statements. Def.'s Br. at 2; Def.-Inter.'s Br. at 7.

Because Commerce failed to adequately consider Suzano's unaudited quarterly reports, its determination that Suzano's derivative losses were not investment-related is unsupported by substantial evidence. As noted above, Commerce is obligated to consider anything in the record that reasonably detracts from the substantiality of the evidence supporting its determination. CS Wind Vietnam, 832 F.3d at 1373. Failure to do so renders Commerce's final determination unsupported by substantial evidence. Id., see also Diamond Sawblades, 219 F. Supp. 3d at 1375. In this case, Suzano's quarterly reports explicitly separated the incurred expenses related to the Fibria acquisition, including derivative losses. See Initial Section D. Resp. at D-31, Ex. D-19a. Commerce's consideration of these reports, however, was limited to the following two sentences:

> . . . Suzano bases its arguments on its own quarterly earnings releases to show that certain derivatives were related to the cash requirements of the acquisition of Fibria. We agree with the petitioners that we should rely on the findings of Suzano's auditors and not exclude a portion of Suzano's financial expenses from our calculations.

IDM at 5. This brief dismissal does not amount to "consideration" of the record evidence suggesting that the contested derivative losses were incurred in the course of the Fibria acquisition and were therefore investment-related.

While "there is no statutory requirement that . . . [Commerce] explicitly discuss every piece of record evidence that is put before it," Def.'s Br. at 19 (quoting Allegheny Ludlum Corp. v. United States, 24 CIT 452, 479 (2000)), Commerce is nevertheless required to discuss "issues material to [its] determination," Itochu, 164 F. Supp. 3d at 1338 (quoting Timken U.S. Corp. v. United States, 421 F.3d 1350, 1355 (Fed. Cir. 2005)). This obligation ensures, in part, that Commerce's treatment of material issues is reviewable. See, e.g., NMB Singapore Ltd. v. United

States, 557 F.3d 1316, 1319 (Fed. Cir. 2009) (citing Motor Vehicle Mfrs., 463 U.S. 29, 43) ("Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court."). Here, Commerce's decision to rely on Suzano's audited financial statements while disregarding its unaudited quarterly reports materially affected Suzano's calculated COP, and thus the applicable AD margin, by altering the applicable financial expense ratio. IDM at 6. Commerce was therefore obligated to explicitly discuss that decision, and failed to satisfy its obligation.

Although the Government contends that Commerce "considered the quarterly earnings reports, [but] determined that section 1677b(f)(1)(A) required it to 'rely on the findings of Suzano's auditors'" because only the latter documents were GAAP-compliant, such a determination is not present in the text of the IDM and therefore cannot be reviewed. Def.'s Br. at 18; IDM at 5; see Itochu, 163 F. Supp. 3d at 1337 ("Further, the Court may not accept 'post hoc rationalizations for agency action' and may only sustain the agency's decision 'on the same basis articulated in the order by the agency itself.'") (quoting Burlington Truck Lines, 371 U.S. at 168–69). Even if it were, it misconstrues the statutory requirements. "[S]tatute requires [a producer's] records be used if they are kept in accordance with [GAAP] and reasonably reflect the costs associated with the production and sale of the merchandise," not if they are GAAP-compliant alone. Am. Silicon Techs. v. United States, 261 F.3d 1371, 1380 (Fed. Cir. 2001) (emphasis added). Indeed, even if a specific set of records are GAAP-compliant, Commerce may still "reject the records if accepting them would distort the company's true costs." Id. at 1377 (citation omitted). Here, Commerce made no determination as to the representativeness (or not) of the audited financial statements when choosing to rely on them to the exclusion of Suzano's quarterly reports. Thus, to the extent Commerce did attempt to explain its exclusive reliance on Suzano's

audited financial statements by their compliance with Brazilian GAAP, such explanation is insufficient.

Furthermore, as Suzano notes, there is no indication that Commerce's reliance on the "findings of Suzano's auditors" precluded Commerce from also considering the unaudited quarterly reports. Pl.'s Reply at 12–13. In fact, 19 U.S.C. § 1677b(f)(1)(A) requires Commerce to "consider all available evidence on the proper allocation of costs, including that which is made available by the exporter or producer on a timely basis, if such allocations have been historically used by the exporter or producer." Here, the evidence "made available by the exporter or producer" includes the quarterly reports -- documents that were prepared by Suzano in the course of the review period and directly address the allocation of costs. Nor are the two documents in opposition such that consideration of both would be impossible: rather, the audited financial statements include an explanatory note indicating that over half of Suzano's derivative expenses were directly associated with the Fibria acquisition, and not Suzano's cash management. Compare Initial Section A Resp. at Ex. A-17 p.61 with Initial Section D Resp. at Ex. D-19a p.11.

Accordingly, because Commerce did not explain its material decision to rely on Suzano's audited financial statements while disregarding its quarterly reports, and because any explanation given fails to satisfy Commerce's statutory obligations, Commerce's determination that the contested derivative losses were not investment related must be remanded for further explanation and consideration of the record evidence.

### II. *Commerce's Determination that the Derivative Expenses were Not Extraordinary was Unsupported by Substantial Evidence.*

Addressing Suzano's argument that its derivative losses were extraordinary and thus excludable from the financial ratio calculation, Commerce stated:

> [W]e disagree with Suzano's claim that these derivative expenses are extraordinary and stem from an isolated event. In [the AD administrative review of Certain Orange Juice from Brazil] Commerce did not exclude similar expenses as extraordinary because the respondent's financial statements did not classify the expenses as extraordinary. Here, the auditors who issued an unqualified opinion on Suzano's financial statements did not classify the derivative expenses as extraordinary.

IDM at 5 (citing Mem. from E. Yang to R. Lorentzen re Issues and Decision Mem. for the Antidumping Duty Admin. Rev. on Certain Orange Juice from Brazil – March 1, 2008 through February 28, 2009 at 31–33 (Dep't Commerce Aug. 11, 2010) (on file with the Int'l Trade Admin.) ("OJ from Brazil"). Accordingly, Commerce did not exclude the derivative losses as extraordinary.

Suzano now contends that Commerce erred by concluding the contested derivative expenses were not extraordinary. Pl.'s Br. at 26–27. Suzano argues specifically that (1) the fact that the audited financial statements did not classify the derivative expenses as extraordinary is not dispositive, and (2) the record evidence clearly demonstrates that Suzano's acquisition of Fibria was unusual and would not recur. Id. at 29–30. The Government and Domtar disagree, contending that Commerce properly included the expenses in Suzano's financial expense ratio because the audited financial statements do not classify the expenses as extraordinary. Def.'s Br. at 20–23; Def.-Inter.'s Br. at 4.

The court concludes that Commerce has not supported its inclusion of the derivative losses by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera, 340 U.S. at 477. As Suzano notes, "costs that are not categorized as extraordinary on the financial statements are not precluded from being considered unforeseen and extraordinary by [Commerce] in its analysis of costs for exclusion or inclusion in the COP." Pl.'s Br. at 27–28 (quoting Mem. from S. Claeys to D. Spooner re Issues and Decision Mem. for the

Antidumping Duty Admin. Rev. on Certain Frozen Warmwater Shrimp from Brazil – Aug. 4, 2004 through Jan. 31, 2006 at 14 (Dep't Commerce Sept. 5, 2007) (on file with the Int'l Trade Admin.) ("Frozen Shrimp from Brazil"). Rather, Commerce's determination of whether certain costs must be excluded as extraordinary remains subject to its statutory obligation to employ "a method that reasonably reflects and accurately captures all of the actual costs incurred in producing and selling the product under investigation or review." Am. Silicon Techs., 261 F.3d at 1377 (citing Agreement on Implementation of Article VI of the GATT, 834–35, reprinted in 1994 U.S.C.C.A.N. at 4172); see also 19 U.S.C. § 3511(a). Applying this principle, the court has previously upheld findings of extraordinary costs, even where the exporters' financial statements failed to categorize the costs accordingly, where "[b]lind adherence to the accounting methods chosen by respondents would not yield a result properly reflective of costs." See, e.g., Floral Trade Council of Davis, Cal. v. United States, 16 CIT 1014, 1017 (1992) (finding that expenses incurred by Colombian flower farmers following unusual and infrequently-occurring floods and viral attacks were properly categorized as extraordinary). Taken alone, the fact that "the auditors who issued an unqualified opinion on Suzano's financial statements did not classify the derivative expenses as extraordinary" is therefore not a reasonable basis for Commerce's conclusion that the expenses were indeed not extraordinary. IDM at 5.

Nor is the determination relied upon by Commerce, Certain OJ from Brazil, analogous to the facts of this case. There, Brazilian exporter Fischer argued that its exchange variation expenses resulting from fluctuations in the exchange rate following the 2008 financial crisis -- an event which "both was unforeseen and . . . not reasonably expected to recur" -- should properly be categorized as extraordinary. Certain OJ from Brazil at 30. Contrary to Commerce's characterization in the Suzano IDM, Commerce rejected Fischer's argument in Certain OJ from

Brazil because (1) Fischer's exchange variation expenses "occur annually," (2) the expenses were not classified as extraordinary in Fischer's audited financial statements, and (3) "the absolute amount of exchange variation . . . is substantially smaller in this review than in the prior segment." Id. at 32. This approach does not amount to Commerce's inclusion of allegedly extraordinary expenses solely "because the respondent's financial statements did not classify the expenses as extraordinary." IDM at 5. Furthermore, while Suzano's derivative losses were not explicitly deemed extraordinary by its audited financial statements, and while Suzano may regularly incur some derivative losses, the losses allegedly tied to the Fibria acquisition are undisputedly much larger than previously reported annual losses. See Initial Section A Resp. at Ex. A-17. In fact, the derivative expenses allegedly related to the Fibria acquisition were more than one and a half times the sum of Suzano and Fibria's total expenses for the preceding year. Initial Section D Resp. at Ex. D-19. Certain OJ from Brazil is thus inapposite and does not adequately support Commerce's conclusion that Suzano's derivative losses are unextraordinary.

Furthermore, Commerce failed to address the record evidence supporting Suzano's argument that the derivative losses constitute an extraordinary expense. As previously discussed, Commerce is obligated to discuss "issues material to [its] determination," Itochu, 164 F. Supp. 3d at 1338 (quoting Timken, 421 F.3d at 1355), and must "must take into account whatever in the record fairly detracts from" its conclusion, CS Wind Vietnam, 832 F.3d at 1373 (quoting Gerald Metals, 132 F.3d at 720). Here, the record contains evidence linking the derivative expenses to the Fibria acquisition, including the quarterly reports addressed above. Initial Section D Resp. Ex. D-19a at p.11. Furthermore, even the audited financial reports relied upon by Commerce note that "the year 2018 was an atypical one for Suzano, given the start of the process that led to the integration with Fibria" and state that Suzano's "net financial expense[s] stood at R$1.0 billion,"

for 2018, "up 14.0% from 2017, driv[en] by all the expenses [of] financing the business combination with Fibria." Id. at 7, 10, see also Pl.'s Br. at 29–30.

Because Commerce did not support its categorization of the contested derivative losses by "such relevant evidence as a reasonable mind might accept as adequate," Universal Camera, 340 U.S. at 477, and because it failed to consider the record evidence which reasonably detracted from its conclusion, Commerce's determination that the derivative losses were unextraordinary must be remanded for further explanation and review.

## CONCLUSION

For the reasons stated, it is hereby

**ORDERED** that Suzano's motion for judgment on the agency record is granted; and it is further

**ORDERED** that Commerce's inclusion of Suzano's derivative expenses in its cost of production calculation is remanded to Commerce for further explanation and consideration of the record evidence, and if appropriate, reconsideration of the costs analysis pursuant to 19 U.S.C. § 1677b(f)(1)(A); and it is further

**ORDERED** that Commerce shall file with this court and provide to the parties its remand results within 90 days of the date of this order; and it is further

**ORDERED** that the deadlines provided by USCIT Rule 56.2(h) shall govern thereafter.

/s/    *Gary S. Katzmann*
Judge

Dated: <u>August 16, 2022</u>
New York, New York