UNITED STATES COURT OF INTERNATIONAL TRADE
NEW YORK, NEW YORK

BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE

—————————————————————————

SUZANO S.A. (FORMERLY KNOWN AS
SUZANO PAPEL E CELULOSE S.A.),

      Plaintiff,

      v.

UNITED STATES,

      Defendant.

—————————————————————————

Case No. 21-00069

**PUBLIC DOCUMENT**

**PLAINTIFF'S COMMENTS IN OPPOSITION TO
THE U.S. DEPARTMENT OF COMMERCE'S FINAL RESULTS OF
REDETERMINATION PURSUANT TO COURT REMAND**

Craig A. Lewis, Esq.
Nicholas W. Laneville, Esq.
Cayla D. Ebert, Esq.

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone:  +1.202.637.5600
Fax:  +1.202.637.5910

*Counsel to Suzano S.A.*

December 14, 2022

## TABLE OF CONTENTS

I.    BACKGROUND ................................................................................................1

II.   SUZANO'S AUDITED FINANCIAL STATEMENTS AND QUARTERLY
      EARNINGS RELEASES CLEARLY TIE THE DERIVATIVE LOSSES AT
      ISSUE TO THE FIBRIA ACQUISITION ............................................................4

III.  THE DERIVATIVE LOSSES RELATED TO THE FIBRIA ACQUISITION
      ARE "INVESTMENT-RELATED"......................................................................6

      A.    The Existence of Suzano's Hedging Policy Does Not Preclude Using
            Separate Derivative Transactions for Specific Investments ........................6

      B.    The Acquisition of an Entire Company is Not a Mere "Expansion"
            But is the Quintessential Example of an Investment Activity....................8

IV.   THE FIBRIA-RELATED DERIVATIVE EXPENSES ARE
      EXTRAORDINARY AND NOT PART OF SUZANO'S NORMAL
      OPERATIONS ................................................................................................13

V.    CONCLUSION................................................................................................19

# TABLE OF AUTHORITIES

## Cases

*Am. Silicon Techs. v. United States*, 261 F. 3d 1371 (Fed. Cir. 2001).......................................... 2

*Corus Engineering Steels Ltd. v. United States*, 27 CIT 1286 (2003) ........................................ 11

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474 (1951) ..................................................... 3, 13

## Statutes

19 U.S.C. § 1677b(f)(1)(A)................................................................................................... 17, 18

## Administrative Materials

*Carbon and Alloy Steel Wire Rod from Spain*, 83 Fed. Reg. 13,233 (Dep't Commerce Mar. 28, 2018) (final determination of sales at less than fair value and final determination of critical circumstances) and accompanying Issues and Decision Memorandum ...................... 15

*Certain Pasta from Italy*, 70 Fed. Reg. 71,464 (Dep't Commerce Nov. 29, 2005) (final results of administrative review of antidumping duty order and determination to revoke in part) and accompanying Issues and Decision Memorandum.......................................... 15, 16

*Certain Softwood Lumber Products from* Canada, 67 Fed. Reg. 15,539 (Dep't Commerce Apr. 2, 2002) (final determination of sales at less than fair value) and accompanying Issues & Decision Memorandum ............................................................................... 11

*Chlorinated Isocyanurates from Spain*, 74 Fed. Reg. 50,774 (Dep't Commerce Oct. 1, 2009) (final results of administrative review of antidumping duty order) and accompanying Issues & Decision Memorandum...................................................................... 10

*Granular Polytetrafluoroethylene Resin from India*, 87 Fed. Reg. 3,722 (Dep't Commerce Jan. 25, 2022) (final determination of sales at less than fair value and final affirmative determination of critical circumstances) and accompanying Issues & Decision Memorandum ...................................................................................................................... 12

Memorandum from Kristin Leigh Case to Neal M. Halper, *Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination – Gujarat Fluorochemicals Ltd.*, Case No. A-533-899 (INV) (Aug. 25, 2021) ......................... 12

Suzano S.A. ("Suzano"), respectfully submits the following comments in opposition to the U.S. Department of Commerce's ("Commerce") November 14, 2022, *Final Results of Redetermination Pursuant to Court Remand* ("*Final Remand*"), ECF No. 60.

## I.   BACKGROUND

The *Final Remand* concerns Commerce's final results of the antidumping duty administrative review of uncoated paper from Brazil for the 2018-2019 review period.  *Certain Uncoated Paper From Brazil*, 86 Fed. Reg. 7,254 (Dep't Commerce Jan. 27, 2021) (final results of 2018-2019 administrative review) (hereinafter *Final Determination*) (P.R. 170) and accompanying Issues & Decision Memorandum (Jan. 19, 2021) (hereinafter "IDM") (P.R. 167). Suzano was a mandatory respondent in this review and was assigned a final antidumping duty margin of 32.31%.  Final Determination at 7,254 (P.R. 170).

At issue is the single question of whether Commerce properly included certain derivative losses in its calculation of Suzano's net financial expense ratio used to determine Suzano's cost of production ("COP").  As amply evidenced in Suzano's audited financial statements and in certain related quarterly earnings ("QE") releases from the period, the derivatives that generated these losses were obtained by Suzano specifically in order to finance Suzano's acquisition of Fibria Celulose S.A. ("Fibria"), a very large separate company with a distinct business.  During the review, Suzano argued that these very large derivative losses are distinguishable from other financial losses in the period and should be excluded from the financial expense ratio consistent with established agency practice.  This is because the derivatives and their associated losses are investment-related and because the expenses were also extraordinary in nature.  Commerce nevertheless included these derivative losses in the calculation of Suzano's financial expense ratio finding that they related to Suzano's "normal operations" and were part of Suzano's allegedly indistinguishable "overall cash management" activities.  IDM at Cmt. 1 (P.R. 167).  In doing so,

Commerce refused to consider the information contained in QE releases quantifying the derivative losses associated with the Fibria investment as submitted by Suzano and also failed to consider or explain the matching information contained in Suzano's audited financial statements separately identifying these same derivatives.  Commerce's further rejection of the claim that these expenses were "extraordinary" was based on the fact that the losses were not classified as "extraordinary" in Suzano's audited financial statements. *Id.* at Cmt. 1 (P.R. 167).

Suzano timely challenged Commerce's determination to this Court.  This Court agreed with Suzano, holding that Commerce's determinations were not supported by substantial evidence, and remanded this matter to Commerce to reconsider its decision.  *Suzano S.A. v. United States*, Court No. 21-00069, Slip Op. 22-95, ECF No. 56 (Ct. Int'l Trade Aug. 16, 2022).  The Court concluded that Commerce failed to adequately address or explain the agency's finding that the derivative losses at issue were indistinguishable from Suzano's overall cash management operations.  The Court recognized instead that the QE releases "explicitly separated the incurred expenses related to the Fibria acquisition, including derivatives losses" and that "the audited financial statements include an explanatory note indicating that over half of Suzano's derivative expenses were directly associated with the Fibria acquisition, and not Suzano's cash management." *Id.* at 12, 14.  In addition, the Court found that Commerce's *Final Determination* failed to adequately explain why Commerce was precluded from considering the QE releases.  *Id*. at 12. The Court held that Commerce's underlying goal must be to rely on record evidence that "reasonably reflect the costs associated with the production and sale of merchandise."  *Id.* at 13 (quoting *Am. Silicon Techs. v. United States*, 261 F. 3d 1371, 1380 (Fed. Cir. 2001)).

The Court further held that Commerce failed to support its conclusion that Suzano's derivative expenses were not "extraordinary" with "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Id.* at 15 (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951)).  The Court observed that "{t}aken alone, the fact that 'the auditors who issued an unqualified opinion on Suzano's financial statements did not classify the derivative expenses as extraordinary' is therefore not a reasonable basis for Commerce's conclusion that the expenses were indeed not extraordinary."  Suzano, Slip Op. 22-95 at 16 (quoting IDM at Cmt. 1 (P.R. 167)).  The Court also noted that "the losses allegedly tied to the Fibria acquisition are undisputedly {much} larger than previously reported annual losses." *Id.* at 17 (emphasis added).

On remand, Commerce has again without sufficient or reasonable basis found that the derivative expenses at issue are neither investment-related nor extraordinary in nature.  In doing so, the agency has attempted to change its reasoning and has made a number of new and unsupported factual findings.  As explained below, Commerce's changed reasoning is flawed and its new factual findings are neither supported by substantial evidence on the record nor in accordance with law.  Commerce's claims to the contrary notwithstanding, the derivative instruments at issue and their associated losses cannot reasonably be characterized as part of Suzano's normal "overall cash management" operations, but were instead specifically and directly related to the acquisition of Fibria, a completely distinct and unprecedented investment activity that is undeniably outside of Suzano's normal operations involving the manufacture and sale of paper.  Indeed, Suzano's auditors were careful to *separately identify and document* the amount of these derivatives instruments and the related losses in Suzano's audited financial statements (and in the related QE releases) precisely *because* these expenses are distinguishable from Suzano's derivative activities related to the company's general cash management and because the investment activities were outside of the sphere of the company's normal business operations.

3

The continued errors in Commerce's analysis requiring a second remand are further discussed below.  Commerce should be instructed to address these issues and determine a revised margin of dumping for Suzano excluding these derivative losses from Suzano's financial expense ratio.

## II.   SUZANO'S AUDITED FINANCIAL STATEMENTS AND QUARTERLY EARNINGS RELEASES CLEARLY TIE THE DERIVATIVE LOSSES AT ISSUE TO THE FIBRIA ACQUISITION

In the original *Final Determination*, Commerce incorrectly claimed that Suzano's QE releases are inconsistent with its audited financial statements in the treatment of the derivative losses.  In particular, Commerce incorrectly asserted that "the footnotes to those financial statements do not identify any derivatives related to the Fibria acquisition."  IDM at Cmt. 1 (P.R. 167).  On this basis, Commerce attempted to suggest that Suzano had not established that the derivative instruments at issue and their associated losses were separately identified and tied to the Fibria acquisition.

Although, Commerce now acknowledges and concedes (as it must) that Suzano's audited financial statements and its QE releases *are* consistent with each other, Commerce nevertheless asserts that "{w}hile the QE releases segregate Suzano's derivative losses, Suzano's audited financial statements do not segregate the losses," and therefore do not directly tie the losses to the acquisition.  *Final Remand* at 19.  Commerce further asserts, "{t}he QE releases are not audited and, as such, the classification of the derivative losses in the QE releases cannot, therefore, be assumed to be accomplished by or substantiated by Suzano's auditors."  *Id.*

Commerce's continued rejection of the quantification of the derivative losses associated with the Fibria investment reflected in the QE releases is patently unreasonable and contrary to the evidence.  As discussed above, the audited financial statements and the QE releases are completely consistent with respect to the derivative losses at issue.  Note 4.5a to Suzano's 2018 financial

statements identifies the precise balance of certain derivatives that were obtained specifically to finance the investment in Fibria as of December 31, 2018, totaling US$ 4.45 billion.  *See* Letter from Steptoe & Johnson LLP to the U.S. Department of Commerce, Case No. A-351-842 (July 26, 2019) at Ex. A-17 at p. 61 ("Initial Section A Response") (P.R. 35-38; C.R. 31-34).  This balance matches ***exactly*** to the derivative balances for the Fibria investment that are reported in the QE releases.  *See* Letter from Steptoe & Johnson LLP to the U.S. Department of Commerce, Case No. A-351-842 (Aug. 21, 2019) at Ex. D-19a at p. 12 ("Initial Section D Response") (P.R. 79-80; C.R. 154-156).  The QE releases also identify the losses specifically associated with the Fibria investment (R$ 2.217 billion) as well as the total of all derivative losses R$ 2.735 billion. *Id.* at Ex. D-19 (P.R. 79-80; C.R. 154-156) (providing at the second page of the exhibit a chart summarizing the quarterly gains and losses associated with the Fibria and non-Fibria derivatives). This total derivative loss, in turn reconciles ***exactly*** to the total derivative losses reported for the company in 2018 of R$ 2.735 billion as reported in Note 26 to Suzano's 2018 audited financial statements.  *See* Initial Section A Response at Exh. A-17 at 105 (P.R. 35-38; C.R. 31-34).

Thus, while the audited financial statements may not have broken out the Fibria-related derivative losses as the QE releases do, both reports separately identify the same balance of derivatives related to the Fibria investment that generated these losses, and both reports reconcile as to the total derivative balances and losses.  There is no daylight between the two sources.

Commerce nevertheless suggests that the QE releases are somehow unreliable as a source of information because they are not audited.  This is not reasonable and is unsupported by the record.  This argument may have held some weight had there been even minor differences or inconsistencies between the two reports forcing Commerce to choose between conflicting sources. However, as noted above, the documents are ***completely*** consistent and reconcile to each other.

Indeed, the reliability of the QE releases is substantiated by the fact that the derivative balance amounts and losses reconcile exactly. While it is Commerce's general practice to substantiate reported data by requiring respondents to reconcile that data to their audited financial statements, to our knowledge Commerce has never unreasonably insisted that every figure reported to the agency must actually be reported as such in the financial statements. Absent more, Commerce's rejection of the derivative loss amounts reported in the QE releases is unreasonable and should be rejected by the Court.

## III. THE DERIVATIVE LOSSES RELATED TO THE FIBRIA ACQUISITION ARE "INVESTMENT-RELATED"

Notwithstanding clear record evidence linking the derivative losses to the Fibria acquisition as described above, Commerce still incorrectly concludes that all of Suzano's derivative-related losses are indistinguishably related instead to the "overall cash management" operations of the company. *Final Remand* at 6-7. This finding, too, is not supported by substantial evidence on the record and is contrary to law. As discussed below, the record evidence before Commerce, viewed in the context of Commerce's established practices and policies, clearly demonstrates that the losses related to the Fibria acquisition are indeed "investment-related."

### A. The Existence of Suzano's Hedging Policy Does Not Preclude Using Separate Derivative Transactions for Specific Investments

Commerce's first argument is broad and definitional – and wrong. Commerce refers to the existence of Suzano's hedging "policy" 1/ pursuant to which Suzano may use derivative transactions to hedge its exposure to foreign currency risk as part of its overall cash management. Suzano does not deny that it may use derivatives for such purposes. Commerce, however, cites to

---

1/      Interestingly, Commerce references to the existence of this "policy" are based on Suzano's First Quarter Earnings Release – one of the very documents Commerce elsewhere rejects because it is allegedly unaudited. *See Final Remand* at 7.

this policy as proof that *every* derivative transaction engaged in by Suzano categorically relates to "overall cash management" operations of the company and therefore cannot be investment-related. *See Final Remand* at 7.   Notwithstanding the multiple uncontroverted record sources that separately identify specific derivatives (and their associated losses) as used to finance the Fibria investment, Commerce insists that all derivatives must be considered used for general cash management purposes because "Suzano has not pointed to any evidence that states that the hedging policy cited in its QE release is only used for specific purposes." *Id.* at 19.

Commerce's argument obviously proves too much.  The mere fact that Suzano may also use some derivatives as part of its general cash management operations does not logically or in any practical sense preclude the use of other derivatives for other purposes, such as to aid in the funding of an investment.  If Suzano had any burden to identify evidence that the derivatives at issue (and their associated losses) were actually used for an investment purpose rather than for general cash management purposes, Suzano has clearly overcome that burden through the multiple documents identifying exactly that.  As noted above, the audited financial statements and the QE releases both separately identify the derivatives (and associated losses) that are related to the Fibria acquisition and report them separately from other derivatives held by Suzano in this period precisely *because* the Fibria-related derivatives were *not* part of the general financial operations of the company but were instead investment-related.  This Court has already recognized these facts.  *See Suzano*, Slip Op. 22-95 at 12 ("Suzano's quarterly reports explicitly separated the incurred expenses related to the Fibria acquisition, including derivative losses.").  Had these derivatives been simply part of Suzano's overall cash management, as Commerce falsely contends, there would have been no reason for Suzano's auditors to separately identify and segregate those amounts.

Lastly, in its *Final Remand*, Commerce argues that the derivative instruments were not used for an investment, but were instead used for a mere "expansion" of Suzano's existing operations (discussed further in the following section).  Commerce contends that the investment in Fibria merely reflects the purchase of production assets.  *See Final Remand* at 22-23.  Commerce cannot have it both ways.  It cannot argue that the derivative losses are tied to a specific purpose – expansion of Suzano's existing operations – while also characterizing them as simply part of the overall cash management of the company.  Such results-oriented characterization of the derivatives is neither reasonable nor supported by substantial evidence.

**B.     The Acquisition of an Entire Company is Not a Mere "Expansion" But is the Quintessential Example of Investment Activity**

Perhaps recognizing that Commerce cannot credibly rely on the accounting treatment of the derivatives as a "hedging activity" to support its overly-simple characterization of the Fibria-related derivatives, Commerce has contrived a new argument concerning the nature of the Fibria acquisition itself.  Commerce now asserts that the acquisition of Fibria was not an investment for profit sharing purposes, but rather merely an "expansion of Suzano's pulp operations."  *Final Remand* at 6, 20-23.

Commerce is wrong.  Suzano's acquisition of Fibria was not a mere "expansion" of existing pulp facilities, but rather represented a major financial investment to acquire ***in its entirety*** a separate publicly-traded legal entity with a distinct line of business, facilities, management, and staff.  The cost to acquire Fibria – $R 37.2 billion or 3.5 times Suzano's 2017 total net sales revenue – alone indicates that this could not have simply been an expansion of Suzano's existing pulp operations.  *See* Initial Section A Response at Exh. A-17 at 21 (P.R. 35-38; C.R. 31-34) (indicating Suzano's total net sales revenue for 2017 was $R 10.5 billion).  Indeed, Suzano did not simply purchase certain production assets from Fibria for pulp manufacturing.  Suzano purchased the

entire company and all of its operations – a publicly traded corporation engaged in both the growth of renewable and sustainable forests and the production of pulp, with separate facilities, management, staff, assets and liabilities.  *See* Letter from Steptoe & Johnson LLP to the U.S. Department of Commerce, Case No. A-351-842 (Feb. 10, 2020) at Ex. SA-4a (Fibria 2017 audited financial statement) (P.R. 112; C.R. 197).  Moreover, it is uncontested that Suzano did not purchase pulp from Fibria.  *See, e.g.*, Initial Section A Response at A-1, n.1 (P.R. 28,; C.R. 2).  Indeed, Commerce tries to bolster its contrary position by offering a misleading, truncated quotation from Suzano's management report to its audited financial statements providing that "the combination of two successful and globally relevant companies effectively creates opportunities to build a future with even greater capacity."  *Final Remand* at 6 (quoting Suzano's Initial Section A Response at Ex. A-17 at "Management Report" (P.R. 35-38; C.R. 31-34).  The full statement reads:

> Concluded on January 14, 2019, the combination of two successful and globally relevant companies effectively creates opportunities to build a future with even greater capacity ***to create value and to share these accomplishments with all our related parties***.

*Id.* (emphasis added).  Commerce did not even bother to include ellipses at the end of the quote to signal that it had been truncated.  *Final Remand* at 6.  More importantly, management was not stating or even implying that production capacity for pulp manufacturing was being expanded, contrary to Commerce's implication, but that the combined companies were better positioned to bring create value and achieve success following their combination.  The distinction is important in the context of this appeal.

Commerce and the Courts not surprisingly have consistently recognized that similar transactions involving the gain or loss of ***entire companies or facilities*** are outside of a respondent's normal operations.  In fact, in its failed attempt to support its *Final Remand*, Commerce cites to a leading case that explicitly acknowledges this point.  *See Final Remand* at 9,

22 (citing *Chlorinated Isocyanurates from Spain*, 74 Fed. Reg. 50,774 (Dep't Commerce Oct. 1, 2009) (final results of administrative review of antidumping duty order) ("*Chlorinated Isocyanurates from Spain*") and accompanying Issues & Decision Memorandum at Cmt. 1). In *Chlorinated Isocyanurates from Spain*, Commerce distinguished between the limited shutdown or disposal of certain production lines or assets within a facility or entity, and the closure of an entire facility. *See Chlorinated Isocyanurates from Spain* and accompanying Issues & Decision Memorandum at Cmt. 1. Commerce considered the former "restructuring costs" to be related to the general operations of the company and included in the general and administrative expenses calculation, whereas the latter sale of an entire facility or entity was properly acknowledged to be unrelated to the company's general operations. *Id.* (stating that "the Department's practice is to exclude the closure costs"). 2/ Commerce further acknowledged that a "resulting gain or loss from the sale or disposal of an entire production facility generates non-recurring income or losses that are not part of a company's normal business operations." *Id.* (internal citation omitted). As Commerce has also admitted, companies are "in the business of producing and selling commercial goods to consumers; they are not in the business of manufacturing and selling or disposing of entire production facilities." *Id.*

Suzano agrees and submits that the same logic must apply to ***acquisitions*** of entirely separate companies. Suzano is not in the business of buying and selling entire companies and its acquisition of Fibria amounted to extraordinarily large non-recurring expenses that were entirely separate from its normal business operations (as seen by its accountants and its accounting reports discussed above). *Chlorinated Isocyanurates from Spain*, therefore, supports the ***opposite***

---

2/      Suzano submits (and Commerce does not appear to dispute) that inclusion of certain costs in G&A expenses is analogous to inclusion of certain costs (i.e., derivative losses tied to the Fibria acquisition) in respondent's financial expense ratio, as both expenses are included in the COP figures, and therefore the cases discussed herein are persuasive.

conclusion to the one drawn by Commerce—that is, Suzano's expenses related to the acquisition of an entirely separate company and must, consistent with Commerce practice, be excluded from Suzano's COP. 3/   The cost to acquire Fibria cannot reasonably be interpreted as ordinary operational costs associated with producing and selling merchandise under consideration.

Commerce also attempts to rely on *Corus Engineering Steels Ltd. v. United States* for the proposition that inclusion of "restructuring costs" in a respondent's G&A expenses has been upheld by the Court. *Final Remand* at 9 (citing *Corus Engineering Steels Ltd. v. United States*, 27 CIT 1286, 1298-1300 (2003)).   However, the facts in that case are easily distinguished. 4/   In *Corus*, the Court found that Commerce's determination to include restructuring costs resulting from the closure of a single furnace and a rolling mill (not an entire business or facility, but ***part*** of a facility) in the respondent's financial expenses was reasonable.   *Corus Engineering Steels Ltd.*, 27 CIT at 1298-1300.  In acquiring Fibria, by way of contrast, Suzano was not purchasing a single production line, or even a single facility.  Suzano was acquiring a different company in its entirety (in fact a company substantially larger than itself) with its own separate operations and facilities as described above.

After now conceding in its *Final Remand* that its reliance on *Corus* was actually "misplaced," Commerce continues to attempt to support its overly broad conclusion that all "restructuring costs" should be included in reported costs with a reference to *Granular*

---

3/      Commerce also cites to *Certain Softwood Lumber Products from Canada* in which Commerce included certain stock option redemptions related to a merger in the respondent's G&A expenses.  This is consistent with Commerce's practice of treating certain restructuring costs as G&A expenses, but does not apply here as it is distinct from the acquisition of an entire facility. *See Certain Softwood Lumber Products from* Canada, 67 Fed. Reg. 15,539 (Dep't Commerce Apr. 2, 2002) (final determination of sales at less than fair value) and accompanying Issues & Decision Memorandum at Cmt. 16.

4/      Commerce also concedes in its *Final Remand* that its reliance on *Corus* was "misplaced," yet it failed to remove its reference to and reliance on this authority.  *See Final Remand*, n. 51, 94.

*Polytetrafluoroethylene Resin from India*. *Final Remand*, n. 94 (citing *Granular Polytetrafluoroethylene Resin from India*, 87 Fed. Reg. 3,722 (Dep't Commerce Jan. 25, 2022) (final determination of sales at less than fair value and final affirmative determination of critical circumstances) and accompanying Issues & Decision Memorandum at Cmt. 5 (hereinafter "Resin from India IDM")).  The agency's determinations and memoranda in this case do not provide any clear details on the nature of the restructuring costs at issue.  It appears, however, that the costs dealt with the transfer of property as a result of a demerger.  *Id.*; *see also* Memorandum from Kristin Leigh Case to Neal M. Halper, *Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination – Gujarat Fluorochemicals Ltd.*, Case No. A-533-899 (INV) (Aug. 25, 2021).  Given that the facts of this transfer are unknown, it is unclear how this case supports Commerce's argument.   What is clear, is that the costs in *Granular Polytetrafluoroethylene Resin from India* were incurred as a ***result*** of a demerger, which Commerce determined should be included in respondent's G&A expenses based on the agency's precedent.   Resin from India IDM at Cmt. 5 ("Commerce has explained previously that restructuring costs incurred as a result of a merger . . .  are includable in a respondent's G&A expense rate calculation.").  The costs at issue here relate to the investment itself – specifically, the financing costs incurred to make the initial acquisition of a separate company, which are clearly investment-related.

In summary, Commerce's continued denial of the investment-related nature of the derivative losses incurred to acquire Fibria is not supported by substantial evidence and is contrary to law.  Commerce's determination that the acquisition of Fibria was merely an "expansion" of existing pulp production facilities is belied by the fact that Suzano purchased an entirely separate publicly traded legal entity substantially larger than itself, with distinct operations (forest assets

and pulp), management, and facilities.  Commerce's treatment of the Fibria acquisition cannot be reconciled with the agency's established practice to exclude expenses directly related to the acquisition or disposal of an entire company or facility.  Simply put, Suzano is not in the business of buying or selling companies.  It is in the business of producing paper.  Following Commerce's precedent, this matter should be remanded to Commerce to treat Suzano's acquisition of Fibria the same way it consistently treats a closure or disposal of an entire facility – as a non-recurring expense completely separate from the company's normal business operations – and therefore, an investment activity that is properly excluded from Suzano's COP for the period.

## IV.   THE FIBRIA-RELATED DERIVATIVE EXPENSES ARE EXTRAORDINARY AND NOT PART OF SUZANO'S NORMAL OPERATIONS

The Court also reversed and remanded Commerce's rejection of Suzano's claim that the Fibria-related derivative losses should be excluded from the financial ratio calculation as "extraordinary" expenses, finding that Commerce "did not support its categorization of the contested derivative losses by 'such evidence as a reasonable mind might accept as adequate.'" *Suzano*, Slip Op. 22-95 at 18 (quoting *Universal Camera Corp.*, 340 U.S. at 477).  In doing so, the Court affirmed Suzano's position that whether Suzano's auditors classified the expenses as extraordinary is not dispositive.  *Suzano*, Slip Op. 22-95 at 17.  Further, the Court treated as relevant to this question the fact that the losses tied to the Fibria acquisition were much larger than previously reported annual losses.  The Court also noted that Commerce failed to consider evidence in the audited financial reports discussing the fact that "the year 2018 was an atypical one for Suzano, given the start of the process that led to the integration with Fibria," and that "net financial expense{s} stood at R$1.0 billion," a figure that was up 14% from 2017 "driv{en} by all the expenses {of} financing the business combination with Fibria."  *Id*. at 17-18 (referencing Suzano's 2018 financial report).  Indeed, the record before the agency reflected that the acquisition

13

of Fibria was a singular activity of enormous magnitude and significance that completely altered the size, scope, and nature of the combined entity's operations.

Although Commerce now appears to accept that the auditors' classification of an event is not dispositive, Commerce continues to find that the massive acquisition of Fibria and the related losses on the derivative instruments used to finance the acquisition represent an "ordinary" part of Suzano's operations in the manufacture of paper.  At the heart of Commerce's position are several arguments discussed above concerning the nature and purpose of the derivatives at issue. Commerce takes the position generally that "a derivative is a derivative" and any adoption of a derivative is necessarily part of the company's "general cash management" operations.  As noted above, however, the mere existence of a general policy to use derivatives to hedge foreign currency exposure does not preclude finding that *specific* derivatives may have been used for a different purpose.  Commerce's position in this case unreasonably ignores the uncontested evidence that the derivatives at issue here were specifically acquired for the purpose of financing the Fibria acquisition not for "general cash management" purposes.  Despite a second bite at the apple, Commerce has failed to identify any evidence or policy that supports the agency simply blinding itself to the use that the derivatives were actually applied.

Commerce's reasoning that all derivatives are the same also leads to absurd results and is inconstant with the agency's own stated practices.  For example, even if Suzano specifically acquired currency hedges to reduce risk in a particular currency-denominated investment that currency hedge would, under Commerce's proposed rule, *ipso facto* be considered part of Suzano's ordinary operations – even if Commerce agreed that the activity being financed was unequivocally an investment (say, in a real-estate venture).  This cannot be correct and cannot be reconciled with Commerce's stated policy of evaluating whether the event at issue is "infrequent in occurrence"

and is either "abnormal" or "unrelated or incidentally related to the ordinary and typical activities of the entity, in light of the entity's environment." *Suzano*, Slip Op. 22-95 at 4-5 (quoting *Carbon and Alloy Steel Wire Rod from Spain*, 83 Fed. Reg. 13,233 (Dep't Commerce Mar. 28, 2018) (final determination of sales at less than fair value and final determination of critical circumstances) and accompanying Issues and Decision Memorandum at Cmt. 2 (citing *Certain Pasta from Italy*, 70 Fed. Reg. 71,464 (Dep't Commerce Nov. 29, 2005) (final results of administrative review of antidumping duty order and determination to revoke in part) and accompanying Issues and Decision Memorandum at Cmt. 11 ("*Certain Pasta from Italy*"))).

As discussed above, Commerce also assumes that because Fibria and Suzano both make pulp, the acquisition of Fibria merely amounts to a routine "expansion" of Suzano's paper-making business. *Final Remand* at 23. This again is inaccurate and not supported by record evidence. Fibria does more than simply manufacture pulp, including managing forestry assets. Also, notwithstanding the complementary nature of the investment in Fibria, the companies were separate legal entities and the primary businesses of the two companies remain separate. As Suzano told Commerce: "Fibria does not produce paper and its pulp is to be utilized for pulp sales, not for Suzano's papermaking operations." Suzano's Initial Section D Response at D-38–D-39 (P.R. 79-80; C.R. 154-156). Commerce attempts to rely on Suzano's management statement that "the combination of two successful and globally relevant companies effectively creates opportunities to build a future with even greater capacity" (an egregiously incomplete quotation) (*Final Remand* at 6 (citing Suzano's Initial Section A Response at Ex. A-17 at "Management Report") (P.R. 35-38; C.R. 31-34) but, this does not prove, in any form, that Suzano's acquisition of Fibria amounted to a ordinary expansion of Suzano's pre-existing business. In fact, Suzano Management's statement goes on to refer to its operations as "the world's leading producer of

eucalyptus pulp *and* Latin America's leading producer of printing & writing paper," properly characterizing the two businesses as distinct.  Suzano's Initial Section A Response at Exh. A-17 at "Management Report" (emphasis added) (P.R. 35-38; C.R. 31-34).

Commerce cites to *Certain Pasta from Italy*, to in support of its contention that "Commerce has found that expenses related to a merger are not extraordinary, even in instances where such expenses are classified as exceptional or extraordinary in a respondent's financial statements." *Final Remand* at 9 (citing *Certain Pasta from Italy* at Cmt. 11).  In that case, however, Commerce determined that certain restructuring costs, mainly incentives paid to top managers to leave the company *after the merger took place*, were not extraordinary.  *Id.* at 9; *Certain Pasta from Italy* at cmt 11.  Incentives paid to management *after* a merger of two companies are clearly distinct from costs associated with derivative instruments used to finance the actual R$37.2 billion acquisition of the world's largest pulp manufacturer.  Arguably the cost of incentives provided after the merger are part of the subsequent normal operations of running the newly formed company – but, they are not part of the investment/acquisition itself, which is what at issue here. Commerce's reliance on *Certain Pasta from Italy* is inapt and of no moment.

Further, contradicting its early suggestions that all derivatives are the same, regardless of their purpose, Commerce also submits that the ***amount*** of an expense is not determinative of whether an event is extraordinary, and that Commerce instead looks to the underlying event itself to make it assessment.  Suzano agrees the amount of an expense, alone, is not determinative.  But it is directly relevant.  The magnitude of the expense associated with the event in this instance, serves as a reasonable, relative measure of the significance and extraordinariness of the event itself. That is, the amount of the expenses incurred for the acquisition relative to the Company's overall operating expenses may, as in this case, demonstrate how extraordinary the acquisition was.  Here,

the magnitude of the expense, set in contrast to Suzano's normal business operations and financial expenses, demonstrates how unique of an occurrence this was.  By way of example, the consolidated Suzano entity earned R$10.5 billion in net sales revenue in 2017, while the acquisition of Fibria cost R$37.2 billion (or 3.5 times Suzano's 2017 total net sales revenue).  *See* Suzano's Initial Section A Response at Ex. A-17 (P.R. 35-38; C.R. 31-34).  By virtue of the sheer magnitude of this once in a lifetime acquisition, this event ***could only be*** described as "unusual in nature and infrequent in occurrence."

Commerce is statutorily mandated to construct Suzano's expenses to "reasonably reflect the costs associated with production and sale of the merchandise."  19 U.S.C. § 1677b(f)(1)(A). In its *Final Remand*, Commerce argues that this statute "does not quantify reasonableness" and therefore, it cannot and will not consider the magnitude of Suzano's derivative losses and the affect it has on Suzano's COP.  *Final Remand* at 24.  Yet, Commerce provides no legal precedent or other reasoning for this statutory interpretation.

While Suzano acknowledges the agency's discretion in interpreting its mandate to "reasonably reflect" the COP, Suzano submits that Commerce attempts to use this interpretation to justify its disregard of record evidence clearly establishing the extraordinary nature of the derivative losses associated with the Fibria acquisition.  The Fibria acquisition was a unique, once-in-a-corporate lifetime event where Suzano acquired a larger company with a different scope and nature of operations.  The transaction required an extraordinarily large amount of financial resources dedicated specifically to the acquisition, and Suzano incurred substantial derivative losses in the reporting period as a direct result of that financing.  These specific and identifiable financial losses differ from, and dwarf, the financial expenses incurred by Suzano in the normal course of its papermaking business operations in this period, and Commerce's inclusion of these

17

extraordinary investment-related expenses would unquestionably distort the calculation of Suzano's cost of production contrary to Commerce's statutory mandate that such expenses must "reasonably reflect the costs associated with production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A). Just as Commerce would not allow an extraordinary windfall that is unrelated to Suzano's ordinary operations to be used to offset actual current production costs, Commerce cannot reasonably include these extraordinary expenses in Suzano's costs. Such rules reasonably go both ways.

Commerce's *Final Remand* concluding the derivative losses were not extraordinary, merely because they related to derivative instruments, is not reasonable, is contrary to law, and not is supported by substantial evidence.

## V.       CONCLUSION

Commerce's decision to maintain its earlier determination that Suzano's derivative losses related to the acquisition of Fibria should be included in Suzano's financial expense ratio because those losses were neither investment-related nor extraordinary is unsupported by substantial evidence and does not comport with the Court's Remand Order.  The evidence demonstrates to the contrary that the derivative losses were incurred as a result of an extraordinary investment in another company.   The inclusion of these losses in Commerce's calculation of the cost of producing subject paper distorted those costs, is not supported by substantial evidence, and is contrary to law.   Suzano respectfully requests that this Court again remand to Commerce to recalculate Suzano's financial ratio excluding the derivative losses generated in the acquisition of Fibria.

                                                Respectfully submitted,

                                                /s/ Craig A. Lewis
                                                Craig A. Lewis, Esq.
                                                Nicholas W. Laneville, Esq.
                                                Cayla D. Ebert, Esq.

                                                HOGAN LOVELLS US LLP
                                                Columbia Square Building
                                                555 Thirteenth Street, NW
                                                Washington, DC 20004-1109
                                                Phone:  +1.202.637.5600
                                                Fax:  +1.202.637.5910
                                                E-mail: craig.lewis@hoganlovells.com

                                                *Counsel to Suzano S.A.*

Dated: December 14, 2022

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Hogan Lovells US LLP hereby certifies that the foregoing comments comply with the word-count limitation described in the Standard Chambers Procedures. These comments contain 5,689 words according to the word-count function of the word-processing software used to prepare the comments.

Respectfully submitted,

*/s/ Craig A. Lewis*
Craig A. Lewis

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone: +1.202.637.5600
Fax: +1.202.637.5910
E-mail: craig.lewis@hoganlovells.com

*Counsel to Suzano S.A*

December 14, 2022