# UNITED STATES COURT OF INTERNATIONAL TRADE
# BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| SUZANO S.A., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and, <br><br> DOMTAR CORPORATION, <br><br> Defendant-Intervenor. | **Court No. 21-00069** |

## DEFENDANT-INTERVENOR'S RESPONSE IN SUPPORT OF COMMERCE'S REMAND DETERMINATION

Stephen J. Orava
Daniel L. Schneiderman

**KING & SPALDING LLP**
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 626-2950

*Counsel to Defendant-Intervenor Domtar Corporation*

January 10, 2023

45605756v31

## **TABLE OF CONTENTS**

I. INTRODUCTION..........................................................…............................1

II. THE STATUTE REQUIRES CAPTURING SUZANO'S DERIVATIVES LOSSES AS PART OF FINANCIAL EXPENSE....2

III. COMMERCE'S ESTABLISHED PRACTICE REQUIRES TREATING THE LOSSES AS PART OF FINANCIAL EXPENSE, REGARDLESS OF THE REASONS WHY SUZANO INCURRED THOSE LOSSES….……………….....……....…………………...............5

IV. COMMERCE REASONABLY FOUND THAT THE DERIVATIVE LOSSES WERE NOT "EXTRAORDINARY"..................…..…......7

V. CONCLUSION..................…....…………………………………..9

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Suzano S.A. v. United States*,
  46 CIT __, 589 F. Supp. 3d 1225 (2022)..............................................................1

**Statutes**

19 U.S.C. § 1677b(f)(1)(A)...............................................................................2, 4

**Administrative Materials**

*Certain Softwood Lumber from Canada*,
  86 Fed. Reg. 68471 (Dec. 2, 2021)......................................................................5

*Certain Softwood Lumber from Canada*,
  82 Fed. Reg. 51806 (Nov. 8, 2017) .....................................................................6

*Certain Softwood Lumber Products from Canada*,
  69 Fed. Reg. 75921 (Dec. 20, 2004)..............................................................6, 7

*Certain Tapered Roller Bearings from Korea*,
  83 Fed. Reg. 29092 (June 22, 2018)....................................................................6

*Certain Uncoated Paper From Brazil: Final Results of Antidumping
  Duty Administrative Review; 2018-2019*, 86 Fed. Reg. 7254
  (January 27, 2021) ...............................................................................................2

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes
  from Korea*,  86 Fed. Reg. 35060 (July 1, 2021)................................................5

*Phosphor Copper from the Republic of Korea*,
  84 Fed. Reg. 69720 (Dec. 19, 2019)....................................................................5

*Phosphor Copper from the Republic of Korea*,
  82 Fed. Reg. 12433 (March 3, 2017)...................................................................6

*Polyethylene Terephthalate Resin From the Republic of Korea*,
  83 Fed. Reg. 48283 (Sept. 24, 2018)....................................................................5

# DEFENDANT-INTERVENOR'S RESPONSE IN SUPPORT OF COMMERCE'S REMAND DETERMINATION

Defendant-Intervenor Domtar Corporation provides these comments in support of Commerce's Final Results of Redetermination Pursuant To Court Remand ("*Final Redetermination*") with respect to plaintiff Suzano S.A. ("Suzano" or "Plaintiff"). The *Final Redetermination* fully complies with this Court's opinion in *Suzano S.A. v. United States*, 46 CIT __, 589 F. Supp. 3d 1225 (2022), and it should be sustained.

## I.   INTRODUCTION

Throughout this litigation, Plaintiff has been conflating two events: (1) its 2018 derivatives trading and (2) its 2019 acquisition of Fibria. Plaintiff's argument is premised on the assumption that, if it can show that the 2018 derivatives trading was performed specifically to finance the anticipated Fibria acquisition and that the 2019 acquisition was an "investment," then any losses related to the derivatives trading must be considered "investment-related." But this does not necessarily follow. A company may take out a loan to finance an investment. If the company pays interest on the loan, the company's auditors may classify such costs as "financial expenses." If the investment itself loses value, the company's auditors may classify such losses as "investment losses." There is no requirement under generally accepted accounting principles ("GAAP") – or under the trade law – to

treat those separate costs the same way. Plaintiff's position appears to be that, so long as the loan can be tied to the investment, any interest on that loan must be treated as "investment-related" (in the sense that it would not have been incurred but for the investment) for antidumping purposes, even if it was not characterized as an investment expense in the respondent's own financial statements. That position, however, is contrary to the statute and Commerce's longstanding practice.

## II. THE STATUTE REQUIRES CAPTURING SUZANO'S DERIVATIVES LOSSES AS PART OF FINANCIAL EXPENSE

By statute, the analysis must begin with how Suzano classified the expenses at issue under Brazilian GAAP. *See* 19 U.S.C. § 1677b(f)(1)(A) (requiring that costs be based on the respondents records kept in accordance with generally accepted accounting principles of the exporting country). In its audited financial statement, Suzano makes distinctions among various asset classes.[1] Relevant here, "investments" are considered "interests in other companies controlled, jointly controlled and joint venture, evaluated by the equity method." Suzano's Section A Response (July 29, 2019) at Exhibit A-17, page 39 (note 3.1.7) (P.R. 28). These typically would be long-term equity investments in subsidiaries and other companies. In Suzano's income statement, gains and losses associated with this

---

[1] The financial expense ratio is based on Suzano's 2018 consolidated financial statements. *See Certain Uncoated Paper From Brazil: Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 Fed. Reg. 7254 (January 27, 2021), Decision Memoranda at Comment 1 (P.R. 167).

asset class are reported in a line item entitled "equity in earnings of associates," which is a component of "operating income and expenses." *Id*. at page 21 (income statement) and page 78 (note 14).  By contrast, there is another asset class entitled "financial assets measured at fair value through profit or loss." *Id.* at page 37 (note 3.1.2(b)ii).  This encompasses short-term assets held for trading, including "derivatives." *Id.*  Gains and losses associated with this asset class "are recognized as financial income or expense in the income statement when incurred." *Id*.  Thus, gains and losses associated with derivatives appear on Suzano's income statement within the "financial income" and "financial expense" line items.  *Id*. at page 21 (income statement) and page 105 (note 26) (showing the large derivative losses during 2018).

In other words, Suzano's auditors classified the derivatives in question as financial instruments (rather than as investments) and characterized all of the relevant trading losses as financial expenses (rather than as investment expenses) under Brazilian GAAP.  Nothing in Suzano's quarterly earnings ("QE") release contradicts that characterization.[2]  Suzano's own accounting treatment, unless

---

[2] In fact, the QE release describes the company's derivatives trading as "hedging . . . to minimize the volatility of its cash generation and to impart greater flexibility to cash flow management."  Suzano's Section D Response (Aug. 21, 2019) at Exhibit D-19a (P.R. 79).  Thus, Suzano's derivatives trading was a cash management tool by the company's own admission, regardless of what purpose the cash generated thereby would later serve.

shown to be distortive, is dispositive per 19 U.S.C. § 1677b(f)(1)(A).  No party has claimed that Suzano's normal accounting was distortive, unreasonable, or inconsistent with generally accepted accounting principles.  That should be the end of the matter.

Suzano cites various cases where transactions involving the sale or disposal of an entire company was deemed to have generated investment gains and losses.  *Pl. Br*. at 8-10.  Suzano contends, without citation or support, that "the same logic must apply to *acquisitions* of entirely separate companies." *Id.* at 10 (emphasis in original).  It does not.  Purchases of companies do not generate gains or losses for the buyer with respect to the acquired assets.  To be clear, if Suzano had recognized a large loss through the sale or impairment (write-down) of another company (and treated it as an investment loss on the annual financial statements), then it would have been perfectly appropriate to exclude such losses from the cost of production ("COP").  But the losses at issue here were generated through Suzano's derivatives trading during 2018, not due to some decline in the value of Fibria (which had not even been acquired by the end of that fiscal year).  *See Final Redetermination* at 2.  There is no basis under the statute to recharacterize financial expenses incurred in 2018 as "investment losses" merely because they were incurred in anticipation of making an investment the following year.

### III. COMMERCE'S ESTABLISHED PRACTICE REQUIRES TREATING THE LOSSES AS PART OF FINANCIAL EXPENSE, REGARDLESS OF THE REASONS WHY SUZANO INCURRED THOSE LOSSES

Plaintiff asserts that, regardless of the accounting treatment in the audited financial statements, the company's QE reports show that derivatives trading was done in preparation for the Fibria acquisition completed the following year, *Pl. Br.* at 4-6, which Suzano claims was an "investment." *Id*. at 8-13. But that purported linkage is irrelevant; all financial expenses are included in COP, regardless of whether they were incurred to support manufacturing activities or investment activities. As explained in the *Final Redetermination*, "Commerce's practice in calculating the financial expense is to examine the nature of the financial assets and liabilities that generated the financial expenses, rather than the association of specific financial expenses with particular uses of the funds or activities." *Final Redetermination* at 17.

When deciding how to treat derivatives gains and losses in every prior case, Commerce evaluated the nature of the assets being traded and how gains and losses from such trading were characterized under GAAP of the exporting country. *See, e.g., Certain Softwood Lumber from Canada*, 86 Fed. Reg. 68471 (Dec. 2, 2021) (final results) at Comment 15; *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from Korea*, 86 Fed. Reg. 35060 (July 1, 2021) (final results) at Comment 13; *Phosphor Copper from the Republic of Korea*, 84 Fed. Reg. 69720 (Dec. 19, 2019) (final results) at Comment 4; *Polyethylene Terephthalate Resin*

5

*From the Republic of Korea*, 83 Fed. Reg. 48283 (Sept. 24, 2018) (final determination) at Comment 3; *Certain Tapered Roller Bearings from Korea*, 83 Fed. Reg. 29092 (June 22, 2018) (final determination) at Comment 7; *Certain Softwood Lumber from Canada*, 82 Fed. Reg. 51806 (Nov. 8, 2017) (final results) at Comment 32 ("*Softwood Lumber 2017*"); *Phosphor Copper from the Republic of Korea*, 82 Fed. Reg. 12433 (March 3, 2017) (final determination) at Comment 2. The relevant question in those cases was whether the derivatives themselves were "investments" or "financial tools" to manage cash, not whether any cash raised from derivatives trading was dedicated to finance manufacturing activity or, alternatively, equity investments in other companies. *Id.* In almost every case, the gains and losses were found to be financial (rather than investment) income and expenses. *Id.* And even in the one above-cited case where derivatives gains and losses were found to be "investment related," the decision was based on Commerce's evaluation of the nature of the "particular derivative instruments in question" – not the respondent's intent to use the funds generated thereby to purchase equities or acquire other companies. *See Softwood Lumber 2017* at Comment 32.

Commerce's established practice is consistent with the fact that, as stated in the *Final Redetermination*, "Commerce considers money to be fungible." *Final Redetermination* at 17, citing *Certain Softwood Lumber Products from Canada*, 69

6

Fed. Reg. 75921 (Dec. 20, 2004) (final results) ("*Softwood Lumber 2004*") at Comment 10.  As explained in *Softwood Lumber 2004*, "because money is fungible, financing costs need not be allocated with respect to the specific purposes for which funds are used.  This is one reason financial accounting does not typically associate financial expenses, such as interest expense, with particular activities, nor does it associate corporate debt with particular assets.  Instead, it treats interest expense as being related equally to all current operating activities of the company, and, in effect, burdens all products equally."  *Id*.

In this case, Plaintiff argues that information in the QE reports allowed Commerce to link the derivatives trading to the subsequent Fibria acquisition.  *Pl. Br.* at 4-6.  Even if that were correct, Plaintiff points to no statutory or regulatory authority that *requires* Commerce to change its practice so as to (1) differentiate between financial expenses incurred in support of manufacturing and investment activities and (2) exclude from COP those financial expenses related to investment activities.  Plaintiff's arguments, therefore, must fail.

**IV.   COMMERCE REASONABLY FOUND THAT THE DERIVATIVE LOSSES WERE NOT "EXTRAORDINARY"**

Plaintiff contends that, although Suzano's auditors did not characterize the derivative losses as "extraordinary" for financial accounting purposes, that does not preclude Commerce from treating them as such for antidumping purposes.  *Pl.*

7

*Br.* at 13-18.  Suzano acknowledges that it regularly traded derivatives as part of its normal cash management system.  *Id.* at 14.  Suzano argues, however, that Commerce must consider that "the derivatives at issue here were specifically acquired for the purpose of financing the Fibria acquisition," which Suzano characterizes as a "singular" event.  *Id*.

Again, however, Plaintiff is conflating normal company operations, *i.e.*, derivatives trading, with the purported unusual event.  The acquisition of Fibria did not generate any losses during 2018 (and in fact the purchase was not even completed until the following year).  *See Final Redetermination* at 2.  The fact that the magnitude of Suzano's derivatives trading was far higher in 2018 because of the anticipated acquisition does not render the resulting losses "extraordinary."  As Commerce explained, the "definition of extraordinary (*i.e.*, unusual in nature and infrequent) … relates not to the *amount* of gain or loss but, rather, the *underlying event*, which caused the gain or loss."  *Id*. at 10 (emphasis in original).  Here, the "underlying event" generating the loss was the derivatives trading.  Most of the derivatives trading in 2018 likely was conducted in anticipation of the future acquisition, but that simply is not relevant.  Because the "underlying event," *i.e.*, the derivatives trading, was not unusual in nature and infrequent, it cannot be characterized as extraordinary, regardless of the magnitude of the losses incurred here.  Plaintiff points to no authority or precedent compelling Commerce to

8

exclude these losses from COP as "extraordinary," and thus its argument must fail.

## V. CONCLUSION

Suzano's derivatives were classified by its auditors as financial assets (rather than investments) that generated financial expenses (rather than investment losses). Moreover, the derivative losses were not "extraordinary." Under the statute and established practice, therefore, Suzano's derivatives losses were appropriately captured in COP as financial expenses, whether or not Suzano engaged in the derivatives trading to finance later investment activity.

The *Final Redetermination* is supported by substantial record evidence and in accordance with law, and it should be sustained.

                         Respectfully submitted,

                         <u>*/s/ Daniel L. Schneiderman*</u>
                         Stephen J. Orava
                         Daniel L. Schneiderman

                         KING & SPALDING LLP
                         1700 Pennsylvania Avenue, NW
                         Washington, DC 20006
                         (202) 737-0500

                         *Counsel for Defendant-Intervenor*

January 10, 2022

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that these comments comply with the word-count limitation described in the described in the Court's Standard Chambers Procedures. The comments contain **1,939** words according to the word count function of the word processing software used to prepare the submission.

                                                               Respectfully submitted,

                                                               */s/ Daniel L. Schneiderman*
                                                               Stephen Orava
                                                               Daniel L. Schneiderman

                                                               KING & SPALDING LLP
                                                              1700 Pennsylvania Avenue, NW
                                                              Washington, DC 20006
                                                              (202) 737-0500

January 10, 2023                              *Counsel for Defendant-Intervenor*