UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

|  |  |  |
|---|---|---|
| SUZANO S.A., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Court No. 21-00069 |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DOMTAR CORPORATION, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

## <u>ORDER</u>

Upon consideration of the remand redetermination issued by the Department of

Commerce pursuant to *Suzano S.A. v. United States*, 589 F. Supp. 3d 1225 (Ct. Int'l Trade 2022);

plaintiff's comments upon the remand redetermination; and defendant's and defendant-

intervenors' replies thereto, and all other pertinent papers, it is hereby

ORDERED that the remand redetermination is sustained in all respects; and it is further

ORDERED that judgment is entered in favor of the United States.

<br>

_____
                                                                       JUDGE

Dated: _____, 2023
            New York, NY

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| SUZANO S.A., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Court No. 21-00069 |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| DOMTAR CORPORATION, | ) |
| | ) |
| Defendant-Intervenor. | ) |

**DEFENDANT'S REPLY IN SUPPORT OF THE**
**DEPARTMENT OF COMMERCE'S REMAND REDETERMINATION**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL:
BENJAMIN JUVELIER
Attorney
Office of the Chief Counsel
   for Trade Enforcement & Compliance
U.S. Department of Commerce

ANTONIA R. SOARES
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044

January 13, 2023

Attorneys for Defendant

# **TABLE OF CONTENTS**

BACKGROUND .................................................................................................................2

I.      Commerce's Final Results.......................................................................................2

II.     Procedural Background ...........................................................................................2

III.    The Court's Remand Order .....................................................................................2

IV.     Remand Redetermination ........................................................................................3

ARGUMENT .....................................................................................................................6

I.      Standard Of Review................................................................................................6

II.     Commerce's Remand Redetermination Is Supported By Substantial Evidence
        And In Accordance With Law .................................................................................6

        A.      Relevant Legal Framework...........................................................................7

        B.      Commerce Lawfully Determined That Suzano's Derivative Losses Were
                Not Investment Related.................................................................................8

                1.      Suzano's Policy Of Using Derivatives Exclusively For Hedging
                        Activity Undermines Its Argument That Its Use Of Derivatives For
                        The Fibria Acquisition Was Investment-Related.........................................9

                2.      Suzano's Purchase Of Fibria Constitutes The Purchase Of A
                        Production Asset To Expand Its Normal Business Operations — Not
                        An Investment .........................................................................................12

        C.      Commerce Lawfully Determined That Suzano's Derivative Expenses
                Related To The Fibria Purchase Were Not Extraordinary....................................21

CONCLUSION...................................................................................................................29

## **TABLE OF AUTHORITIES**

**Cases**                                                              **Page(s)**

*AG der Dillinger Hüttenwerke v. United States,*
   532 F. Supp. 3d 1338 (Ct. Int'l Trade 2021).................................................................... *passim*

*Am. Silicon Techns. v. United States,*
   261 F.3d 1371 (Fed. Cir. 2001).................................................................................. 7

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
   467 U.S. 837........................................................................................................ 30

*Consol. Edison Co. v. NLRB,*
   305 U.S. 197 (1938)............................................................................................. 6

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1966)............................................................................................. 6

*Corus Engineering Steels Ltd. v. United States*
   27 C.I.T. 1286 (2003) ..................................................................................... 19, 26

*Downhole Pipe & Equipment, L.P. v. United States,*
   776 F.3d 1369 (Fed. Cir. 2015).......................................................................... 11, 30

*Floral Trade Council of Davis, CA v. United States,*
   16 C.I.T. 1014 (1992)................................................................................... 8, 21, 26

*Hornos Electricos de Venezuela v. United States*
   285 F. Supp. 2d 1353, 1365 (Ct. Int'l Trade 2003) ...................................... 8, 22, 25

*MacLean-Fogg Co. v. United States,*
   100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015)......................................................... 6

*NTN Bearing Corp. v. United States,*
   74 F.3d 1204 (Fed. Cir. 1995)............................................................................. 8

*SolarWorld Americas, Inc. v. United States,*
   910 F.3d 1216 (Fed. Cir. 2018)........................................................................... 11

*Suzano S.A. v. United States,*
   589 F. Supp. 3d 1225 (Ct. Int'l Trade 2022)................................................... *passim*

*Thai Pineapple Canning Indus. Corp. v. United States,*
   273 F.3d 1077 (Fed. Cir. 2001)........................................................................... 7

*Thai Pineapple Public Co. v. United States*,
187 F.3d 1362 (Fed. Cir. 1999) ........................................................................... 8

*Camargo Correa Metais v. United States*,
17 C.I.T. 897 (1993) ........................................................................................... 12

**Statutes**

19 U.S.C. § 1677 ................................................................................................... *passim*

**Administrative Decisions**

*Carbon and Alloy Steel Wire Rod from Spain*,
83 Fed. Reg. 13,233 (Dep't of Commerce March 28, 2018). ............................. *passim*

*Certain Carbon and Alloy Steel Cut-to-Length Plate*
*From the Federal Republic of Germany*,
82 Fed. Reg. 16, 360 (Dep't of Commerce Apr. 4, 2017) ........................... 11, 26, 28

*Certain Frozen and Canned Warmwater Shrimp from India*,
69 Fed. Reg. 76,916 (Dep't Commerce Dec. 23, 2004) ................................ 11, 25

*Certain Pasta from*,
 70 Fed. Reg. 71,464 (Dep't of Commerce Nov. 29, 2005)............................... 26, 27

*Certain Uncoated Paper from Brazil*,
86 Fed. Reg. 7,254 (Dep't. of Commerce Jan. 27, 2021) ..................................... 2

*Chlorinated Isocyanurates from Spain*,
74 Fed. Reg. 50,774 (Dep't. of Commerce Oct. 1, 2009)................................. 17, 26

*Granular Polytetrafluoroethylene Resin from India*,
87 Fed. Reg. 3,772 (Dep't of Commerce Jan. 25, 2022) ..................................... 20

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
84 Fed. Reg. 24,743 (Dep't. of Commerce May 29, 2019) ..................................... 2

*Polyethylene Terephthalate Film, Sheet and Strip from Korea*,
66 Fed. Reg. 57,417 (Dep't of Commerce Nov. 15, 2001)................................. 8, 19

*Softwood Lumber from Canada 2002*,
67 Fed. Reg. 15,539 (Dep't of Commerce Apr. 2, 2002) ..................................... 26

*Softwood Lumber Products from Canada*,
70 Fed. Reg. 73,437 (Dep't Commerce Dec. 12, 2005) ................................ *passim*

*Stainless Steel Wire Rod from Taiwan*,
66 FR 52587 (Dep't of Commerce Oct. 16, 2001) .................................................................. 12

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| SUZANO S.A.,<br><br>          Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br><br>          Defendant,<br><br>    and<br><br>DOMTAR CORPORATION,<br><br>          Defendant-Intervenor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Court No. 21-00069 |

**DEFENDANT'S REPLY IN SUPPORT OF THE
DEPARTMENT OF COMMERCE'S REMAND REDETERMINATION**

Defendant, the United States, respectfully submits this reply to the comments filed by

plaintiff, Suzano S.A. (Pl. Cmts.) (ECF No. 62), concerning the remand redetermination filed by

the Department of Commerce pursuant to this Court's opinion and remand order in *Suzano S.A.*

*v. United States*, 589 F. Supp. 3d 1225 (Ct. Int'l Trade 2022).  *See* Final Results of

Redetermination Pursuant to Court Remand (Redet.), ECF No. 60 (Remand P.R. 6).[1]  As

demonstrated below, the Court should sustain the remand redetermination and enter judgment for

the United States because Commerce has complied with the Court's remand order, and because

the remand redetermination is supported by substantial evidence and otherwise in accordance

with law.

---

[1] Citations to the public record "P.R. __" and confidential record "C.R. __" refer to the underlying administrative review record.  Citations to "Remand P.R. __" refer to the record of the remand redetermination for which there was only a public record.

## BACKGROUND

### I.      Commerce's Final Results

On May 29, 2019, Commerce initiated the third antidumping review covering uncoated

paper from Brazil.  *See Initiation of Antidumping and Countervailing Duty Administrative*

*Reviews*, 84 Fed. Reg. 24,743 (Dep't. of Commerce May 29, 2019).  Commerce selected

International Paper do Brasil Ltda. and its affiliate, International Paper Exportadora Ltda.

(collectively, International Paper), and Suzano S.A. (Suzano) as mandatory respondents.  *See*

*Certain Uncoated Paper from Brazil*, 86 Fed. Reg. 7,254 (Dep't of Commerce Jan. 27, 2021)

(final results) (P.R. 170), and accompanying Issues and Decision Memorandum (IDM) (P.R.

171).  In the final results, Commerce declined to use Suzano's proposed expense ratio which

excluded derivative losses from Suzano's acquisition of Fibria Celulose S.A. (Fibria), a producer

of eucalyptus pulp, in the calculation of Suzano's cost of production.  *Id.* at 4-5.  This

determination is the sole issue in this proceeding.

### II.     Procedural Background

On February 24, 2021, Suzano commenced this action to contest the *Final Results*,

contending that Commerce's failure to exclude certain of its derivative losses from its calculation

of the financial expense ratio was unsupported by substantial evidence and otherwise not in

accordance with law.  Summons, ECF No. 1; Compl., ECF No. 9.  In particular, Suzano

contended that Commerce unlawfully failed to exclude the Fibria derivative losses from the cost

of production calculation because those losses were both investment-related and extraordinary.

*Suzano*, 589 F. Supp. 3d. at 1227-1228.

### III.    The Court's Remand Order

On April 16, 2022, the Court held that Commerce's decision to include the derivative

expenses related to the Fibria acquisition in the financial expense calculation was not supported by substantial evidence. *Suzano*, 589 F. Supp. 3d at 1234-37. Specifically, the Court held that Commerce failed to address record evidence that could reasonably detract from its finding that Suzano's expenses were neither investment-related nor extraordinary and, thus, should be included in the financial expense ratio calculation. *Id.* The Court found that Commerce failed to adequately consider Suzano's unaudited quarterly earnings reports, which explicitly separated the expenses from the Fibria acquisition, including derivative losses. *Id.* at 1234, 1235.

The Court also found that Commerce failed to support its finding that the expenses were not extraordinary because: (1) Commerce's reliance on the auditor's failure to classify the expenses as extraordinary was not a reasonable basis for the agency to conclude that the expenses were not extraordinary given that such classification is not dispositive; (2) Commerce failed to consider that Suzano's losses allegedly tied to the Fibria acquisition were much larger than Suzano's previously reported annual losses; and (3) Commerce failed to address record evidence supporting Suzano's argument that the derivative losses were extraordinary. *Id.* at 1236-1237. The Court remanded the case and ordered Commerce to provide further explanation and consideration of the record evidence concerning these issues. *Id.* at 1237.

## IV.    Remand Redetermination

In October 2022, Commerce issued draft remand redetermination to interested parties for comment. *See* Draft Remand Redetermination (October 13, 2022) (Remand P.R. 1). Both Suzano and defendant-intervenor, Domtar Corporation, submitted comments on the draft results. *See* Pet. Cmts. on Draft Results of Redetermination (October 24, 2022) (Remand P.R. 4); Suzano Cmts. on Draft Redetermination (October 24, 2022) (Remand P.R. 5).

On November 14, 2022, Commerce filed the final remand redetermination. *See* Redet.,

ECF No. 60 (Remand P.R. 6).  As directed by the remand order, Commerce re-evaluated the issues under consideration by: (1) providing further explanation regarding its determination that derivative losses incurred by Suzano as a result of the Fibria acquisition are not investment-related and additional consideration of the record evidence identified by the Court; and (2) providing further explanation of its determination that the derivative losses incurred by Suzano are not "extraordinary" within the meaning of U.S. General Accepted Accounting Principles (GAAP) and its practice.  Redet. at 5-10, 17-25.

Commerce provided a thorough explanation supporting its determination that Suzano's derivative losses related to the Fibria purchase were not investment related.  *Id.* at 5-7, 17-23. Commerce explained that, because money is fungible, its practice in calculating financial expenses is to examine the nature of the financial assets and liabilities that generate the financial expenses rather than examining the particular uses of the funds or activities.  *Id.* at 17. Commerce found that record evidence demonstrated that Suzano's policy was to use derivative transactions exclusively for hedging purposes.  *Id.* at 6-7, 20-21.  Specifically, Commerce found that, as part of its overall cash management, Suzano used derivative instruments to hedge its company-wide exposure to foreign currency risk.  *Id.*  As such, any derivative losses sustained by Suzano relate to currency hedging activity.  *Id.*  Based on its practice, Commerce included such derivative losses in its financial expense ratio computation.  *Id.*  Commerce also determined that Suzano's derivative losses were not investment related because Suzano's quarterly earnings releases and other record evidence demonstrated that the Fibria acquisition was not investment related — defined by Commerce as "a separate profit-making activity" — but rather constituted an expansion of Suzano's pulp operations.  *Id.* at 6, 21-23.

Commerce also provided a thorough explanation supporting its determination that Suzano's derivative losses related to the Fibria purchase were not extraordinary — defined as an event that is "unusual in nature and infrequent in occurrence" — but rather represent financing expenses related to Suzano's normal operations. *Id.* at 7, 10. Commerce found that the acquisition of Fibria, a pulp producer, was not unusual in nature and infrequent in occurrence because it was an expansion of the company's normal operations, which include the production of pulp, paper, and tissue. *Id.* at 8 (citing Suzano's Initial Section A Questionnaire Response at Ex. A-17 (stating in footnote 1 of its audited financial statements that the company's operations include pulp, paper, and tissue production) (P.R. 37, C.R. 31-34); *id.* at "Management Report" (stating that, with the merger of Fibria and Suzano, "Suzano is transformed into an even more competitive and robust company") (P.R. 35-38; C.R. 31-34)); *see also* Suzano's Initial Section D Questionnaire Response at D-31 (C.R. 154-156)).

Further, Commerce found that Suzano's derivative losses associated with the financing of the Fibria acquisition were not extraordinary based on Suzano's cash management approach of hedging against exposure to foreign currency fluctuations as a normal part of doing business in multiple currencies. *Id.* (citing Suzano's Initial Section A Questionnaire Response at Ex. A-17 at "Management Report"; Suzano's Initial Section D Questionnaire Response at Ex. D-19a (1Q18 Earnings Release) (stating that "the current volatility in the BRL/USD exchange rate makes {derivatives} the most adequate strategy for protecting the Company's cashflow") (P.R. 79-80, C.R. 154-156). Commerce explained that Suzano's use of derivative instruments to hedge its foreign currency exposure is not unusual in nature or infrequent in occurrence because it is a strategic part of capital management used by Suzano on a normal and frequent basis as demonstrated by the fact that Suzano has a currency exposure policy which states that "Suzano

carries out derivatives transactions exclusively for hedging" surplus cash.  *Id.* at 8-9 (citing

Suzano's Initial Section D Questionnaire Response at Ex. D-19a (2Q18 Earnings Release" at

"Derivative Transactions").  Commerce found that, if Suzano did not carry out these types of

transactions on a normal and frequent basis, there would be no need for such a policy.  *Id.* at 9.

Thus, Commerce continued to exclude Suzano's derivative expenses from the financial expense

ratio calculation.  *Id.*

## ARGUMENT

### I.   Standard Of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in

accordance with the remand order," and are "supported by substantial evidence, and are

otherwise in accordance with law."  *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d

1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).  "Substantial evidence"

means "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Under this standard, "the

possibility of drawing two inconsistent conclusions from the evidence does not prevent an

administrative agency's finding from being supported by substantial evidence."  *Consolo v. Fed.*

*Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted).

### II.   Commerce's Remand Redetermination Is Supported By Substantial Evidence And In Accordance With Law

In the remand results, Commerce provided a thorough explanation as to why Suzano's

derivative losses related to the Fibria acquisition are neither investment related nor extraordinary

and, thus, were lawfully included in the financial expense calculation.  In so doing, Commerce

complied with the remand order and addressed Suzano's unaudited quarterly earnings releases

and other record evidence that might detract from its conclusion.  As demonstrated below, the

Court should sustain the remand redetermination because it is supported by substantial evidence and in accordance with law.

### A.     <u>Relevant Legal Framework</u>

"Cost of production is calculated according to a statutory formula by adding together several costs and expenses, including the cost of materials, fabrication, containers, coverings, and other processing costs, and selling, general, and administrative expenses." *Thai Pineapple Canning Indus. Corp. v. United States*, 273 F.3d 1077, 1080 (Fed. Cir. 2001); 19 U.S.C. § 1677b(b)(3). Section 1677b(f)(1)(A) contains the special rules for Commerce's calculation of costs of production. Section 1677b(f)(1)(A) provides in pertinent part:

> Costs shall normally be calculated based on the records of the exporter or producer of the merchandise if such records are kept in accordance with the generally accepted accounting principles of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise.

19 U.S.C. § 1677b(f)(1)(A). Thus, "as a general rule," Commerce "may either accept financial records kept according to generally accepted accounting principles in the country of exportation, or reject the records if accepting them would distort the company's true costs." *Am. Silicon Techns. v. United States*, 261 F.3d 1371, 1377 (Fed. Cir. 2001) (citing *Thai Pineapple*, 187 F.3d at 1362; *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1206 (Fed. Cir. 1995)).

In calculating the cost of production, Commerce will exclude expenses that are investment related, which Commerce defines as "a separate profit-making activity not related to the company's normal operations." *Certain Carbon and Alloy Steel Cut-to-Length Plate From the Federal Republic of Germany*, 82 Fed. Reg. 16, 360 (Dep't of Commerce Apr. 4, 2017), IDM at Cmt. 33; *see also AG der Dillinger Hüttenwerke v. United States*, 532 F. Supp. 3d 1338, 1344 (Ct. Int'l Trade 2021) (discussing same). Commerce has determined, for example, that a

"separate profit-making activity" arises in cases involving profit or losses from the sale or closure of a business unit because such activity is unrelated to a company's general business operations.  *See, e.g.*, *Certain Frozen and Canned Warmwater Shrimp from India*, 69 Fed. Reg. 76,916 (Dep't Commerce Dec. 23, 2004), and accompanying IDM at cmt. 16 (profit or losses arising from the sale of a business unit); *Polyethylene Terephthalate Film, Sheet and Strip from Korea*, 66 Fed. Reg. 57,417 (Dep't of Commerce Nov. 15, 2001), and accompanying IDM at cmt. 1 ("{i}ncome related to the sale of an entire division"); *Softwood Lumber Products from Canada*, 70 Fed. Reg. 73,437 (Dep't Commerce Dec. 12, 2005), and accompanying IDM at cmt. 8 (gains or losses related to the permanent closure or sale of a production facility).

In calculating the cost of production, Commerce will also exclude expenses deemed extraordinary if they pertain to an event that is "unusual in nature and infrequent in occurrence." *Hornos Electricos de Venezuela v. United States*, 285 F. Supp. 2d 1353, 1365 (Ct. Int'l Trade 2003) (quoting *Floral Trade Council of Davis, CA v. United States*, 16 C.I.T. 1014, 1016 (1992)).  "An event is unusual in nature if it 'possesses a high degree of abnormality and is of a type clearly unrelated to, or only incidentally related to, the ordinary and typical activities of the enterprise.'" *Id.* (quoting Financial Accounting Standards Board, Accounting Standards Current Text, General Standards (FASB) § 17.107(a) at 24,469).  "An event is infrequent in occurrence if it 'is of a type that would not reasonably be expected to recur in the foreseeable future.'" *Id.* at 1365-66 (quoting FASB § 17.107(b) at 24,469).

## B.  Commerce Lawfully Determined That Suzano's Derivative Losses Were Not Investment Related

As demonstrated below, substantial evidence supports Commerce's determination that Suzano's use of derivative expenses for the Fibria acquisition was not investment-related.  The record contained evidence demonstrating that (1) Suzano's policy is to use derivative

transactions exclusively for hedging purposes; and (2) Suzano's acquisition of Fibria constituted

an expansion of Suzano's normal business operations related to pulp production.  Thus,

Commerce's determination to exclude Suzano's derivative expenses from the financial expense

ratio calculation is supported by substantial evidence.

1. **Suzano's Policy Of Using Derivatives *Exclusively* For Hedging Activity Undermines Its Argument That Its Use Of Derivatives For The Fibria Acquisition Was Investment-Related**

In the remand redetermination, Commerce explained that, because money is fungible, its

practice in calculating financial expenses is to examine the nature of the financial assets and

liabilities that generate the financial expenses rather than examining the particular uses of the

funds or activities.  Redet, at 17.  Commerce found that record evidence — in particular,

Suzano's quarterly earnings releases — demonstrated that Suzano's policy was to use derivative

transactions *exclusively* for hedging purposes.  *Id.* at 6-7, 19-21.  Specifically, as part of its

overall cash management, Suzano used derivative instruments to hedge its company-wide

exposure to foreign currency risk.  *Id.*  As such, any derivative losses sustained by Suzano

pertain to its currency hedging activity.  *Id.*  Based on its longstanding practice, Commerce

included such derivative losses in the financial expense ratio computation.  *Id.*

Suzano raises several challenges to Commerce's reasoning, all of which lack merit.  First,

Suzano contends that the derivative losses at issue are investment-related because its audited

financial statements and quarterly earnings releases "clearly tie the derivative losses at issue to

the Fibria acquisition."  Pl. Cmts. at 4-6.  In so doing, Suzano challenges Commerce's finding

that Suzano's audited financial statements do not segregate Suzano's derivative losses as being

related to the Fibria acquisition, while the quarterly earnings releases do.  *Id.* at 4 (citing Redet.

at 19).  But Suzano fails to explain why it was unreasonable for Commerce to conclude that,

because the quarterly earning releases are not audited, "the classification of the derivative losses in the {quarterly earnings} releases cannot, therefore, be assumed to be accomplished by or substantiated by Suzano's auditors."  Redet. at 19.  In any event, nothing in the remand order precluded Commerce from preferring audited financial statements over unaudited ones.  Rather, the remand order directed Commerce to consider the quarterly earnings releases in light of the statute's requirement that a producer's records be used "if they are kept in accordance with {GAAP} *and* reasonably reflect the costs associated with the production and sale of the merchandise{.}"  *Suzano*, 589 F. Supp. 3d at 1235 (emphasis in the original).  On remand, Commerce considered the quarterly earnings releases, and found that they expressly state that "as part of its overall cash management, Suzano used the derivative instruments to hedge its company-wide exposure to foreign currency risk."  Redet. at 7.

Further, in considering the quarterly earnings releases, Commerce was not required to give weight to the releases' separation of the derivatives related to the Fibria transaction from other derivatives.  As Commerce explained, the fact that derivative instruments and the resulting gains or losses may be reported separately in the quarterly earnings releases does not mean that some are related to normal operations while the others are investment-related; it simply means that the company may hold different derivative instruments.  Redet. at 19.  Suzano's disagreement with Commerce's reasoning amounts to a request that this Court "reweigh the evidence already considered by Commerce," which this Court must decline to do.  *SolarWorld Americas, Inc.*, 910 F.3d at 1225; *see also Downhole Pipe & Equipment, L.P. v. United States*, 776 F.3d 1369, 1378 (Fed. Cir. 2015) ("This court declines Appellants' invitation to reweigh the evidence in order to reject Commerce's conclusions, which were well-supported and fully explained.").

Suzano also places great weight on the consistency between the audited financial statements and the quarterly earnings releases in terms of quantifying the derivative losses related to the Fibria acquisition.  Pl. Cmts. at 4-6.  That consistency does not transform those derivative losses into investment-related activity.  That Suzano used derivate instruments to acquire Fibria is irrelevant to the framework Commerce applies to determine whether activity is investment related.  As explained in the remand redetermination, because "Commerce considers money to be fungible{,}" its "practice in calculating the financial expense is to examine the nature of the financial assets and liabilities that generated the financial expenses, *rather than the association of specific financial expenses with particular uses of the funds or activities*."  Redet. at 21 (emphasis added) (citing *Stainless Steel Wire Rod from Taiwan*, 66 Fed. Reg. 52,587 (Dep't of Commerce Oct. 16, 2001), and accompanying IDM at Cmt. 1; *Camargo Correa Metais, S.A. v. United States*, 17 C.I.T. 897, 902 (1993) (recognizing the fungibility of financing funds); *Certain Softwood Lumber Products from Canada*, 69 Fed. Reg. 75,921 (Dep't of Commerce Dec. 20, 2004), and accompanying IDM at Cmt. 10).  Here, Suzano uses derivative instruments exclusively for hedging activity, which relates to the company's overall cash management — not a "separate profit-making activity."  Thus, based on Commerce's practice, Suzano's use of derivative instruments for the Fibria acquisition is not a relevant factor.

Suzano also claims that the existence of its hedging policy does not demonstrate that every derivative transaction engaged in by Suzano relates to overall cash management operations and is irrelevant to the question of whether these specific derivative transactions are in fact used for that purpose or for investment purposes.  Pl. Cmts. at 6-8.  But Commerce considered Suzano's hedging policy as set forth in Suzano's quarterly earnings release, which states:

> *Suzano carries out derivatives transactions exclusively for hedging purposes.*  {Suzano's} currency exposure policy seeks to minimize

> the volatility of its cash generation and to impart greater flexibility
> to cash flow management. The policy currently stipulates that
> surplus dollars may be partially hedged … and matched with dollar
> inflows.

Redet. at 6 (emphasis added) (quoting Suzano's Initial Section D Questionnaire Response at

Exhibit D-19a).  Indeed, "Suzano does not deny that it may use derivatives for such purposes."

Pl. Cmts. at 6.  Commerce's reasonably considered Suzano's quarterly earning releases, as

directed by the remand order.  Suzano cannot now take issue with what Commerce found there

in the form of an express statement of company policy related to its *exclusive* use of derivative

transactions for hedging purposes.

###  2. Suzano's Purchase Of Fibria Constitutes The Purchase Of A Production Asset To Expand Its Normal Business Operations — *Not An Investment*

In the remand redetermination, Commerce determined that Suzano's unaudited quarterly

earnings releases meet both prongs of 19 U.S.C. § 1677b(f)(1)(A), and found that the releases

support its determination that Suzano's derivative expenses related to the Fibria acquisition

should be included in the cost of production calculations.  Redet. at 5.  Relying on the quarterly

earnings releases and other record evidence, Commerce found that Suzano's acquisition of Fibria

was not an investment for profit sharing purposes, but rather an expansion of Suzano's pulp

operations.  *Id.* at 5-6, 21-23.  Commerce relied on record evidence indicating that both Suzano

and Fibria were pulp producers.  *Id.* at 6 (citing Suzano's Initial Section A Questionnaire

Response at n.1 & Ex. A-17 (stating in footnote 1 of its audited financial statements that the

company's operations include pulp, paper, and tissue production); Suzano's Initial Section D

Questionnaire Response at Exhibit D-19a at "2Q18 Earnings Release: Transaction with Fibria.").

Commerce also relied on record evidence indicating that, at the time of the merger, Suzano Papel

e Celulose S.A. and Fibria underwent a change in company name to Suzano S.A, and both

former companies have since been operating under this single name.  *Id.*; *see also id.* at 21.

Commerce thus concluded that the quarterly earnings releases support the finding that the

acquisition of Fibria was not an investment for profit sharing purposes, but rather an expansion

of Suzano's pulp operations.  *Id.* at 6 citing Suzano's Initial Section A Questionnaire Response at

Exhibit A-17 at "Management Report" (stating that with the merger of Fibria and Suzano,

"Suzano is transformed into an even more competitive and robust company"); *see also* Suzano's

Initial Section D Questionnaire Response at Exhibit D-19a at "Earnings Release 3Q18," where

Suzano refers to the acquisition of Fibria as a "business combination").  While acknowledging

Suzano's assertion that the pulp produced by Fibria would not specifically be used in the

production of the subject merchandise (*see* Pl. Cmt. at 15), Commerce found that this distinction

does not exclude the pulp produced by Fibria from being part of its normal operations.  Redet. at

6 n.31.

Commerce further determined that Suzano's derivative losses constituted ordinary

operating expenses rather than being investment related.  Redet. at 6-7, 17-23.  Relying on

Suzano's quarterly earnings releases, Commerce found that, as part of the planned expansion of

its operations, Suzano obtained significant amounts of foreign denominated debt to meet the cash

requirements of the acquisition.  *Id.* at 6 (citing Suzano's Initial Section D Questionnaire

Response at Exhibit D-19a ("Earnings Release 4Q18: Indebtedness") (where Suzano states: "At

December 31, 2018, gross debt amounted to R$35.7 billion, composed of 90.4% long-term

maturities and 9.6% short-term maturities, with 73.8% denominated in foreign currency and

26.2% in local currency.").  Commerce also relied on Suzano's quarterly earnings release, which

states that "Suzano carries out derivatives transactions exclusively for hedging purposes{,} and

that {Suzano's} currency exposure policy seeks to minimize the volatility of its cash generation

and to impart greater flexibility to cash flow management." *Id.* at 6-7 (quoting Suzano's Initial Section D Questionnaire Response at Exhibit D-19a).  Based on this evidence, Commerce found that, as part of its overall cash management, Suzano used the derivative instruments to hedge its company-wide exposure to foreign currency risk. *Id*. at 7.  Commerce observed that it has previously found that derivative instruments used for cash management purposes are typically included in the financial expense rate calculation. *Id.* (citing *Polyethylene Terephthalate Resin from the Republic of Korea*, 83 Fed. Reg. 48,283 (Dept. of Commerce Sept. 24, 2018), and accompanying IDM at Cmt. 3).  Thus, Commerce concluded that the Fibria acquisition was not an investment for profit-sharing purposes, but rather constituted an expansion of Suzano's pulp operations.

Suzano raises several challenges to Commerce's reasoning and consideration of the record evidence, all of which lack merit.  First, Suzano challenges Commerce's determination that the Fibria acquisition constitutes a purchase of production assets rather than investment-related activity.  Pl. Cmts. at 8-9.  Suzano contends that the acquisition was a "{q}uintessential" investment activity in that it "represented a major financial investment to acquire *in its entirety* a separate publicly-traded legal entity with a distinct line of business, facilities, management, and staff." *Id.* at 8 (emphasis in the original); *see also id.* at 12-13.  But as Commerce explained, the acquisition was not investment-related activity because Suzano and Fibria maintained comparable pulp operations, and Suzano's acquisition of Fibria was an expansion of Suzano's current operations that include pulp production.  Redet. at 21.

Commerce identified record evidence supporting its determination that Suzano's purchase of Fibria constitutes the purchase of production assets.  In particular, Commerce relied on Suzano's audited financial statements, which state that the company's operations include

14

pulp, paper, and tissue production.  Redet. at 6, 21 (citing Suzano's Initial Section A

Questionnaire Response at Exhibit A-17).  Commerce also relied on Suzano's management

report, which states that, "{w}ith 95 years of history, Suzano is a bio-based company that uses

renewable resources to make pulp and paper from eucalyptus forests{.}"  *Id.* at 21 (citing

Suzano's Initial Section A Questionnaire Response at Exhibit A-17 ("Management Report:

Innovation.")).  The management report also states that, "{i}n 2018, net revenue from Suzano's

pulp sales amounted to R\$8.8 billion, advancing 27.4% on 2017."  *Id.* (citing Suzano's Initial

Section A Questionnaire Response at Exhibit A-17 ("Management Report: Pulp Business

Unit.")).  All of this constitutes substantial evidence in support of Commerce's conclusion that

"Suzano and Fibria's pulp operations are comparable."  *Id.*

Commerce also explained that it defines investment activities as those activities not

related to production, but rather a "separate profit-making activity."  *Id.* (citing *Corrosion-

Resistant Carbon Steel Flat Products from the Republic of Korea*, 76 Fed. Reg. 15,291 (Dep't of

Commerce March 21, 2011), and accompanying IDM at Cmt. 14).  Commerce further explained

that companies purchase production assets, whether through the acquisition of an established

company like Fibria, or a new factory, with the intent to expand normal business operations.  *Id.*

at 23.  Thus, the cost of acquiring such production assets is related to the general operations of

the acquiring company.  *Id.*  Purchasing production facilities, including management, employees,

and assets, as is the case here with the acquisition of Fibria, is related to production when the

company intends to expand its capacity.  *Id.*  Commerce thus concluded that the evidence

established that the merger of Suzano and Fibria resulted in an expansion of Suzano's normal

production operations — not a separate profit-making activity.  *Id.* at 21, 23.

Second, Suzano contends that Commerce's finding that the Fibria purchase constituted a

purchase of production assets is based on an incomplete reading of Suzano's management report. Pl. Cmts. at 9.  The full quotation is: "Concluded on January 14, 2019, the combination of two successful and globally relevant companies effectively creates opportunities to build a future with even greater capacity to create value and to share these accomplishments with all our related parties."  *See* Suzano's Initial Section A Response at Ex. A-17 at "Management Report" (P.R. 35-38; C.R. 31-34)).  Although we concede that Commerce's quote was not correctly punctuated to indicate that it was a partial quote ending at the term "capacity," the truncated quotation was not intended to mislead, nor could it, be misleading.  Nothing in the omitted language changes the meaning of the statement for purposes of Commerce's reliance on the statement to show that the merger of Suzano and Fibria increased capacity.  In any event, Suzano's management report was one of several pieces of evidence that Commerce relied on to establish that the Fibria acquisition constituted an expansion of Suzano's production and, thus, constitutes an expansion of its general operations.  *See* Redet. at 21.

Third, Suzano contends that *Chlorinated Isocyanurates from Spain*, relied on by Commerce, in fact supports its position that the acquisition of an entire company is definitionally separate from an expansion of operations and, thus, is an investment-related activity.  Pl. Cmts. at 9-11 (citing 74 Fed. Reg. 50,774 (Dep't. of Commerce Oct. 1, 2009) and accompanying IDM).  Suzano interprets *Chlorinated Isocyanurates from Spain* as supporting its position that because it is "not in the business of buying and selling entire companies and its acquisition of Fibria amounted to extraordinarily large non-recurring expenses that were entirely separate from its normal business operations," its derivative losses should be excluded from the cost of production calculation.  Pl. Cmts. at 10-11 (citing *Chlorinated Isocyanurates from Spain* IDM at Cmt. 1).  Suzano's arguments, however, are not supported by this decision or the administrative record.

As a preliminary matter, *Chlorinated Isocyanurates from Spain* lends no support to Suzano's theory that the size of the transaction related to the Fibria acquisition — that it was extraordinarily large — renders the acquisition an investment. Indeed, Commerce's practice is to "consider{ } the nature of every income and expense item separately *regardless of the event that caused it*" and regardless of "*how significant it is*." *Softwood Lumber*, 70 Fed. Reg. 73,437 (Dep't Commerce Dec. 12, 2005), and accompanying IDM at Cmt. 8 (emphasis added).

Further, *Chlorinated Isocyanurates from Spain* supports Commerce's determination that Suzano's purchase of pulp production assets in the form of the Fibria acquisition is distinct from the closure or sale of a production facility. In the remand redetermination, relying on *Chlorinated Isocyanurates from Spain*, Commerce explained that there is a substantial difference between selling facilities that are no longer operating and acquiring new production facilities to expand existing operations because companies are "in the business of producing and selling commercial goods to consumers; they are not in the business of manufacturing and selling or disposing of entire production facilities." Redet. at 22-23 (quoting *Chlorinated Isocyanates from Spain* IDM at Cmt. 1 (citing *Softwood Lumber from Canada 2004* IDM at Cmt. 8)). As Commerce explained, "{a} disposal or sale of an entire facility represents non-recurring income that is entirely separate from a company's normal business operations." *Id.* at 23. In contrast, Commerce explained, "companies purchase production assets, whether it be through the acquisition of an established company like Fibria, or a new factory, with the intent to expand normal business operations." *Id.* "The cost of acquiring such production assets is clearly related to the general operations of the acquiring company and are different from any gain or loss resulting from the sale of a plant or facility." *Id.* Commerce thus concluded that, "{i}n this case the merger of Suzano and Fibria resulted in an expansion of Suzano's general operations." *Id.*

17

(citing Suzano's Initial Section D Questionnaire Response at Exhibit D-19a).

Based on Commerce's definition of the term "investment related," Suzano's purchase of a production asset related to expanding existing operations — in this case, its pulp operations — is not an "investment." Such "routine activities relate to the general operations of the company as a whole because they result from activities that occurred to *support on-going production operations*." *Chlorinated Isocyanurates from Spain* at Comment 1 (emphasis added). Regardless of the scale of the purchase or the scale of the losses incurred, the fact remains that Suzano's actions with respect to the Fibria acquisition "supported on-going production operations" by adding additional production capacity. Redet. at 21, 23. Thus, because the Fibria acquisition was related to the expansion of Suzano's production operations rather than a "separate profit-making activity," it cannot be considered an "investment." *See Steel Flat Products from Korea* IDM at Cmt. 14.

Fourth, Suzano takes issue with Commerce's reliance on *Corus Engineering Steels Ltd. v. United States* for the proposition that inclusion of "restructuring costs" in a respondent's G&A expenses has been upheld by the Court. Pl. Cmt. at 11 (citing Redet. at 9 (citing 27 C.I.T. 1286, 1298-1300 (2003)). Suzano contends that *Corus* is distinguishable because, in that case, the Court found that Commerce's determination to include restructuring costs resulting from the closure of a single furnace and a rolling mill (not an entire business or facility, but *part* of a facility) in the respondent's financial expenses was reasonable, whereas in this case, in acquiring Fibria, Suzano was not purchasing a single production line or a single facility, but acquiring a different, substantially larger company in its entirety with its own separate operations and facilities. *Id.* Contrary to Suzano's suggestion that the acquisition of Fibria is analogous to the closure or sale of a business, division, or facility for purposes of the financial expense

calculation, Commerce's practice is to distinguish between these two types of events.  As Commerce explained, "there is a substantial difference between selling facilities that are no longer operating and acquiring new production facilities to expand existing operations" because "{a} disposal or sale of an entire facility represents non-recurring income that is entirely separate from a company's normal business operations."  Redet. at 22-23 (citing *Chlorinated Isocyanates from Spain*, 74 Fed. Reg. 50,774 (Dep't of Commerce Oct. 1, 2009), and accompanying IDM at Cmt. 1).  Commerce distinguished such a disposal or sale of a facility from Suzano's acquisition of Fibria because that acquisition constituted the purchase of production assets to expand Suzano's normal business operations.  *Id.* at 23; *see also id.* ("The cost of acquiring such production assets is clearly related to the general operations of the acquiring company and are different from any gain or loss resulting from the sale of a plant or facility.").  Commerce concluded that the derivative losses at issue in this case are not associated with the closure of a production facility, but rather are derivative losses related to Suzano's hedging activities associated with the financing of Suzano's expansion of operations.  *Id.* at 22.[2]

Fifth, Suzano challenges Commerce's reliance on *Granular Polytetrafluoroethylene Resin from India*.  Pl. Cmts. at 11-12 (citing 87 Fed. Reg. 3,772 (Dep't of Commerce Jan. 25, 2022), and accompanying IDM at Cmt. 5).  As Suzano acknowledges, "the costs in *Granular Polytetrafluoroethylene Resin from India* were incurred as a *result* of a demerger, which Commerce determined should be included in respondent's G&A expenses based on the agency's precedent."  *Id.* at 12 (emphasis in the original) (citing IDM at Cmt. 5).  The decision recognizes that "that restructuring costs incurred as a result of a merger and classified as extraordinary

---

[2]  Commerce's reference to its reliance on *Corus* as being "misplaced" was limited to Commerce's observation that *Corus* did not involve restructuring costs related to mergers.  Redet. at 23 n.94.

expenses in a respondent's financial statements are includable in a respondent's G&A expense

rate calculation." *Granular Polytetrafluoroethylene Resin from India*, IDM at Cmt. 5 (citing

*Carbon and Alloy Steel Wire Rod from Spain*, 83 Fed. Reg. 13,233 (Dep't of Commerce March

28, 2018), and accompanying IDM at Cmt. 2. That decision also recognized that "such costs are

neither unusual nor infrequent" because they "are commonly incurred by companies in the

manufacturing sector as they try to reduce operating costs{.}" *Id.* Here, Commerce found that

Fibria's pulp operations are directly related to Suzano's normal and typical operations and, thus,

that Suzano's acquisition of Fibria for purposes of expanding Suzano's normal operations was

not unusual. Redet. at 9. Commerce also found that the hedging activities conducted by Suzano

related to the financing of the acquisition are normal activities designed to hedge its company-

wide exposure to foreign currency risk. *Id.* Based on its practice, Commerce found that costs

related to mergers, demergers, and restructuring of a company's operations are not unusual in

nature and, thus, has included those costs in the financial expense ratio calculation. *Id.*

Sixth, Suzano ignores the definition of investment in asserting that "{t}he costs at issue

here relate to the investment itself – specifically, the financing costs incurred to make the initial

acquisition of a separate company{.}" Pl. Cmt. at 12. Commerce defines investment-related

activity as "a separate profit-making activity *not* related to the company's normal operations."

*Certain Carbon and Alloy Steel Cut-to-Length Plate From the Federal Republic of Germany*, 82

Fed. Reg. 16, 360 (Dep't of Commerce Apr. 4, 2017), IDM at cmt. 33 (emphasis added); *AG der

Dillinger Hüttenwerke*, 532 F. Supp. 3d at 1344 (discussing same). Here, Suzano's purchase of

Fibria relates to the expansion of Suzano's normal operations because both companies are pulp

producers. Redet. at 21. This case does not involve a "separate profit-making activity," but

rather the expansion of Suzano's general operations through the purchase of a production asset.

As Commerce explained, "the merger of Fibria is an expansion of Suzano's normal production operations, not a separate profit-making activity." Redet. at 21-23.  And Suzano's derivative losses relate to its currency hedging activity.  *Id.* at 6-7.  Indeed, Suzano hedging policy states that it uses derivative transactions "exclusively for hedging purposes."  *Id.* at 7.

Finally, Suzano's contention that the derivative losses can be simultaneously "financing costs" and "investment-related" because of the purpose and significance of the derivatives losses here — that they relate to financing the Fibria acquisition (*see* Pl. Cmt. at 12) — is incorrect.  Suzano conflates financing activity with investment-related activity, which Suzano may not do.  *See AG der Dillinger*, 532 F. Supp. 3d at 1345.  Further, Suzano's theory is inconsistent with Commerce's practice, which "considers the nature of every income and expense item separately *regardless of the event that caused it*" and regardless of "*how significant it is*."  *Softwood Lumber*, 70 Fed. Reg. 73,437 (Dep't Commerce Dec. 12, 2005), and accompanying IDM at Cmt. 8 (emphasis added).  Under this standard, that financing the potential Fibria acquisition caused Suzano to use derivatives does not change the nature of the activity from cash management related to Suzano's general business operations into investment activity.  Indeed, because money is fungible, Suzano could have spent any cash generated by its use of derivatives on any number of things.  Thus, Suzano's argument fails as a matter of law and is not supported by record evidence.

**C.  Commerce Lawfully Determined That Suzano's Derivative Expenses Related To The Fibria Purchase Were Not Extraordinary**

An "extraordinary" expense is one in which the event causing the expense is "unusual in nature and infrequent in occurrence."  *Hornos Electricos de Venezuela*, 285 F. Supp. 2d at 1365 (quoting *Floral Trade Council of Davis, CA*, 16 C.I.T. at 1016).  "An event is unusual in nature if it 'possesses a high degree of abnormality and is of a type clearly unrelated to, or only

incidentally related to, the ordinary and typical activities of the enterprise.'" *Id.* (citation

omitted). "An event is infrequent in occurrence if it 'is of a type that would not reasonably be

expected to recur in the foreseeable future.'" *Id.* at 1365-66 (citation omitted).

In the remand redetermination, Commerce found that Suzano's audited financial

statements and quarterly earnings releases demonstrate that its derivative losses are not

extraordinary, but rather represent financing expenses related to Suzano's normal operations.

Redet. at 7.  In particular, Commerce found that Suzano's acquisition of Fibria, a pulp producer,

was not unusual in nature because it constituted an expansion of Suzano's normal operations,

which include the production of pulp, paper, and tissue.  *Id.* at 8 (citations omitted).  Commerce

also found that Suzano's derivative losses associated with the financing of the Fibria acquisition

were not extraordinary based on Suzano's concession that hedging against exposure to foreign

currency fluctuations is a normal part of doing business in multiple currencies.  *Id.* (citing

Suzano's Initial Section A Questionnaire Response at Ex. A-17 at "Management Report";

Suzano's Initial Section D Questionnaire Response at Ex. D-19a (1Q18 Earnings Release)

(stating that "the current volatility in the BRL/USD exchange rate makes {derivatives} the most

adequate strategy for protecting the Company's cashflow").

Commerce further found that Suzano's use of derivative instruments to hedge its foreign

currency exposure is not unusual in nature or infrequent in occurrence because it is a strategic

part of capital management used by Suzano on a normal and frequent basis.  *Id.* at 8-9.  This was

demonstrated by Suzano's currency exposure policy, which states that "Suzano carries out

derivatives transactions exclusively for hedging" surplus cash.  *Id.* at 9 (citing Suzano's Initial

Section D Questionnaire Response at Ex. D-19a ("2Q18 Earnings Release" at "Derivative

Transactions").  Commerce found that, if Suzano did not carry out these types of transactions on

a normal and frequent basis, there would be no need for such a policy. *Id.*

Suzano's challenges to this conclusion do not undermine the reasonableness of Commerce's determination or demonstrate that it is unsupported by substantial evidence. First, Suzano contends that Commerce's interpretation of its derivative policy is unreasonable because "the mere existence of a general policy to use derivatives to hedge foreign currency exposure does not preclude finding that *specific* derivatives may have been used for a different purpose{ }" such as financing the Fibria acquisition rather than for "general cash management" purposes. Pl. Cmt. at 14 (emphasis in the original). But Commerce found that Suzano identified no record evidence that "the hedging policy cited in its {quarterly earnings} releases is only used for specific purposes." Redet. at 19. Rather, Suzano's policy states that the company engages in "derivatives transactions exclusively for hedging purposes." *Id.* at 6-7, 20. Commerce also relied on evidence of hedging practices in all of the quarterly earnings releases and Suzano's audited financial statements. *Id.* at 19-20 (citing Suzano's Initial Section D Questionnaire Response at Ex. D-19a; Suzano's Initial Section A Questionnaire Response at Exhibit A-17 at n. 4 (showing evidence of derivative transactions for 2017 and 2018)). This evidence further supported Commerce's conclusion that gains and losses on hedging activities is frequent and normal in occurrence. *Id.*

Second, Suzano maintains that Commerce's reasoning that all derivatives are the same leads to absurd results. In Suzano's view, even if it specifically acquired currency hedges to reduce risk in a particular currency-denominated investment that currency hedge would, under Commerce's rule, *ipso facto* be considered part of Suzano's ordinary operations — even if Commerce agreed that the activity being financed was unequivocally an investment such as a real-estate venture. Pl. Cmts. at 14. In the remand redetermination, Commerce rejected this

23

"hypothetical scenario" because it is inconsistent with Suzano's established policy for using derivative transactions.  Redet. at 20.  Far from failing to consider the actual use of the derivatives, as Suzano contends (Pl. Cmts. at 14), Commerce relied on Suzano's policy statement in its quarterly earnings release, which expressly states that "Suzano carries out derivatives transactions exclusively for hedging purposes{,} and that its "currency exposure policy seeks to minimize the volatility of its cash generation and to impart greater flexibility to cash flow management." *Id.* at 20 (quoting Suzano's Initial Section D Questionnaire Response at Exhibit D-19a).  Based on this policy, Commerce found that Suzano "has plainly indicated that it uses derivatives for the purpose of cash flow management, not to reduce risk in a particular currency-denominated investment as it hypothesized." *Id.*  Consideration of Suzano's hedging policy is consistent with Commerce's practice in calculating financial expenses of examining the nature of the financial assets and liabilities that generate the financial expenses rather than examining the particular uses of the funds or activities.  *Id.* at 17 (citing *Softwood Lumber from Canada 2004 IDM* at Cmt. 10).

Third, Suzano contends that Commerce unreasonably found that Suzano's acquisition of Fibria amounted to an ordinary expansion of Suzano's pre-existing business, given that the companies were separate legal entities and the primary businesses of the two companies remain separate.  Pl. Cmts. at 15-16.  Record evidence demonstrated that Suzano's normal business operations include the production of pulp, paper, and tissue, and that the Fibria acquisition was an expansion of Suzano's normal pulp operations.  Redet. at 8.  Based on that evidence, Commerce found that Fibria's pulp operations are directly related to the typical and normal operations of Suzano.  *Id*. at 9.  Commerce further explained that, "{a}lthough the acquisition of Fibria will not occur again (because the company was merged into Suzano)," Commerce found

that "the acquisition of Fibria for expanding Suzano's normal operations is not unusual{ }" given that "Fibria's pulp operations are directly related to Suzano's normal and typical operations." *Id.* (citing Suzano's Initial Section D Questionnaire Response at D-31). Relying on its longstanding practice, Commerce concluded that expenses related to a merger or a restructuring of a company's operations are not extraordinary. *Id.* (citing *Chlorinated Isocyanates from Spain*, 74 Fed. Reg. 50,774 (Dep't of Commerce Oct. 1, 2009), and accompanying IDM at Cmt. 1; *Softwood Lumber from Canada* 2002, 67 Fed. Reg. 15,539 (Dep't of Commerce Apr. 2, 2002), and accompanying IDM at Cmt. 16; *Pasta from Italy* IDM at Cmt. 11). Nothing in this record remotely suggests that Suzano's purchase of Fibria's pulp operations is "highly abnormal, and unrelated or incidentally related to the ordinary and typical activities" of Suzano in light of its own pulp operations. *See Hornos Electricos de Venezuela*, 285 F. Supp. 2d at 1365.

Fourth, Suzano contends that Commerce's reliance on *Certain Pasta from Italy* is "inapt" because the restructuring costs at issue there were mainly incentives paid to top managers to leave the company after the merger took place. Pl. Cmt. at 16 (citing *Certain Pasta from*, 70 Fed. Reg. 71,464 (Dep't of Commerce Nov. 29, 2005), and accompanying IDM at Cmt. 11). Suzano contends that incentives paid to management after a merger of two companies are clearly distinct from costs associated with derivative instruments used to finance its acquisition of Fibria, the world's largest pulp manufacturer. *Id.* Commerce rejected this argument because its definition of extraordinary, as sustained by this Court, relates not to the significance of the gain or loss, but rather the underlying event that caused the gain or loss. Redet. at 24 (citing *Floral Trade Council*, 16 CIT at 1016).

Further, Suzano fails to explain why the timing of the incentives at issue in *Certain Pasta from Italy* is material to whether those restructuring costs constitute an extraordinary event. In

that case, Commerce found that expenses related to the merger of two companies — payments to employees to leave the company as part of overall restructuring costs paid by the new owners — were not extraordinary because such costs are "commonly incurred by companies in the production and manufacturing sector" as they seek to reduce operating costs, expand capacity, and increase competitiveness. *Certain Pasta from Italy*, 70 Fed. Reg. 71,464 (Dep't of Commerce Nov. 29, 2005), and accompanying IDM at Cmt. 11.  As long as the derivative transactions were directly related to the merger, it does not matter whether they were incurred before or after the companies were joined. *See Granular Polytetrafluoroethylene Resin from India*, 87 Fed. Reg. 3,772 (Dep't of Commerce Jan. 25, 2022), and accompanying IDM at Cmt. 5) (concluding that restructuring costs incurred as a result of a merger are includable in a respondent's financial expense rate calculation because "such costs are neither unusual nor infrequent" as they "are commonly incurred by companies in the manufacturing sector as they try to reduce operating costs").

Fifth, Suzano challenges Commerce's finding that the amount of a derivative expense is not determinative of whether an event is extraordinary, and also challenges the agency's practice of looking to the underlying event itself to make its assessment.  Pl. Cmt. at 13-14.  In particular, Suzano contends that Commerce's determination as to whether an event is extraordinary should be based on the financial impact and the magnitude of the gains or losses associated with that event.  *Id.* at 16-17.  Although not disputing that the Fibria acquisition required a great deal of funding to complete, Commerce explained that the size of the transaction is not a factor in its longstanding practice involving investments and extraordinary expenses for purposes of the financial expense ratio calculation.  Redet. at 24.  Commerce further explained that its definition

of extraordinary — unusual in nature and infrequent in occurrence — relates not to the significance of the gain or loss, but rather the underlying event that caused the gain or loss.  *Id.*

Sixth, Suzano asserts that Commerce failed to address record evidence that Suzano's derivative losses tied to the Fibria acquisition were much larger than previously reported annual losses, as required by the remand order.  Pl. Cmts. at 13 (citing *Suzano*, 589 F. Supp. 3d at 1237 (citing Suzano's 2018 financial report)).  Commerce addressed this issue.  Related to the Court's statement that the derivative losses in question "were more than one and a half times the sum of Suzano and Fibria's total expenses for the preceding year," Commerce explained that it was unclear as to the Court's reference to "total expenses."  Redet. at 10 n.52.  To clarify the record related to total expense, Commerce explained that, while the derivative expenses did increase significantly, those losses did not exceed Suzano's and Fibria's total expenses in 2018 based on the sum of the companies' cost of sales plus operating expenses and financial expenses as reflected in the companies' financial statements.  *Id.*  Further, Commerce provided an explanation as to how the Fibria acquisition could be deemed unextraordinary in light of its costs.  Redet. at 8-9, 23-25.

Seventh, Commerce also addressed the Court's concern that it had failed to consider evidence in the audited financial reports stating that 2018 was an atypical year for Suzano, "given the start of the process that led to the integration with Fibria," and that "net financial expense{s} stood at R$1.0 billion," a figure that was up 14% from 2017 "driv{en} by all the expenses {of} financing the business combination with Fibria."  *Suzano S.A.*, 589 F. Supp. 3d at 1237 (citing Suzano's Initial Section D Questionnaire Response at Ex. D-19a).  As discussed above, Commerce explained that whether an event is extraordinary does not turn on the significance of the gain or loss, but rather the underlying event that caused the gain or loss.

Redet. at 24.  Here, Commerce found that the derivative losses were not extraordinary because they represent financing expenses related to the expansion of Suzano's pulp operations through the Fibria acquisition.  Redet. at 7-8.  Commerce also found that the hedging activities carried out by Suzano to finance the Fibria acquisition were normal activities conducted to hedge its company-wide exposure to foreign currency risk.  *Id.* at 8-9.

Eighth, Suzano argues that, given the statutory requirement to construct costs that "reasonably reflect the costs associated with production and sale of the merchandise," it was unreasonable for Commerce to ignore the Fibria transaction — what Suzano characterizes as "a large 'once in a lifetime' transaction."  Pl. Cmts. at 17 (quoting 19 U.S.C. §1677b(f)(1)(A)).  Commerce did not ignore the Fibria transaction, but considered the acquisition within the context of its longstanding practice whereby a respondent's purchase of production assets constitutes normal business operations.  Redet. at 7-8.  Commerce also found that Suzano's hedging activities related to the financing of the Fibria acquisition were normal activities to hedge its exposure to foreign currency risk.  *Id.* at 8-9.  Commerce acted consistently with its longstanding practice in which Commerce has determined that costs related to mergers, demergers, and restructuring of a company's operations are not unusual in nature, and has included those costs in the calculation of the costof production.  *Id.*  Thus, Suzano's contention that Commerce must look to the size of the financial expenses is inconsistent with Commerce's longstanding policy.

Finally, Suzano contends that the inclusion of its derivative losses would distort the calculation of its costs of production such that the expenses would not "reasonably reflect the costs associated with production and sale of the merchandise."  Pl. Cmt. at 17-18 (quoting 19 U.S.C. § 1677b(f)(1)(A)).  The statute, however, does not quantify reasonableness.  Redet. at 24.  Where the statute is silent or ambiguous on a specific issue, the Court must sustain Commerce's

practice as long as it is based on a permissible construction of the statute.  *Id.*; *see also Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).  Rather than interpreting the meaning of "reasonably reflect" to be based on the magnitude of an expense, Commerce interpreted the statute consistent with its practice and court precedent, neither of which require Commerce to consider the magnitude of expenses as a basis for including or excluding those expenses in the financial expense calculation.  Redet. at 24.  Commerce's interpretation here is permissible because it is "reasonable, consistent with the goals of the statute, and reflects Commerce's long-standing practice."  *Apex Exps. v. United States*, 777 F.3d 1373, 1379 (Fed. Cir. 2015).

Because substantial evidence supports Commerce's determination that Suzano's derivative expenses related to the Fibria acquisition are not extraordinary, the inclusion of these expenses in Commerce's cost of production calculations was reasonable.  *See, e.g.*, *Downhole Pipe & Equipment, L.P.*, 776 F.3d at 1378 ("This court declines Appellants' invitation to reweigh the evidence in order to reject Commerce's conclusions, which were well-supported and fully explained.").

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's remand results and enter final judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General


PATRICIA M. McCARTHY
Director

29

<div style="margin-left: 50%;">

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

</div>

OF COUNSEL:

BENJAMIN JUVELIER
Attorney
Office of the Chief Counsel
    for Trade Enforcement & Compliance
U.S. Department of Commerce

January 13, 2023

<div style="margin-left: 50%;">

/s/ Antonia R. Soares
ANTONIA R. SOARES
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-7405
Email: antonia.soares@usdoj.gov

</div>

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the word limitation of Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains 8,682 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

/s/ Antonia R. Soares
ANTONIA R. SOARES

## CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 13th day of January 2023, a copy of the

foregoing "DEFENDANT'S REPLY IN SUPPORT OF THE DEPARTMENT OF

COMMERCE'S REMAND REDETERMINATION" was filed electronically.  I understand that

notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.


/s/ Antonia R. Soares
ANTONIA R. SOARES