Slip Op. 23-56

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **SUZANO S.A., (FORMERLY KNOWN AS SUZANO PAPEL E CELULOSE S.A.),** <br><br> Plaintiff, <br><br> v. <br><br> **UNITED STATES,** <br><br> Defendant, <br><br> and <br><br> **DOMTAR CORPORATION,** <br><br> Defendant-Intervenor. | Before: Gary S. Katzmann, Judge <br> Court No. 21-00069 |

## OPINION AND ORDER

[The court sustains in part and remands in part the Department of Commerce's Remand Results.]

Dated: April 20, 2023

Craig A. Lewis, Nicholas W. Laneville, and Cayla D. Ebert, Hogan Lovells US LLP, of Washington, D.C., for Plaintiff Suzano S.A.

Antonia R. Soares, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States. With her on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, Tara K. Hogan, Assistant Director. Of counsel on the brief was Benjamin Juvelier, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Daniel L. Schneiderman, and Stephen J. Orava, King & Spalding, LLP, of Washington, D.C., for Defendant-Intervenor Domtar Corporation.

      Katzmann, Judge: The court is asked to revisit a challenge to Commerce's calculation of cost of production. Plaintiff Suzano S.A (formerly known as Suzano Papel e Celulose S.A.) ("Suzano"), brought this action against Defendant United States ("the Government") to challenge

the Department of Commerce's ("Commerce") final determination in the 2018–2019 administrative review of the antidumping duty order on uncoated paper from Brazil. See Certain Uncoated Paper From Brazil: Final Results of Antidumping Duty Administrative Review; 2018–2019, 86 Fed. Reg. 7,254 (Dep't Com. Jan. 27, 2021) ("Final Results"). Suzano argued that Commerce erred by failing to exclude certain of its derivative trading expenses from the cost of production calculation as both (1) investment-related and (2) extraordinary. The court remanded, concluding that Commerce's decision to include the expenses in Suzano's cost of production was unsupported by substantial evidence on both counts. Suzano S.A. v. United States, 46 CIT __, __, 589 F. Supp. 3d 1225, 1228 (2022) ("Suzano I").

On remand, Commerce continues to determine that the derivative trading expenses should be included in the cost of production, as the expenses were neither investment-related nor extraordinary. See Final Results of Redetermination Pursuant to Ct. Remand, Nov. 14, 2022, ECF No. 60-1 ("Remand Results"). Suzano challenges the Remand Results on the basis that (1) record evidence clearly demonstrates a tie between the derivative losses with the acquisition of Fibria, an "investment-related" activity; and (2) the record evidence shows that the derivate losses are extraordinary expenses. Pl.'s Cmts. in Opp. to U.S. Dep't of Com.'s Final Results of Redeter. Pursuant to Ct. Remand, Dec. 14, 2022, ECF No. 62 ("Pl.'s Br."). The Government requests the court sustain the remand results, Def.'s Reply in Supp. of Dep't of Com.'s Remand Redeter., Jan. 13, 2023, ECF No. 64 ("Def.'s Br."), as does Defendant-Intervenor Domtar Corporation ("Domtar"), Def.-Inter.'s Resp. in Supp. of Com.'s Remand Redeter., Jan 10, 2023, ECF No. 63 ("Def.-Inter.'s Br.").

For the reasons set forth below, the court concludes that Commerce's determinations on investment-related costs are supported by substantial evidence and further is in accordance with

law and the court's remand instructions. The court concludes, however, that Commerce's determination on extraordinary expenses is unsupported by substantial evidence. The court therefore sustains the Remand Results in part and remands in part for further explanation.

## BACKGROUND

The court described in detail the factual and legal background of this case in Suzano I. Only the details relevant to the current disposition are provided below.

### I. Statutory Framework and Agency Practice

In calculating a product's normal value, Commerce may choose to disregard sales made at less than the cost of production ("COP"). 19 U.S.C. § 1677b(a)(1)(B)(i). COP is equal to the sum of (1) the cost of "materials and . . . fabrication or other processing," (2) "selling, general, and administrative expenses," and (3) "the cost of all containers and coverings" required for sale and shipment. 19 U.S.C. § 1677b(b)(3)(A)–(C). Costs, including COP, are normally calculated based on records kept in accordance with the generally accepted accounting principles of the exporting country. 19 U.S.C. § 1677b(f)(1)(A). Commerce "shall consider all available evidence on the proper allocation of costs, including that which is made available by the exporter or producer on a timely basis, if such allocations have been historically used by the exporter or producer . . . ." Id. (emphasis added).

In administering the statute, Commerce has generally excluded both "investment-related" and "extraordinary" expenses from COP. AG der Dillinger Hüttenwerke v. United States, 45 CIT __, __, 532 F. Supp. 3d 1338, 1344 (2021) (noting Commerce's "practice [is] to exclude investment-related gains and losses from the calculation of the cost of production because it considers them a separate profit-making activity unrelated to a company's normal operations"); see also Hornos Electricos de Venez. v. United States, 27 CIT 1522, 1534, 285 F. Supp. 2d 1353,

1365 (2003) ("To be considered an 'extraordinary' event giving rise to extraordinary treatment . . . the event must be unusual in nature and infrequent in occurrence.") (quoting <u>Floral Trade Council v. United States</u>, 16 CIT 1014, 1016 (1992)).

Legislative history indicates that the purpose of enacting 19 U.S.C. § 1677b(f) was to "harmonize[] the methods of calculating cost for purposes of examining sales below cost and determining constructed value." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, at 840 (1994), <u>as reprinted in</u> 1994 U.S.C.C.A.N. 4040, 4171 ("<u>SAA</u>").[1] Thus, the statute intends that:

> Costs shall be allocated using a method that <u>reasonably reflects and accurately captures</u> all of the <u>actual costs incurred in producing and selling the product</u> under investigation or review. In determining whether to accept the cost allocation methods proposed by a specific producer, Commerce will consider the production cost information available to the producer and whether such information could <u>reasonably be used to compute a representative measure of the materials, labor and other costs, including financing costs, incurred to produce the subject merchandise,</u> or the foreign like product. Commerce also will consider whether the producer historically used its submitted cost allocation methods to compute the cost of the subject merchandise prior to the investigation or review <u>and in the normal course of its business operation.</u>

<u>Id.</u> at 4172 (emphasis added).

## II.  *Procedural History*

On February 24, 2021, Suzano initiated this appeal to contest Commerce's <u>Final Results</u>. Summons, ECF No. 1; Compl., Mar. 2, 2021, ECF No. 9. The central issue was whether Commerce's categorization of certain of Suzano's expenses as financial costs was supported by substantial evidence. <u>Suzano I</u>, 589 F. Supp. 3d at 1228. Following briefing and oral argument,

---

[1] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

the court remanded on August 16, 2022, for further explanation by Commerce regarding its inclusion of Suzano's derivative expenses in the COP calculation.  See generally id.

On remand, Commerce released its draft results continuing to find that the expenses were neither investment-related nor extraordinary.  See Draft Results of Redeter. Pursuant to Ct. Remand (Dep't Com. Oct. 13, 2022), P.R.R. 1 ("Draft Remand Results").[2]  After receiving written comments from the parties, Commerce issued the Remand Results reiterating its reasoning that the expenses were neither investment-related nor extraordinary, and thus that the expenses would be included in the COP.  Remand Results at 17.  The matter is now before the court as the parties have filed their comments to the Remand Results.  USCIT R. 56.2(h).

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c).  The court sustains Commerce's determinations, findings, and conclusions on remand unless they are unsupported by substantial evidence, or otherwise not in accordance with law.  SeAH Steel VINA Corp. v. United States, 950 F.3d 833, 840 (Fed. Cir. 2020); 19 U.S.C. § 1516a(b)(1)(B).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951); Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).  In conducting its review, the court's function is not to reweigh the evidence but rather to ascertain whether Commerce's determinations are supported by substantial evidence on the record.  Matsushita Elec. Indus. Co. v. United States, 750

---

[2] Documents on the agency record are referred to by the number provided in the U.S. Department of Commerce's administrative record index filed with the Court, see J.A., Apr. 12, 2021, ECF No. 20. Confidential documents are referred to with the rubric "C.R." followed by the relevant number; public documents and public versions of confidential documents are referred to with the rubric "P.R." followed by the relevant number.  Documents on the public agency record on remand, filed with the Court on November 17, 2022, ECF No. 61, are referred to by the rubric "P.R.R."  No confidential agency record has been filed following remand.

F.2d 927, 936 (Fed. Cir. 1984); see also DAK Ams. LLC v. United States, 45 CIT __, __, 517 F. Supp. 3d 1349, 1362 (2021).

## DISCUSSION

Suzano challenges Commerce's continued treatment of the derivative expenses as neither investment-related nor extraordinary. Pl.'s Br. at 6–18. As noted, Suzano again raises two issues: (I) whether Commerce concluded by substantial evidence that the derivative expenses were not investment-related; and (II) whether Commerce concluded by substantial evidence that the derivative expenses were not "extraordinary." See id. Upon review, the court sustains the Remand Results in part and remands in part.

### I. *The Court Sustains Commerce's Determination That the Derivative Losses Were Not Investment Costs.*

In its original opinion, the court concluded that "Commerce failed to adequately consider Suzano's unaudited quarterly reports," and thus its determination that the derivative losses were not investment-related "is unsupported by substantial evidence." Suzano I, 589 F. Supp. 3d at 1234. Specifically, the court pointed to the portion of the quarterly reports separating the expenses related to the Fibria acquisition, including derivative losses. Id. In response to the court's remand instructions, Commerce addressed the evidence and has offered a detailed explanation as to why the derivative losses are properly treated as operating expenses under Brazilian GAAP, and also points to other record evidence that the derivatives transactions were exclusively for hedging purposes in general cash flow management. Remand Results at 19–21; see also Draft Remand Results at 7–9.

The question raised by Suzano is ultimately one of fact, i.e., whether the losses incurred by Suzano through the derivatives trading is treated as an investment cost. Commerce has now addressed the record evidence that the court identified in the original opinion with an explanation,

see Remand Results at 19–21, and additionally offers contrary evidence in the quarterly reports describing the policy of Suzano as "carr[ying] out derivatives transactions exclusively for hedging purposes," id. at 19 (emphasis added); see also Letter from Steptoe & Johnson LLP to Sec'y Commerce, re: Antidumping Duty Investigation of Certain Uncoated Paper from Brazil: Suzano's Resp. to Questionnaire for Section D at D-31, D-38–39, & Exs. D-19, D-19a at 10 (Aug. 21, 2019),P.R. 79–80 ("Initial Section D Resp."). Commerce explains that the losses from derivatives trading is incurred as part of its hedging activities, rather than for the purposes of a specific investment activity. Remand Results at 20.

The record thus presents conflicting evidence on the treatment of the derivative losses, with a portion of the quarterly reports supporting the view that the losses were connected to the investment activity, and another portion of the quarterly reports and the Financial Statements supporting the opposite conclusion. Under such circumstances, the court gives deference to Commerce as the expert factfinder in determining the representativeness of the evidence and resolving the factual question. See Nippon Steel Corp. v. United States, 458 F.3d 1345, 1358 (Fed. Cir. 2006). "[E]ven if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent [Commerce's] determination from being supported by substantial evidence." Id. (first alteration in original) (internal quotation marks omitted) (quoting Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001)); see also SeAH Steel VINA, 950 F.3d at 843 (citing Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)).

Suzano argues that the existence of the policy merely suggests that derivatives may be used for hedging purposes. Pl.'s Br. at 6. Notwithstanding the fact that this argument is in tension with the use of the phrase "exclusively for hedging purposes," Initial Section D Resp. Ex. D-19a at 10 (emphasis added), entertaining this inquiry would require the court to re-weigh the evidence or

draw a separate inference from the record. The court thus declines to disturb Commerce's findings, especially "[w]hen the totality of the evidence does not illuminate a black-and-white answer to a dispute." Nippon Steel Corp., 458 F.3d at 1359. This deference is appropriate considering that the court "'has consistently upheld Commerce's reliance on a firm's expenses as recorded in the firm's financial statements, as long as those statements were prepared in accordance with the home country's GAAP and does not significantly distort the firm's actual costs,' with the burden of proving distortion falling on the company." Solvay Solexis S.p.A. v. United States, 33 CIT 687, 690, 628 F. Supp. 2d 1375, 1379 (2009) (quoting Cinsa, S.A. de C.V. v. United States, 21 CIT 341, 345, 966 F. Supp. 1230, 1235 (1997)), dismissed on consent motion, 375 F. App'x 3 (Fed. Cir. 2009). In short, the court upholds Commerce's further explanation of its conclusion that the derivative losses were not investment costs as based on substantial evidence and otherwise in accordance with law.

> II.  **The Court Remands Commerce's Determination That the Derivative Losses Were Not Extraordinary.**

In examining the Final Results, the court concluded that Commerce had not supported its inclusion of the derivative losses in the COP by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Suzano I, 589 F. Supp. 3d at 1236. The court explained that "Commerce's determination of whether certain costs must be excluded as extraordinary remains subject to its statutory obligation to employ 'a method that reasonably reflects and accurately captures all of the actual costs incurred in producing and selling the product under investigation or review.'" Id. (emphasis added) (quoting Am. Silicon Techns., 261 F.3d at 1377).

The court finds that Commerce has again neglected to support its conclusion by "such relevant evidence as a reasonable mind might accept as adequate." Universal Camera, 340 U.S. at 477. Commerce has failed to provide adequate explanation as to whether its conclusions on the

derivative losses are based on a method that reasonably reflects and accurately captures all of the actual costs.

In its Remand Results, Commerce first explains that the definition of extraordinary relates not to the amount of gain or loss, but rather the underlying event which caused the gain or loss. Remand Results at 10. Commerce then asserts that Suzano's acquisition of Fibria was simply an expansion of normal operations. Id. at 21–23. Commerce further states that the derivative losses in question relate to Suzano's hedging activities and the financial derivatives (assets) used by Suzano as part of those activities and not to the acquisition of Fibria. Id. at 23. Finally, Commerce submits that because the statute does not quantify reasonableness, the determination of a reasonable and appropriate method is left to the discretion of Commerce. Id. at 24.

Commerce's reasoning is flawed with several inconsistencies. Commerce cites to Floral Trade Council of Davis, Cal. v. United States, 16 CIT 1014, 1014 (1992), aff'd, 74 F.3d 1200 (Fed. Cir. 1996), for its main proposition that the "underlying event" is what defines the extraordinary nature of the event. Remand Results at 10 & n.53, 24 & n.96. A close reading of the case, however, reveals no such formulation used by the Floral Trade court. In fact, Floral Trade concerned the adjustment of production expenses due to collapse of a water table and a viral attack. 16 CIT at 1014. The holding in Floral Trade was that the agency is "allowed to prefer substance over form" in not blindly following the financial statement's treatment of the costs, but rather considering the existence of extraordinary events such as virus attacks that led to the incurring of such costs. Id. at 1017. This holding is in tension with Commerce's approach in the instant case, where it continues to rely on the classifications in the financial statement and the quarterly reports, see Remand Results at 7, without considering the "underlying event" of a major acquisition that may

have triggered the costs, see id. at 21–24. Based on this record, the Floral Trade case does not lend support to Commerce's reasoning on this point.

Commerce further points to some of its previous practice in trying to justify its approach. "[I]f Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom." Save Domestic Oil, Inc. v. United States, 357 F.3d 1278, 1283–84 (Fed. Cir. 2004). "Thus, the question becomes: (1) whether Commerce has a standard practice . . . and, (2) if so, whether Commerce reasonably departed therefrom." Id. at 1284.

Turning to the first question, Commerce has not demonstrated a standard practice of treating the costs in question. Commerce insists that the decision in Final Results of Antidumping Duty Administrative Review of Chlorinated Isocyanates from Spain, 74 Fed. Reg. 50,774 (Dep't Com., Oct. 1, 2009), and accompanying Issues and Dec. Mem. (Sept. 24, 2009) ("Chlorinated Isocyanates from Spain IDM") is distinguishable from the current case. See Remand Results at 22. Yet Commerce also relies on the same for the key proposition that "costs related to mergers, un-mergers, and restructuring of a company's operations are not unusual in nature." Remand Results at 9 & n.49. Aside from the inherent tension in arguing that a case is distinguishable and also arguing that it is applicable, the Chlorinated Isocyanates from Spain IDM does not contain the word "merger" or "un-merger" in its text. Rather, the Chlorinated Isocyanates from Spain IDM only mentions restructuring costs, and Commerce's reasoning is based on the characteristics of restructuring as a streamlining of existing operations:

> Restructuring costs are commonly incurred by companies in the production and manufacturing sector as they try to streamline operations and reduce operating costs. Companies evaluate their overall operations and change them accordingly to meet the changing needs of the general organization. Thus, similar to impairment losses, restructuring costs are period costs that relate to the general operations of the company, rather than to the production of a specific product.

Chlorinated Isocyanates from Spain IDM at 7.  It is unclear, however, whether the same logic applies to expansion of operations, as Commerce now argues, or in cases of mergers and acquisitions involving significant changes to the general organization.

Commerce and the Government equates its practice on restructuring costs with all costs arising from mergers, without further explanation.  Commerce cites to Final Determination of Sales at Less Than Fair Value: Certain Softwood Lumber Products from Canada, 67 Fed. Reg. 15,539 (Dep't Com. Apr. 2, 2002)  and accompanying Issues and Dec. Mem. (Mar. 21, 2002) ("Softwood Lumber from Canada 2002 IDM") at Cmt 16, to support its proposition that costs related to mergers are not included.  Remand Results at 9 & n.49.  While the Softwood Lumber from Canada 2002 IDM did discuss costs related to mergers, the costs in question were "redemption of stock options" resulting from a merger.  Softwood Lumber from Canada 2002 IDM at Cmt 16.

Thus, the key question Commerce should address is whether the costs in question relate to the operations of the company.  Not all costs arising from a merger necessarily relate to operations.  As explained in Final Results of the Antidumping Duty Administrative Review of Certain Softwood Lumber Products From Canada, 70 Fed. Reg. 73, 437 (Dep't Com. Dec. 12, 2005) and accompanying Issues and Dec. Mem. (Dec. 5, 2005) ("Softwood Lumber from Canada 2005 IDM"):

> Fundamentally, however, we do not believe that these transactions should be treated identically by the Department just because they all arise from [respondent]'s acquisitions of new businesses.  Rather, the Department considers the nature of every income and expense item separately regardless of the event that caused it.  Closure expenses are costs incurred to take facilities permanently out of production and, as stated in our position above, because the closed facility is no longer involved in production, the closure costs should not be assigned to the cost of manufacturing of products which are still produced.  Integration and restructuring expenses, on the other hand, are not related to the disposition of assets or closing of the facilities, but are costs incurred in the normal course of business to incorporate the newly

Case 1:21-cv-00069-GSK   Document 67   Filed 04/20/23   Page 12 of 16

Court No. 21-00069                                                                                                   Page 12

> acquired businesses into the company and to streamline the company's continuing operations. Thus, integration and restructuring expenses are costs related to the company's general operations and, as such, should be included in the cost of production.

Softwood Lumber from Canada 2005 IDM at 29–30 (emphasis added). A close reading of this excerpt suggests that unlike the Government's argument, Commerce's practice is not to adopt a simple rule that all expenses related to the merger of two companies, or to the acquisition of a new business, are included in general and administrative ("G&A") costs. Cf. Def.'s Br. at 26. Rather, the practice Commerce adopted in Softwood Lumber from Canada 2005 recognizes that different costs may be related to the acquisition of a new business, such as closure expenses and expenses related to integration and restructuring. It then analyzes the impact of the costs on the actual operations of the company to determine whether the costs should be included in the COP. Furthermore, Commerce notes in Softwood Lumber from Canada 2005 that it "ha[s] changed [its previous] practice and excluded the gains and losses associated with plant closures and sales." Softwood Lumber from Canada 2005 IDM at 35.

  Likewise, Commerce falls short in its reference to Granular Polytetrafluoroethylene Resin from India: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, 87 Fed. Reg. 3,722 (Dep't Com. Jan. 25, 2022), and accompanying IDM (Jan. 18, 2022) ("Resin from India IDM") at Cmt 5. Commerce cites this case in a footnote to support its position that Commerce has an established practice of including costs related to a merger in the COP. See Remand Results at 23 & n.94. The Government further quotes a portion of the Resin from India IDM stating that "restructuring costs incurred as a result of a merger and classified as extraordinary expenses in a respondent's financial statements are includable in a respondent's G&A expense rate calculation." Def.'s Br. at 19–20 (internal quotation marks omitted and emphasis added). As seen in the quote, the Resin from India IDM

only establishes that "restructuring costs" related to mergers and demergers are routinely included in G&A expenses. Resin from India IDM at Cmt. 5.

Thus, despite Commerce's citations of its previous decisions, the court has not been shown that there is an established practice treating all costs resulting from a merger as G&A expenses. If such a practice exists, that practice would only extend to "restructuring costs as a result of a merger," not to any cost or expense related to a merger, such as derivative trading expenses. Restructuring costs have specific meaning in accounting and reporting practices, as explained supra p. 10–11 (discussing Chlorinated Isocyanates from Spain IDM). While severance pay may be considered as a restructuring cost, see Final Results of the Eighth Administrative Review of the Antidumping Duty Order on Certain Pasta From Italy and Determination to Revoke in Part, 70 Fed. Reg. 71,464 (Dep't of Com. Nov. 29, 2005) and accompanying IDM (Nov. 29, 2005) ("Pasta from Italy IDM") at Cmt. 11, nothing in the record suggests that financial costs from derivative trading and hedging in anticipation of an acquisition falls in the category of restructuring costs. Indeed, Commerce itself distinguishes "gains or losses associated with the sale of an entire plant or facility in the general and administrative expense rate calculation," i.e., restructuring gains or losses from non-routine sales, from "costs associated with acquiring a company or a new production facility." Remand Results at 22.

In short, the various previous decisions cited by Commerce do not lend support to its position that it is following established practice to include all costs related to merger transactions in the G&A expense ratio calculation, nor to the notion that placement on the financial statements is dispositive. Rather, Commerce's stated practice is that:

> [N]o matter how a particular item of income or expense is recorded on the company's financial statement, or how significant it is, the Department considers the nature of the item in determining whether it should be included or excluded from the costs. . . . Therefore, we believe that the placement of an income or

expense item on the financial statements should not be the determining factor of whether the amount should be included or excluded from the reported cost.

Softwood Lumber from Canada 2005 IDM at 39. This is in line with Commerce's obligation to adopt methodology that "accurately captures" the costs, Am. Silicon Techns., 261 F.3d at 1378 (quoting SAA, H.R. Doc. 103-316, at 834–35), and will "reasonably be used to compute a representative measure of the materials, labor and other costs, including financing costs, incurred to produce the subject merchandise," SAA, H.R. Doc. 103-316, at 873.

Having found no standard Commerce practice on point, the court need not reach the second prong articulated in Save Domestic Oil. See 357 F.3d at 1284. The inquiry on the remainder of Commerce's reasoning reverts to the standard question of whether Commerce has supported its conclusion by "such relevant evidence as a reasonable mind might accept as adequate." Universal Camera, 340 U.S. at 477.

Commerce stated that the amount of gain or loss is not relevant in determining extraordinary expenses, and that because the statute does not quantify reasonableness, it has discretion to determine the methods in calculating costs. Remand Results at 24. Commerce indeed has discretion, but that discretion must be exercised in a reasonable manner.[3] While numerical

---

[3] An opinion of the court is instructive in approaching the issue of discretion. See Daewoo Elecs. Co. v. United States, 13 CIT 253, 712 F. Supp. 931 (1989), rev'd on other grounds by Daewoo Elecs. Co. v. Int'l Union of Elec. Elec., Tech., Salaried & Mach. Workers, AFL-CIO, 6 F.3d 1511 (Fed. Cir. 1993). In Daewoo, the issue was whether marketing and advertising expenses, if made in an unusual, one-time manner regarding a recent acquisition, may be excluded from the calculation of foreign market value as start-up costs. Commerce in that case refused to consider the acquisition-related expenses because the costs related to a "going concern," i.e., its operations, and further focused on the fact that marketing and advertising costs were "ordinary." 13 CIT at 261, 712 F. Supp. at 941. The Daewoo court found that under these circumstances, Commerce had abused its discretion when "Commerce acknowledge[d] the extraordinary amount of these expenses, which indicates that they were not made in the normal course of trade" and nevertheless "ignored the unusual acquisition-related nature and the size of this expense focusing instead on the classification of the type of the expense." 13 CIT at 261–62, 712 F. Supp. at 941–42. While

value may not be dispositive, Commerce regularly considers the nature and impact of the transaction to determine whether such transactions are routine and thus part of the general operations as stated in the Softwood Lumber from Canada 2005 IDM. It offered that:

> For example, the sale of an entire production facility, sale of a business unit, and sale of a business division, are considered non-routine. These sales differ from the sale of a piece of equipment, even large pieces of equipment. These non-routine sales encompass many pieces of production equipment, the buildings, land and fixtures. These are transactions that change the organization and structure of the company and its operations.

Softwood Lumber from Canada 2005 IDM at 95 n. 141 (emphasis added). An acquisition such as the acquisition of Fibria may also change the organization and structure of the company and its operations, and as argued by Suzano, has the nature of a "a unique, once-in-a-corporate lifetime event where Suzano acquired a larger company with a different scope and nature of operations." Pl.'s Br. at 17.

Commerce determined, without citing to agency practice or court precedent, or any accounting principles supporting its position, that all costs arising from a merger are for the purpose of "expand[ing] normal business operations" and thus not extraordinary. Remand Results at 8, 23. Considering the various tensions and conflicting positions in the Remand Results as discussed hereto, the court finds that the record does not contain "such relevant evidence as a reasonable mind might accept as adequate." Universal Camera, 340 U.S. at 477. Commerce should further explain why such transactions of such a nature are still routine as an "expansion" of

---

Daewoo concerns the interpretation of other provisions under 19 U.S.C. § 1677b(b), it is nevertheless helpful in interpreting subsection 1677b(f), which is intended to expound upon 1677b(b) and 1677b(e). See 19 U.S.C. § 1677b(f). Further, considering that the legislative intent in enacting 19 U.S.C. § 1677b(f) was to "harmonize[] the methods of calculating cost for purposes of examining sales below cost and determining constructed value," Dillinger France S.A. v. United States, 981 F.3d 1318, 1322 (Fed Cir. 2020) (quoting SAA, H.R. Rep. No. 103-315, at 826), the statute requires a consistent approach offering predictable outcomes in the calculation of costs.

its operations and not extraordinary items.

In light of the above, Commerce's determination that the derivative losses were not extraordinary must be remanded for further explanation and review.

## CONCLUSION

For the reasons stated, the court sustains the Remand Results in part and remands in part for further explanation. It is hereby

**ORDERED** that Commerce's finding that Suzano's derivative expenses were not extraordinary for the purposes of cost of production calculation is remanded to Commerce for further explanation, and if appropriate, reconsideration of the costs analysis pursuant to 19 U.S.C. § 1677b(f)(1)(A); and it is further

**ORDERED** that Commerce shall file with this court and provide to the parties its remand results within 90 days of the date of this order; and it is further

**ORDERED** that the deadlines provided by USCIT Rule 56.2(h) shall govern thereafter.

**SO ORDERED.**

/s/   Gary S. Katzmann
                                                                                                   Judge

Dated: April 20, 2023
        New York, New York